LOUIS AGRE, *et al.*,

*Plaintiffs,*

v.

THOMAS W. WOLF, Governor of
Pennsylvania, in his official capacity, *et al.*,

*Defendants.*

:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION

No. 2:17-cv-4392

## EXECUTIVE BRANCH DEFENDANTS' POST-TRIAL BRIEF

## TABLE OF CONTENTS

I.   PLAINTIFFS HAVE STANDING TO BRING THIS ACTION ........................................1

II.  PLAINTIFFS PRESENTED COMPELLING EVIDENCE THAT THE
     PENNSYLVANIA GENERAL ASSEMBLY DREW THE 2011 PLAN WITH
     THE INTENT TO BENEFIT REPUBLICAN CANDIDATES ........................................3

     A.   Plaintiffs' Expert Witnesses Demonstrated That the District Lines Were
          Drawn in Odd and Convoluted Ways That Could Only Be Explained by
          Partisan Motivations ...............................................................................................3

     B.   Speaker Turzai's Detailed Partisan Data Was Used to Make the 2011 Plan
          More Favorable to Republicans ...............................................................................4

     C.   The Need to Satisfy Partisan Concerns Was an Important – Perhaps the
          Most Important – Factor in the Map-Making Process ..............................................5

     D.   Incumbency Protection Does Not Establish a Nonpartisan Basis for the
          2011 Map ..................................................................................................................6

III. PLAINTIFFS DEMONSTRATED THAT THE 2011 PLAN HAS HAD ITS
     INTENDED PARTISAN EFFECT .....................................................................................8

IV.  THE EXECUTIVE BRANCH DEFENDANTS' ROLE IN ENFORCING OR
     REPLACING THE 2011 PLAN ........................................................................................10

Defendants Governor Thomas W. Wolf, Acting Secretary of the Commonwealth Robert Torres, and Commissioner Jonathan Marks, in their official capacities (together, the "Executive Branch Defendants") offer this brief to identify, summarize and draw conclusions from certain aspects of the evidence offered at trial. The Executive Branch Defendants will not analyze the application of Plaintiffs' legal theories to that evidence, on the assumption that Plaintiffs and Defendants Speaker Michael C. Turzai and Senate President Pro Tempore Joseph B. Scarnati, III (together, the "Legislative Defendants") will provide that analysis.[1]

## I. PLAINTIFFS HAVE STANDING TO BRING THIS ACTION

To demonstrate standing, a plaintiff must show that she has suffered an injury in fact that is fairly traceable to the challenged conduct of the defendants and is redressable by a favorable decision from the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1991). Here, the evidence established Plaintiffs' standing by showing a number of harms that have flowed from the 2011 Plan, including: dilution of their votes, *see* 12/7/17 A.M. Trial Tr. at 16:22-17:21 (discussing Joy Montgomery, Douglas Graham, Shawndra Holmberg, Barbara Shah); a Congressional representative who does not listen to his constituents because "he's going to get elected whether I vote against him or for him," 12/5/17 P.M. Trial Tr. at 59:20-21 (Jason Magidson); and an inability to effectively advocate to representatives within non-competitive districts, 12/5/17 A.M. Trial Tr. at 99:3-19 (Louis Agre). One plaintiff testified that she was unable to vote for any Democratic Congressional candidate in her district because the Republican candidate has run unopposed since the 2011 Plan went into place, 11/28/17 Dep. of Barbara Shah, Tr. at 12:17-13:1, 13:7-2, while a Republican plaintiff testified that she has been deterred from running for office because the 2011 Plan has made it impossible for any

---

[1] The Executive Branch Defendants' comments and descriptions apply only to the evidence offered in this case, and should not be read to apply to the evidence in any related case.

Republican to win in her now-overwhelmingly Democratic district, 11/30/17 Dep. of Marina Kats, Tr. at 69:11-70:6 11/30. Another plaintiff testified that she suffers from a severe medical condition, and as a result worries "daily" about the votes taking place in the Republican-majority Congress "because of how much they will affect me personally due to my health conditions." 12/5/17 P.M. Trial Tr. at 40:10-17 (Jean Shenk).

Plaintiff Brian Burychka, a high school civics teacher, testified that in recent years his students have lost interest in democracy because they increasingly believe that their representatives do not listen to them. 12/5/17 P.M. Trial Tr. at 69:15. Similarly, Plaintiff Edwyn Gragert lamented his inability to effectively campaign for candidates he supports because voters believe their money would be "wasted" and their votes "futile." 12/1/17 Dep. of Edwyn Gragert at 38:1-11. Indeed, Legislative Defendants' own expert even conceded that the creation of highly partisan and non-competitive districts causes harm, as it results in depressed voter turnout. *See* 12/5/17 P.M. Trial Tr. at 30:24-31:3 (testimony of Nolan McCarty).

The fact that the Plaintiffs have not been physically or legally restrained from engaging in basic political activities—voting, donating to candidates, speaking their minds, and calling their political representatives—does not obviate Plaintiffs' standing to bring this action. There is more to citizenship in a democratic society than mechanically casting votes that cannot make a difference and voicing opinions that will be ignored; a citizen's ability to cast *meaningful* votes, to make effective contributions to the political process, or to be heard by the representatives she contacts are important rights weighing on the fundamental right to vote. The loss of such abilities vests Plaintiffs with standing to bring this action.

## II.     PLAINTIFFS PRESENTED COMPELLING EVIDENCE THAT THE PENNSYLVANIA GENERAL ASSEMBLY DREW THE 2011 PLAN WITH THE INTENT TO BENEFIT REPUBLICAN CANDIDATES

### A.     Plaintiffs' Expert Witnesses Demonstrated That the District Lines Were Drawn in Odd and Convoluted Ways That Could Only Be Explained by Partisan Motivations

Plaintiffs' experts made clear that neutral principles of redistricting—contiguity, compactness, and minimizing splits of political subdivisions—could not justify the shapes of the districts created by the 2011 Plan because those shapes consistently violated those very principles, while at the same time achieving partisan political effects. *See* 12/5/17 A.M. Trial Tr. at 31:20-25 (testimony of Anne Hanna, listing neutral redistricting criteria). Expert witness Daniel McGlone conducted a visual analysis of the 2011 Plan's district boundaries in relation to the geographic distribution of Democratic- and Republican-leaning areas, and illuminated the way that the bizarrely-shaped districts were plainly designed to achieve partisan goals. See 12/4/17 A.M. Trial Tr. at 87:5-88:7. For example, Mr. McGlone testified that the "circuitous boundary" of the Seventh District—which consists of two essentially separate areas connected by a "thin, little arm that extends and wraps around [] Democratic areas" in order to avoid them—was drawn to maintain the Seventh's Republican vote share edge. *Id.* at 185:16-197:12. Regarding the Sixteenth District, he pointed out that the boundaries "extend into the middle of Chester County to pick up the highly Democratic-performing areas of Coatesville and its immediate suburbs," thus "dilut[ing] the Democratic votes in Coatesville and in Reading by putting them in with a more heavily Republican [d]istrict." *Id.* at 183:21-184:23. Expert Anne Hanna similarly attributed the peculiar shapes of certain districts to partisan intent, noting for example that the shape of the Fourteenth District cannot be justified on the basis of "traditional neutral districting principles" due to its "highly non-compact" shape and the resulting split of certain municipalities. 12/4/17 P.M. Trial Tr. at 139:16-140:2.

### B. Speaker Turzai's Detailed Partisan Data Was Used to Make the 2011 Plan More Favorable to Republicans

The use of partisan data to draft the 2011 Plan confirms that the Plan was drafted to achieve wholly partisan goals. On November 8, 2017, the Court ordered the Legislative Defendants to produce the "facts and data considered in creating the 2011 Plan." Order Re: Plaintiffs' Motion to Compel, ECF No. 76 (Nov. 9. 2017) at ¶ 2. In response, Defendant Turzai's counsel emailed Plaintiffs a link to a large compilation of data (the "Turzai data set"), stating in their email that "pursuant to paragraph two" of the Court's November 8 order, "the following is a link to download the facts and data [considered] in creating the 2011 plan." 12/4/17 P.M. Trial Tr. at 4:2-8. No other information was produced in response to ¶ 2 of the November 8 Order. Accordingly, the Court can conclude not only that the creators of the 2011 Plan relied on the Turzai data set, but that they relied on nothing but the Turzai data set.

As shown at trial by Plaintiffs' experts, Mr. McGlone and Ms. Hanna, the partisan data in the Turzai data set was applied with great precision to create the 2011 Plan. The Turzai data set included shapefiles that formed the building blocks for the 2011 Plan, "election return data" and "party registration numbers for spring and fall" of every even year from 2004 to 2010, and "votes aggregated at a voting precinct level indicating whether a precinct is more Democratic-performing based on election returns . . . or more Republican performing." 12/4/17 A.M. Trial Tr. at 162:7-163:1 (McGlone). Notably, the party registration and election return data was "available all the way down to the census block level[,]" which is "the smallest geographic unit" that map-makers use, despite the fact that census block level election data is not available from any public source. *Id.* at 164:11-20; 12/4/17 P.M. Trial Tr. at 55:10-14; 56:12-14. The map-makers undertook a special level of effort to disaggregate the data to that level of precision. As defense expert Dr. James Gimpel forcefully testified, "seek[ing] . . . out" partisan information—as opposed to taking

note of publicly available information—strongly indicates that the information is "important" to the people reviewing it, and human nature means the reviewers will almost certainly use the information if they have it. 12/6/17 P.M. Trial Tr. at 57:9-10; 57:25-58:4.

Mr. McGlone also noted that the map shapefiles and the highly detailed partisan data were "already combined" when he received the Turzai production for review, which further supports an inference that they were used in tandem with one another. 12/4/17 A.M. Trial Tr. at 167:19-23. Mr. McGlone testified at length about the precise district shape manipulations that were undertaken in the creation of the map, which would have been facilitated by the use of the partisan data. For example, he described the three-way split of the Harrisburg area, which had the effect of "crack[ing] . . . a core Democratic constituency" by splitting it "among multiple districts to dilute its influence." *Id.* at 132:9-17. Mr. McGlone also discussed the drawing of a district that entirely avoided the city of Reading, and instead "reached out into Central Pennsylvania to grab more Republican-voting areas." *Id.* at 133:10-25.

Ms. Hanna also reviewed the Turzai data set, and similarly noted that the districts in the 2011 Plan were drawn to reflect partisan data. For example, Ms. Hanna testified that the outlines of the Seventh District "track very closely the border between the red regions and the blue regions of [the] map, the red regions being the ones that voted more strongly for Republicans." 12/4/17 P.M. Trial Tr. at 136:18-23. Ms. Hanna also identified violations of traditional redistricting principles, such as districts that were "highly non-compact." *Id.* at 139:16-20.

### C.     The Need to Satisfy Partisan Concerns Was an Important—Perhaps the Most Important—Factor in the Map-Making Process

Plaintiffs also submitted the deposition testimony of legislative staffers who worked on the redistricting process that led to the creation of the 2011 Plan. 12/6/17 P.M. Trial Tr. at 95:16-19; 104:5-10; 107:7-8; 111:23-24. Both admitted that they took note of partisan data during the

process because elected officials expressed an interest in knowing how certain areas had performed in previous elections and made clear that the views of Democratic lawmakers were not meaningfully incorporated into the project. 12/6/17 P.M. Trial Tr. at 79:25-80:4 (Arneson); 112:24-113:13 (Schaller). The deposition testimony submitted by Plaintiffs shows that no input from a single Democratic senator was considered during the process of creating the 2011 Plan, and that there were no Democrats "in the room" when the maps were being drawn. 12/6/17 P.M. Trial Tr. at 76:9-20. The deposition testimony submitted by Plaintiffs also demonstrates that "discussions among Republican stakeholders" were "probably the most important factor . . . used [in] drawing [the] map," and that no Democrats were involved in those discussions. *Id.* at 128:22-129:2.

Both staffers made clear that the maps were created based on "discussions" and "negotiations" with the goal of drafting a plan that could obtain enough support to ensure final passage in both chambers of the General Assembly and the signature of Pennsylvania's then-Republican governor. 12/6/17 A.M. Trial Tr. at 133:25-134:6 (Arneson) (noting the key consideration in the process was the ability to "come up with a plan that would have 26 votes in the Senate"); 12/6/17 P.M. Trial Tr. at 78:2-7 (Arneson) (describing the effort to "cobble[] something together that can get 26 votes"); 163:2-15 (Schaller). The decision to place particular municipalities into certain districts arose from "the legislative process," meaning "getting the necessary votes to pass a piece of legislation." 12/6/17 P.M. Trial Tr. at 128:11-17 (Schaller).

D.     **Incumbency Protection Does Not Establish a Nonpartisan Basis for the 2011 Map**

In contrast to Plaintiffs' evidence that the 2011 Plan was drawn to give Republicans an advantage over Democrats, the record is devoid of any credible nonpartisan explanation for such an effect. While "incumbency protection" has been oft-mentioned as a justifiable reason to draw

the 2011 Plan as it currently exists, *see, e.g.*, 12/5/17 A.M. Trial Tr. at 142:6-9; 12/6/17 P.M. Trial Tr. at 8:10-13; 82:2-7; 94:15, "incumbency protection" appears, in this instance, to have been one-sided, given the dearth of input from Democratic lawmakers into the process and the protection of Republican incumbents by buttressing their districts with Republican voters.

Indeed, "incumbency protection" cannot be used to carry out politically motivated redistricting. While "avoiding contests between incumbents" may be a legitimate state goal, the U.S. Supreme Court has never approved of reliance upon "incumbency protection" to achieve partisan ends. *Bush v. Vera*, 517 U.S. 952, 964 (1996) (O'Connor, J.), citing *White v. Weiser*, 412 U.S. 783, 797 (1973) (stating that the drawing of district boundaries "in a way that minimizes the number of contests between present incumbents does not in and of itself establish invidiousness."); *see also Karcher v. Daggett*, 462 U.S. 725, 740 (1983) ("avoiding contests between incumbent Representatives" might justify some variance in district populations). Apart from that specific form of the practice, the Supreme Court is well aware "that incumbency protection can take various forms, not all of them in the interests of the constituents." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440-41 (2006). With that understanding, the court has stated unequivocally that "[i]f . . . incumbency protection means excluding some voters from the district simply because they are likely to vote against the officeholder, the change is to benefit the officeholder, not the voters." *Id.* The Supreme Court has certainly never endorsed incumbency protection as a redistricting criterion that could, merely by its invocation, justify discriminatory gerrymandering.

One of the Legislative Defendants' experts, Dr. Gimpel, testified that drawing districts to protect incumbents benefits citizens, because their representatives will have: (1) seniority, which increases their effectiveness in the committee system; (2) expertise that facilitates representation;

(3) institutional knowledge of how best to navigate federal agencies and the legislative system; and (4) a deeper understanding of their constituents' interests, developed over time. 12/6/17 P.M. Trial Tr. at 21:7-22:6. In contrast to Dr. Gimpel's testimony, however, the 2011 Plan did not focus on protecting long-term incumbents who might plausibly possess those allegedly beneficial characteristics. Rather, the Plan protected and secured the reelection of four *freshman* Republican representatives – Representatives Pat Meehan, Lou Barletta, Tom Marino, and Mike Kelly – and another Republican representative, Mike Fitzpatrick, who had previously held and lost a Congressional seat and had only returned to the legislature one term before implementation of the Plan. *See* Pl. Ex. 4 at 0721-23. Moreover, the Plan *eliminated* two incumbent Democratic representatives, Jason Altmire and Mark Critz.[2] *Id.* at 0723. Such a result does not appear to engender the beneficial effects that Dr. Gimpel would seem to expect.

## III. PLAINTIFFS DEMONSTRATED THAT THE 2011 PLAN HAS HAD ITS INTENDED PARTISAN EFFECT

Plaintiffs have shown that the 2011 Plan has, as intended, given Republican candidates significant advantages over Democratic ones. At the district level, Mr. McGlone's analysis of the Plan's boundaries in conjunction with election data and the Cook Partisan Voter Index determined that Democratic constituencies were efficiently packed into a handful of districts and cracked elsewhere to minimize their influence within Republican-leaning districts. For example, Mr. McGlone testified that the boundaries of the First District are drawn such that they include the Democratic-performing area of Swarthmore—which might "more naturally reside" in the adjacent Seventh District—thus packing Democratic voters into the First District and making the

---

[2] Rather than providing incumbency *protection*, the 2011 Plan may have functioned as an incumbency *creation* program that locked a number of first- and second-term representatives into their seats for a period of time, with the hope that protecting their seats might be more plausibly described as incumbency "protection" during a future redistricting process.

Seventh District safer for Republicans. 12/4/17 A.M. Trial Tr. at 120:23-121:4; 123:1-5. Similarly, the Second District's inclusion of Lower Merion Township, "an area that's been trending Democratic and voting more and more Democratic over the past decade or so" and which was previously part of the Seventh District, "keeps the Seventh more Republican[.]" *Id.* at 126:6-18. Mr. McGlone also presented examples of effective cracking, such as the "very heavily Republican" Sixteenth District, which took in "the Democratic-performing areas of Reading and Coatesville," therefore diluting the Democratic vote and minimizing its influence. *Id.* at 155:7-14. Meanwhile, the design of the Third and Fifth Districts cracked another Democratic constituency by "putting the City of Erie in the Third District but [its] suburbs and the rest of the county in the Fifth District." *Id.* at 128:4-14. As a result, the Third and Fifth Districts became "less likely to elect a Democratic congressperson," especially the Third. *Id.* at 129:8-10.

Plaintiffs also demonstrated that the 2011 Plan effectively secured Republicans a partisan advantage statewide. As shown in Plaintiffs' Exhibit 4, since the implementation of the 2011 Plan, Republicans have maintained 13 seats to Democrats' 5 seats in every election. Pl. Ex. 4 at 0723-25. That seat distribution has persisted even through the resignation of incumbent Congressional representatives. *Id.* Dr. McCarty, an expert called by the defense, proffers the unlikely theory that the 2011 Plan theoretically permits Democrats to win eight seats, but that they have simply underperformed by precisely the same margin in each of the last three elections. 12/5/17 A.M. Trial Tr. at 139:18-23; 140:11-18. A far more plausible explanation is that the 2011 Plan has functioned precisely as it was designed to, reliably guaranteeing a majority Republican congressional delegation since its implementation.

## IV. THE EXECUTIVE BRANCH DEFENDANTS' ROLE IN ENFORCING OR REPLACING THE 2011 PLAN

As representatives of the branch of the Commonwealth government charged with enforcing the statutes that the General Assembly enacts, the Executive Branch Defendants intend to administer and enforce the 2011 Plan unless and until a Court orders them to do otherwise.[3] Should the Court order that a new plan be drafted, however, the Executive Branch Defendants will make every effort to ensure that the 2018 elections cycle can proceed under the new plan.

The Executive Branch Defendants have informed the Court that in order for the May 15, 2018 primaries to proceed under a new districting plan, that plan would need to be in place by January 23, 2018. *See* Joint Statement of Stipulated and Undisputed Facts, ECF No. 150 (Nov. 29, 2017), at ¶¶ 19-28; 12/7/17 P.M. Trial Tr. at 54:18-20. If, however, the Court changes a number of election deadlines and the Department of State devotes additional resources to certain tasks, it would be possible to put a new plan in place by around February 20, and still hold the primary election on May 15. It would also be possible for the Court to order postponement of the May 15 primary election, although such a postponement would entail significant logistical challenges for county election administrators. Should the Court wish for additional information about potential changes to the elections schedule, the Executive Branch Defendants stand ready to provide details in an evidentiary hearing or in written submissions.

---

[3] At closing argument, the Legislative Defendants' counsel accused the Executive Branch Defendants of "utterly abandon[ing] the state's duly enacted law." 12/7/17 P.M. Trial Tr. 55:14-16. In fact, the Executive Branch Defendants are enforcing the law and will continue to do so as this Court, and the Pennsylvania state courts, weigh the 2011 Plan's constitutionality.

Respectfully submitted,

HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER

Dated: December 15, 2017                    By: /s/ Michele D. Hangley
                                         Mark A. Aronchick
                                         Michele D. Hangley
                                         Claudia De Palma
                                         Ashton R. Lattimore (*pro hac vice*)
                                         One Logan Square, 27th Floor
                                         Philadelphia, PA 19103
                                         (215) 568-6200

*Attorneys for Defendants, Thomas W. Wolf, Governor of Pennsylvania; Robert Torres, Acting Secretary of the Commonwealth; and Jonathan Marks, Commissioner for the Bureau of Commissions, Elections, and Legislation, in their official capacities*

Gregory G. Schwab
Governor's Office of General Counsel
333 Market Street, 17th Floor
Harrisburg, PA 17101

*Attorney for Defendant, Governor Thomas Wolf*

Timothy E. Gates
Kathleen M. Kotula
Pennsylvania Department of State
Office of Chief Counsel
306 North Office Building
Harrisburg, PA 17120

*Attorneys for Defendants, Acting Secretary of the Commonwealth Robert Torres and Commissioner Jonathan Marks*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 15, 2017, I caused a true and correct copy of the foregoing Post-Trial Brief to be electronically filed pursuant to the Court's electronic filing system, and that the filing is available for downloading and viewing from the electronic court filing system by counsel for all parties.

/s/ Michele D. Hangley
Michele D. Hangley