IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **Louis Agre** *et al.*, : | |
| : | |
| Plaintiffs, : | Civil Action No. 2:17-cv-4392 |
| : | |
| v. : | |
| : | |
| **Thomas W. Wolf** *et al.*, : | |
| : | |
| Defendants. : | |

### LEGISLATIVE DEFENDANTS' POST-TRIAL SUBMISSION

Legislative Defendants hereby make this submission in accordance with the Court's instruction of December 7, 2017. This submission renews and supplements Legislative Defendants' Motion for Judgment Pursuant to Fed.R.Civ.P. 50 or 52(c) (ECF No. 185).

A. <u>**Plaintiffs Have Failed To Advance, Or Prove, A Justiciable Claim**</u>

1. **There is no legal basis for Plaintiffs' "claim"**

Plaintiffs have consistently failed to advance a coherent set of elements governing their admittedly novel Elections Clause claim. And the test proposed by Plaintiffs – literally on the eve of trial – that the intended number of winning seats be "greater than the expected number of winning seats that would be determined by the voters if the districts were drawn using even-handed criteria" (ECF No. 173 at 1) raises more questions than it answers.

As an initial matter, Plaintiffs' terminology has no grounding in precedent. For instance, the phrase "expected number of winning seats" is not found in any potentially informative precedent. Indeed, the phrase itself begs the question: "number of winning seats" according to whose expectations? Neither Plaintiffs nor their experts have provided any clear criteria for the Court to evaluate this pivotal point advanced within Plaintiffs' "test".

Similarly absent from precedent in the redistricting context is Plaintiffs' phrase "even-handed criteria." Perhaps Plaintiffs intended to say "traditional neutral redistricting criteria" – the phrase used by their experts, (*e.g.*, 12/4 Tr. (p.m.) 77:2), but even that language can be found only in racial gerrymandering cases. *See e.g., Bush v. Vera*, 517 U.S. 952 (1996); *Perez v. Abbott*, 253 F. Supp. 3d 864 (W.D. Tex. 2017). And even within such cases, *none* have ever relied on that phrase to absolutely prohibit any consideration of political data, incumbent residences, or preservation of existing districts in the manner now advanced by Plaintiffs.

Plaintiffs' statement of purportedly applicable elements also contemplates that discriminatory intent must constitute "a substantial motivating factor". But, the only redistricting case to ever use this phrase (albeit in the racial gerrymandering context) was the lower court in *Shaw v. Hunt*, 861 F. Supp. 408 (E.D.N.C. 1994), *reversed by Shaw v. Hunt*, 517 U.S. 899

1

(1996).  In short, no partisan redistricting case has ever applied such a standard and, in any event, it is inherently subjective and unworkable.  In the end, both the Court and Legislative Defendants are left to ponder (once again) the evidentiary showing applicable to Plaintiffs' novel claim.

### 2. Plaintiffs' theory of their claim continues to evolve

Of course, this is not the first time that Plaintiffs' formulation of their claim has left the Court and the parties guessing.  To survive a motion to dismiss, Plaintiffs first argued that "none means none" is an easy and appropriate standard as there should be zero-tolerance for any political influence.  (ECF No. 53.)  After two-thirds of their initial complaint was dismissed, Plaintiffs pivoted, and acknowledged in their Amended Complaint that districting "necessarily has some political effect and in that respect is [*sic*] inherently political process[.]"  (Am. Compl. at ¶ 79.)  But Plaintiffs' articulation of their claim remained fluid thereafter, compelling even the Executive Defendants to observe that "Plaintiffs' description of the elements of their claims and the standards required to establish them has evolved".  (ECF No. 156 at 2-3 (collecting instances of Plaintiffs' shifting terminology).)  The ever-shifting contours of Plaintiffs' claim were not lost on the Court, which felt compelled to seek clarification from Plaintiffs on the eve of trial.  The Court noted that Plaintiffs' first pretrial elements brief was "inconsistent and not sufficiently specific as to what elements their evidence must contain in order to satisfy Count I based on the Elections Clause." (ECF No. 169.)  But, Plaintiffs' last effort to propose the elements applicable to their novel claim in their revised statement only added to the confusion.  (ECF No. 173.)

This uncertainty continued throughout the trial.  For example, during closing argument Plaintiffs' counsel again tried to articulate the elements of Plaintiffs' claim:

> That there was a one-sided partisan gerrymander by stakeholders who are largely Republican congressman . . . that had the intent of maximizing the election not of incumbents, but of Republicans in the state delegation, that had the intent of targeting two Democratic incumbents . . . discouraging another . . . and generally

> putting up hurdles to challengers. . . . And that this scheme did have an outcome determinative effect, an important causal effect, in the current repetition of this 13 to 5 cycle in 2012, 2014, 2016. (12/7 Tr. (p.m.) 58:22-59:10.)

Notably absent is any use of the terms "expected number of winning seats", "even-handed criteria", or even "substantial motivating factor" – each hallmarks of the elements advanced within Plaintiffs' Statement of the Elements. (ECF No. 173.) Also absent is any explanation of who was apparently "discouraged" from running for office, much less identification of evidence supporting such a charge. Instead, this restatement of "elements" calls into question whether Plaintiffs' legal theory has, yet again, pivoted. The ongoing prejudice to Legislative Defendants resulting from these ever-morphing elements is plain.

### 3. Each of Plaintiffs' theories run afoul of well-established precedent

Equally problematic, every one of Plaintiffs' proposed "tests" runs headlong into decades of Supreme Court precedent acknowledging - and in many cases stating - that politics has always been an inherent and expected part of the redistricting process. As Justice Scalia explained in *Vieth*, "[p]olitical gerrymanders are not new to the American scene." *Vieth*, 541 U.S. at 274. Acting under the broad authority of the Elections Clause, state legislatures have *always* engaged in partisan redistricting. *See id*. at 274-75.[1] Indeed, since the founding of this Nation, partisan redistricting under the Elections Clause has been expected, accepted, and legally permissible. *See, e.g.*, *Gaffney, v. Cummings*, 412 U.S. 735, 753 (1973); *Vieth*, 541 U.S. at 285 (plurality op.); *see id*. at 358, 360 (Breyer, J., dissenting); *id.* at 307 (Kennedy, J., concurring); *In re Pa. Cong. Dist. Reapport. Cases,* 567 F. Supp. 1507, 1517 (M.D. Pa. 1982). In fact, the Supreme Court has expressly noted that drawing lines for political purposes is a defense to a racial gerrymandering claim. *See Bethune-Hill v. Virginia State Board of Elections*, 137 S. Ct. 788 (2017); *Cooper v.*

---

[1] The Founders included the "make or alter" provision within the Elections Clause so Congress could take action if it so chose. It has done so previously.

*Harris*, 137 S. Ct. 1455 (2017) (Alito, J., dissenting joined by Roberts, C.J., and Kennedy, J.). Plaintiffs have not attempted to reconcile this authority; instead each of the "tests" that they advanced turn this long-established precedent on its head.

Plaintiffs have repeatedly advised that their claim is predicated upon *Cook v. Gralike*, 531 U.S. 510 (2001) and *United States Term Limits v. Thornton,* 514 U.S. 779 (1995). But, Plaintiffs' reliance on these decisions is misplaced. Plaintiffs argued in their closing that these cases "set out our understanding of the Elections Clause, which is that it is a grant of procedural regulations, time, place and manner, and not a source of authority for dictating electoral outcomes or favoring or disfavoring a class of candidates." (12/7 Tr. (p.m.) 59:16-60:10.) But neither *Gralike* nor *Thornton* involved redistricting at all, let alone partisan redistricting. And subsequent redistricting cases *have not* embraced the "standard" Plaintiffs divine from *Gralike*.

For example, the *Vieth* plurality did not mention *Gralike*. Rather, it cited the Elections Clause to state that "the Constitution clearly contemplates districting by political entities" because the Framers allowed states to draw the districts and anticipated that partisan considerations would play a role. 541 U.S. at 285. No Justice suggested that *Gralike* strictly forbids any partisan intent when redistricting. And Justice Kennedy did not find that any partisan intent necessarily leads to a Constitutional violation. In fact, he stated the exact *opposite*. *Id.* at 306-07 (Kennedy, J., concurring). So even under Plaintiffs' tortured interpretation of Elections Clause precedent, they still fail to articulate a justiciable claim.

**B. <u>Plaintiffs Have Failed To Show That The 2011 Plan Is Unconstitutional</u>**

But even if Plaintiffs' claim is deemed justiciable, Plaintiffs have wholly failed to meet the burden they advanced. For starters, the 2011 Plan is presumed constitutional. *See San Antonio Indep. Sch. Dist*. *v. Rodriguez*, 411 U.S. 1, 60 (1973) ("[O]ne of the first principles of

constitutional adjudication [is] the basic presumption of the constitutional validity of a duly enacted state or federal law.") (Stewart, J. concurring). And as this Court has already pointed out, "the state defendants' obligation to shoulder this obligation [prove the constitutionality of the 2011 Plan] will be triggered *only* if Plaintiffs provide a cognizable standard *and* adduce proof that supports it." (ECF No. 169 at 3 (emphasis added).) Here, Plaintiffs have failed to advance sufficient proof to come close to meeting their burden.

### 1. Plaintiffs' intent allegations have fallen short

In their pleadings, Plaintiffs promised a "deep dive" into the alleged nefarious partisan intent they believe influenced the 2011 Plan, with tales of a nationally-coordinated Republican conspiracy to shut out the Democrats and paint Pennsylvania's electoral map red. But the evidence at trial disclosed no such thing. Rather, the evidence showed:

- That an entire Congressional district had to be eliminated due to population loss in the western part of the state, requiring adjustment of all remaining 18 districts. (12/6 Tr. (p.m.) 6:8-7:9.)
- Those who were involved with drawing the 2011 Plan were struggling to comply with equal population and Voters Rights Act requirements – no easy task considering that a prior redistricting plan had been invalidated when it was found that the population within the districts therein deviated by 19 people. (*Id.* at 17:16-20:10; 12/6 Tr. (p.m.) 124:17-23.)
- The pairing of two Democratic incumbents was not the result of any partisan gerrymandering, but because a significant amount of Pennsylvania's population loss occurred in those districts. (*See* 12/7 Tr. (a.m.) 54:1-8.)

With respect to process, no evidence was produced regarding "RedMap", or of any alleged map-drawing in Washington, D.C. or elsewhere by any political consultants or party operatives. Rather, the evidence was that the same publicly available census and election data – provided by the Pennsylvania Department of State and the Legislative Data Processing Center – was in the hands of the House and Senate, Democratic and Republican caucuses, and the Governor's Office. (12/7 Tr. (a.m.) 45:14-47:1.) There was no evidence that the legislature used outside consultants, or any other high-tech data analysis. (12/6 Tr. (p.m.) 101:12-13.) And

5

while conversations with Republican and Democratic stakeholders did take place, there was no evidence presented that such conversations were anything but part of standard legislative process. In any event, routine discussions with stakeholders does not establish that the 2011 Plan was the result of political motivations or the desire to create "voter proof" districts. Plaintiffs adduced no evidence of the content of these conversations, or what impact, if any, they had on the 2011 Plan.

Further, far from being shutout from the process, the evidence established that Democrats played a key role in passing the 2011 Plan. It was the vote of Democratic Senator Tartaglione that enabled the 2011 Plan to move to the Senate floor. (12/6 Tr. (a.m.) 61:5-63:7.) In the House, 36 Democrats (roughly 40% of the Democratic Caucus) voted in favor of the Plan. Indeed, the Plan could not have passed without those Democrats' support. (*See* Vitali Dep. Tr. 47:7-49:12.) Moreover, Democratic Congressman Bob Brady was consulted in the drawing of the Plan. (12/6 Tr. (p.m.) 76:9-21.) In short, Plaintiffs never proved their allegations of intent.

### 2. Plaintiffs' "effects" argument cannot succeed

Plaintiffs' "effects" prong suffers from similar deficiencies in proof. Plaintiffs have failed to provide any detailed information of how competitive the House election races have been since 2011, instead only repeatedly referring to the 13 to 5 split in Congressional representation. By contrast, defense experts, Drs. McCarty and Gimpel testified that not only were many of these races competitive, and that Democrats had a real chance to win in at least eight districts, but that various factors also bear out the competitive nature of these districts. (12/5 Tr. (a.m.) 137:17-138:4; 12/6 Tr. (p.m.) 27:22-28:10.) Drs. McCarty and Gimpel also testified that Democrats are disadvantaged by the high concentration of Democratic voters in urban areas. (12/5 Tr. (a.m.) 144:6-16; 12/6 Tr. (p.m.) 48:12-49:7.) Therefore, urban Democratic districts naturally tend to be super majorities. (12/6 Tr. (p.m.) 23:4-24.)

In the end, the record confirms that Plaintiffs' effects argument boils down to a perceived lack of proportional representation, an argument the Supreme Court rejected in *Davis v. Bandemer*, 478 U.S. 109, 129-30, 132 (1986) (plurality); *see also id.* at 145 (O'Connor, J., concurring), and which seven members of the Supreme Court rejected in *Vieth*. Accordingly, the "effects" prong has not been satisfied, and Plaintiffs have failed to meet their burden of proof. And even if the burden somehow shifted to Legislative Defendants, the record is clear that the individuals involved in drawing the Plan considered constitutionally-permissible and traditional redistricting criteria, including Pennsylvania's changing population, and received bipartisan input and support.

### C. Executive Defendants' Closing Argument Misstated Critical Parts of The Trial

Executive Defendants' closing argument cannot salvage the deficiencies in Plaintiffs' case. In reality, their closing is better characterized as a campaign speech, peppered with misstatements and mischaracterizations of the record.

#### 1. The exaggeration of Plaintiffs' experts

Executive Defendants' counsel badly misconstrued the record with respect to the expert testimony. Counsel overstated the import of Plaintiffs' experts, arguing that according to Mr. McGlone the census blocks were added and subtracted for the purpose of packing and cracking, and "it makes no other sense in this record, than that they were done so on -- based on the partisan data that was produced here and for partisan reasons." (12/7 Tr. (p.m.) 41:7-18.) In reality, Mr. McGlone simply applied a visual test (12/4 Tr. (p.m.) 10:8-14), which does not translate into any manageable standard. As Mr. McGlone admitted, that sort of test has never been applied by any other expert in any redistricting case. (*Id.* at 10:15-18.) And, as Dr. Gimpel explained, such a visual method is fatally flawed. (12/6 Tr. (p.m.) 31:18-32:7.)

Executive Defendants' counsel also tried to morph Ms. Hanna's testimony to make it appear more credible, stating that he "heard Ms. Hanna say, you know, incumbency, yes, I'll recognize that as a factor." (12/7 Tr. (p.m.) 45:16-17.) But what she actually said was the opposite. When asked by the Court if she considered incumbency as part of her "five factors," she responded that she did not, stating, "It's not something that I considered important, first of all. It just – I don't -- in my personal sort of ethics I don't really care about it." (12/5 Tr. (a.m.) 79:25-80:6-9.) Ultimately, Ms. Hanna's "factors" are simply her own personal, off-the-cuff statements.

### 2. The attempted attacks on Legislative Defendants' experts

Executive Defendants' counsel then engaged in petty attacks on Legislative Defendants' experts while ignoring the whole of their testimony. Counsel stated that Dr. Gimpel testified "that you can only draw conclusions about intent with regard to the use of partisan data, if someone affirmatively sought that data out. . . . And that's exactly what happened here." (12/7 Tr. (p.m.) 41:23-42:1.) This mischaracterizes Dr. Gimpel's testimony and is factually wrong. The evidence was that the drawers did not go in search of election data; it was publicly-available and made available to all four caucuses. (12/7 Tr. (a.m.) 46:15-47:1; 12/6 Tr. (p.m.) 80:25-81:19.) They explained that this data was required to equalize the populations of each district. (12/7 Tr. (a.m.) 47:13-25; 12/6 Tr. (p.m.) 80:25-81:19.) And while counsel mocked Dr. Gimpel's "enthusiasm," he ignored Dr. Gimpel's testimony about: the ripple effect of losing a district; the importance of incumbency protection; and party registration and identification data showing that many Congressional districts are quite competitive. (12/6 Tr. (p.m.) 6:16-7:9; 8:19-13; 21:5-22:13; 23:25-24:12; 24:23-27:10; 28:11-31:17; Report Tables 2 and 3 (LD Ex. 10).)

Executive Defendants' counsel also assailed Dr. McCarty about his assessment of what constituted competitive districts based on PVIs. (12/7 Tr. (p.m.) 43:3-44:2.) But Dr. McCarty

8

simply testified that there are many variables to any election, that the "sure thing" elections do not appear until PVIs of +9, and that competitive districts are those with PVIs in the +/- 5 range. (12/5 Tr. (a.m.) 136:12-21.) Further, while engaging in an exaggerated attack about "middle school" computation errors, counsel was unable to refute Dr. McCarty's testimony that: the failure of Democratic candidates to secure more than five seats since 2011 represents historic underperformance explained by a variety of national trends, and that voters are not evenly distributed across the state, which has an impact on the aggregate statewide votes for Congress and for the individual district outcomes. (*Id.* at 140:3-17; 143:21-144:6.)

### 3. Counsel's assessment of fact witnesses was also wrong

Executive Defendants' counsel also oversold Plaintiffs' fact witnesses, representing that Plaintiffs demonstrated their harm "witness-wide" because they spoke about things like alleged voter dilution, (12/7 Tr. (p.m.) 52:4-19.), while chastising Legislative Defendants for their "callous look at citizen participation and citizen standing." (*Id.* at 53:8-9.) While Legislative Defendants do not deny that Plaintiffs are passionate and civic-minded individuals, the fact remains that their generalized grievances about proportional representation and some alleged violation of the Election Clause simply do not suffice for Article III standing.

Similarly misdirected was counsel's assessment that Legislative Defendants' witnesses Arneson and Schaller "helped the Plaintiffs' case." (*Id.* at 45:25-46:1.) In reality, both Arneson and Schaller flatly contradicted Plaintiffs' case of discriminatory partisan gerrymandering. When Arneson was asked if it was true that at the time he helped draw the 2011 Plan, he "intended a fixed outcome of the 12/6 or 13/5 Republicans over Democrats" until the next redistricting, he replied plainly: "No. . . I think trying to, trying to do that is at some level folly because you are always going to have voters doing exactly what they want to." (12/6 Tr. (p.m.)

82:2-16.) Likewise, Arneson could not recall "anybody saying we had to have at least this much partisan gerrymandering." (*Id.* at 88:8-10.) And, he testified that in his work on the 2011 Plan, he never considered "numbers such as R-5 [PVI numbers][.]" (*Id.* at 92:3-8 ("I did not take those numbers into account.").  Additionally, he stated that "we never went district by district across the State looking at voter data." (*Id.* at 98:20-21.)

So, too, with Schaller. He testified that there were never any simulations run in an effort to create a district that would be "more likely to vote Republican." (12/7 Tr. (a.m.) 102:22-24.) And, he did not recall ever being asked "during the 2011 congressional redistricting process to create districts more likely to vote Republican[.]" (*Id.* at 102:25-103:3.) Moreover, like Arneson, he did not even consider the Cook PVI when drawing the Plan. (*Id.* at 104:22-24.)

Similarly, while Executive Defendants' counsel made much of the fact that Arneson and Schaller *possessed* voter data, he ignored critical testimony from both staffers as to the criteria they actually used when drawing the 2011 Plan. Arneson testified that the "top two criteria" were equal population and Voting Rights Act compliance. (12/7 Tr. (a.m.) 50:14-20.) In addition, he considered: Incumbency protection; compliance with the Federal and State Constitutions; the loss of a Congressional seat; Pennsylvania's eastward population shift; and reducing split counties and municipalities. (*Id.* at 50:21-54:21; 12/6 Tr. (a.m.) 133:24-134:6; 12/6 Tr. (p.m.) 94:6-15.) Schaller likewise considered: "existing patterns of representation" (that is, what the districts looked like previously); Voting Rights Act information; incumbent residency; geography and contiguity; the loss of a district; population equality; and communities of interest. (12/6 Tr. (p.m.) 116:17-117:6; 12/7 Tr. (a.m.) 99:21-100:19, 103:19-23.)

Ultimately, the trial evidence is clear. Plaintiffs failed to offer any cognizable standard. And they failed to prove their case even under any of their ever-shifting frameworks.

Dated: December 15, 2017

Respectfully submitted,

| **BLANK ROME LLP** | **CIPRIANI & WERNER PC** |
|---|---|
| /s/ Brian S. Paszamant | /s/ Kathleen Gallagher |
| BRIAN S. PASZAMANT<br>JASON A. SNYDERMAN<br>JOHN P. WIXTED<br>One Logan Square<br>130 N. 18th Street<br>Philadelphia, Pennsylvania 19103<br>Phone: 215-569-5791<br>Facsimile: 215-832-5791<br>Email: Paszamant@blankrome.com<br>Snyderman@blankrome.com<br>JWixted@blankrome.com<br><br>*Attorneys for Legislative Defendant Senator Joseph B. Scarnati, III* | KATHLEEN GALLAGHER<br>CAROLYN BATZ MCGEE<br>650 Washington Road, Suite 700<br>Pittsburgh, Pennsylvania 15228<br>Phone: 412-563-4978<br>Email: KGallagher@c-wlaw.com<br>CMcgee@c-wlaw.com<br><br>*Attorneys for Legislative Defendant Representative Michael C. Turzai* |

| **HOLTZMAN VOGEL JOSEFIAK TORCHINSKY PLLC** | **BAKER & HOSTETLER LLP** |
|---|---|
| /s/ Jason Torchinsky | /s/ Patrick T. Lewis |
| JASON TORCHINSKY (admitted *Pro Hac Vice*)<br>SHAWN SHEEHY (admitted *Pro Hac Vice*)<br>45 North Hill Drive, Suite 100<br>Warrenton, Virginia 20186<br>Phone: 540-341-8808<br>Facsimile: 540-341-8809<br>Email: JTorchinsky@hvjt.law<br>ssheehy@hvjt.law<br><br>*Attorneys for Legislative Defendants Senator Joseph B. Scarnati, III and Representative Michael C. Turzai* | PATRICK T. LEWIS<br>(Pro Hac Vice)<br>Key Tower<br>127 Public Square<br>Suite 2000<br>Cleveland, OH 441144114<br>Phone: 216-621-0200<br>Email: plewis@bakerlaw.com<br><br>ROBERT J. TUCKER<br>(Pro Hac Vice)<br>200 Civic Center Drive, Suite 1200<br>Columbus, OH 43215<br>Phone: 614-462-2680<br>Email: rtucker@bakerlaw.com<br><br>*Attorneys for Legislative Defendant Representative Michael Turzai* |

**CERTIFICATE OF SERVICE**

The undersigned certifies that on December 15, 2017, the foregoing was served upon the following Counsel of Record via the Court's ECF system:

Alice W. Ballard, Esquire
Law Office of Alice W. Ballard, PC
123 S. Broad Street, Suite 2135
Philadelphia, Pennsylvania 19109
*Attorneys for Plaintiffs*

Michael Persoon, Esquire
Sean Morales-Doyle, Esquire
Thomas H. Geoghegan, Esquire
Despres Schwartz & Geoghegan, Ltd.
77 W. Washington Street, Suite 711
Chicago, Illinois 60602
*Attorneys for Plaintiffs*

Brian A. Gordon, Esquire
Gordon & Ashworth PC
One Belmont Avenue, Suite 519
Bala Cynwyd, Pennsylvania 19004
*Attorneys for Plaintiffs*

Timothy E. Gates, Esquire
Pennsylvania Department of State
Office of Chief Counsel
306 North Office Building
Harrisburg, Pennsylvania 17120
*Attorneys for Defendant, Pedro Cortes, Secretary of State of Pennsylvania*

Mark A. Aronchick, Esquire
Claudia DePalma, Esquire
Michele D. Hangley, Esquire
Hangley Aronchick Segal & Pudlin
One Logan Square, 27th Floor
Philadelphia, Pennsylvania 19103
*Attorneys for Defendants, Thomas W. Wolf, Governor of Pennsylvania; Pedro A. Cortés, Secretary of State of Pennsylvania; and Jonathan M. Marks, Commissioner for the Bureau of Commissions, Elections, and Legislation, in their official capacities*

Gregory George Schwab, Esquire
Governor's Office of General Counsel

333 Market Street, 17th Floor  
Harrisburg, Pennsylvania 17101  
*Attorneys for Defendant, Governor Thomas Wolf*

Dated: December 15, 2017

                                      */s/ Brian S. Paszamant*  
                                      BRIAN S. PASZAMANT