# Plaintiff's Trial Exhibit 55

IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LOUIS AGRE, et al.,

Plaintiffs,

vs. No. 2:17-cv-4392

THOMAS W. WOLF, Governor of Pennsylvania, et al.,

Defendants.

- - - -

DEPOSITION OF: DANA KELLERMAN, DVM

- - - -

DATE: November 28, 2017
Tuesday, 9:25 a.m.

LOCATION: Cipriani & Werner
650 Washington Road
Suite 700
Pittsburgh, PA 15228
412-563-2500

TAKEN BY: Defendants

REPORTED BY: Sheila Stauffer, RPR
AKF REPORTERS, INC.
Notary Public
Reference No. SS47133A

DEPOSITION OF DANA KELLERMAN, DVM, a Plaintiff herein, called by the Defendants for examination, in accordance with the Federal Rules of Civil Procedure, taken by and before Sheila Stauffer, a Registered Professional Reporter and a Notary Public in and for the Commonwealth of Pennsylvania, at the offices of Cipriani & Werner, 650 Washington Road, Pittsburgh, Pennsylvania, on Tuesday, November 28, 2017, at 9:25 a.m.

APPEARANCES:

FOR THE PLAINTIFFS:
Michael J. Healey, Esq.
HEALEY & HORNACK
247 Fort Pitt Boulevard, 4th Floor
Pittsburgh, PA 15222
412-391-7711
mike@unionlawyers.net

FOR THE DEFENDANTS:
John E. Hall, Esq.
Of Counsel
CIPRIANI & WERNER
650 Washington Road, Suite 700
Pittsburgh, PA 15228
412-563-2500
tkuhn@c-wlaw.com

EXAMINATION INDEX

DANA KELLERMAN
BY MR. HALL . . . . . . . . . . . . . . . 4

CERTIFICATE OF REPORTER . . . . . . . . . .45

EXHIBITS

| NAME | MARKED |
| --- | --- |
| Exhibit 1 | 5 |
| Exhibit 2 | 12 |
| Exhibit 3 | 21 |
| Exhibit 4 | 24 |

PROCEEDINGS

-----

DANA KELLERMAN, DVM,
being first duly sworn,
was examined and testified as follows:

-----

EXAMINATION

-----

BY MR. HALL:
Q. Would you state your name for the record, please.
A. Dana Kellerman.
Q. What is your address, Ms. Kellerman?
A. It's Dr.
Q. Dr. Kellerman.
A. Yes. 1299 Fox Chapel Road, Pittsburgh, 15238.
Q. So is that Fox Chapel Borough?
A. Yes.
Q. Are you a medical doctor or PhD?
A. I am a veterinarian.
Q. Okay. Well, we all like our vets, that's for sure. Where do you practice? Where is your practice?
A. I do a mobile consulting practice for the local veterinarians.

-----

(Exhibit 1 was marked for identification.)

-----

Q. I am going to show you and your attorney first the Amended Complaint, and I highlighted your name.
A. Okay.
Q. Dr. Kellerman, had you seen that Amended Complaint before this morning?
A. Yes.
Q. Did you participate in the drafting of that complaint?
A. No.
Q. When did you see that complaint?
A. I looked at it on the Brennan Law Center website last night.
Q. Had it already been filed when you looked at it with the Eastern District Court?
A. I assumed so because after that there are listed decisions by the court as to various portions of it.

MR. HEALEY: Just for the record, the file stamp indicates it was filed November 17 up on top.

A. So, yes, it was already filed because

yesterday was after that.
Q. How did you come to engage the attorney or attorneys representing the plaintiffs in Civil Action No. 17-3492 where Louis Agre is the first named plaintiff, and you are one of the named plaintiffs? I'm not going to read them all.
A. Somebody I know on-line said that there was a lawsuit going on about gerrymandering, and they were looking for citizens living in each congressional district who feel they might be harmed by gerrymandering, and I volunteered.
Q. When you said somebody, I am going to ask who somebody is.
A. I have no idea. Possibly Lee Longo, but honestly I really don't know. But they sent me Brian Gordon, the other attorney's contact information, and I got in contact with Brian.
Q. So you volunteered on-line; is that right?
A. Yes.
Q. Did you fill out an application or any type of registration?
A. No. She asked if people -- I am assuming it was a woman -- asked if there was anybody in the district, I said I was, and she forwarded

me Brian's contact information and said if you are interested, get in touch with him, and they will let you know what that would involve.
Q. What is Brian's full name?
A. Brian Gordon.
Q. Did you enter into an engagement letter with any attorney representing the plaintiffs in Civil Action No. 2:17-cv-4392 in the Eastern District of Pennsylvania?
A. What is an engagement letter?
Q. That would be a letter from the attorney setting forth the terms of the engagement with the attorney, and what that attorney is going to do and maybe what he is not going to do, or she is not going to do, and what the fees would be.
A. There are no fees. I don't believe I did. I did tell Brian I would attend the deposition.
Q. Have you ever had to sign an engagement letter with an attorney?
A. No, no.
Q. Do you have an attorney like for your business, your veterinary business?
A. No.

Q. So at any rate, this complaint had been filed before you saw it?
A. Yes.
Q. And you have never been asked to sign what I have termed an engagement letter from any attorney?
A. I have not been asked to sign anything.
Q. And then there are no fees you say?
A. I have not been asked to receive or to pay any fees.
Q. So who is paying the lawyers, do you know?
A. No, I do not. Maybe they are doing it out of the goodness of their hearts.
MR. HEALEY: That happens sometimes.
-----
(There was a discussion off the record.)
-----
Q. At any rate, you've never paid any of these lawyers?
A. No.
Q. You are not aware of any other plaintiff that has paid any of these lawyers?
A. No.
Q. So you are, according to the complaint, you are a resident of the 12th Pennsylvania

congressional district?
A. Yes.
Q. And who would be your congressman?
A. Keith Rothfus.
Q. Did you vote for Keith in the last election?
A. No.
Q. Who did you vote for?
MR. HEALEY: I am going to object to specifics on vote. If you want to ask generally, do you generally vote Democratic or Republican, but in terms of who you voted specifically in a particular election, but she answered she didn't vote for Rothfus.
Q. Were you prevented in any way from voting for who you wanted to in the last election for Congress in your 12th congressional district?
A. I was not prevented from voting for either of the people who were on the ballot.
Q. Did you write anybody in?
A. I did not. My previous district, where I would have preferred my representative, disappeared. I used to be part of the 4th district.
Q. Tell me geographically where that is?
A. It is in exactly the same place it is now. I

live in the exact same place I did. My district was changed.
Q. How many times did you vote in the 12th district?
A. We have been the 12th since 2010 or 2012.
Q. And has --
A. I vote every two years.
Q. Has Keith Rothfus been the congressman there that entire time?
A. Mark Critz was the congressman first.
Q. What party affiliation is Mark Critz?
A. He is a Democrat sort of.
Q. Sort of?
A. Sort of. It is a conservative Democrat.
Q. Keith is Republican, right?
A. Yes.
Q. Did you work for any campaigns in the 12th district?
A. I did not.
Q. Did you contribute any monies financially to the congressional race?
A. Prior to 2016 --
Q. Okay. That was a bad question. Let me ask a better question. In the years 2016, 2014, or 2012, let's say, did you contribute

financially to any candidate in the 12th district?
A. No, I did not.
Q. Were you prevented from contributing by anybody?
A. No, I was not.
Q. Now, before 2012, when it was, you said, the 4th congressional district, right?
A. Yes.
Q. Did you contribute to any candidate for Congress?
A. I did not.
Q. Have you ever, Doctor, been an elected government official?
A. I have not.
Q. Have you ever run?
A. Nope.
Q. You don't fall in the category, if nominated I will not run, if elected, I will not serve, right?
A. No.
Q. I am going to show you -- I only have one copy, but I will make another copy for your attorney -- this is an order from the court about the questions that the lawyers can ask

you if they want to. So why don't we mark this as Exhibit 2.

-----

(Exhibit 2 was marked for identification.)

-----

Q. Doctor, the highlighting is mine.
A. Okay.
Q. Okay. Could I look at it for a second. So the court states in this order that "plaintiffs may be questioned about their political registration and voting history." So we have been talking about that, right?
A. Yes.
Q. And also the court says "to describe any harm, quote-unquote, they allege in this case, and shall produce, preferably before but no later than at the deposition, documents in their possession, custody or control on these topics."
So let me break that down. What harm are you alleging happened to you personally in this complaint?
A. I am alleging that my vote does not count as much as it should. I am alleging that because I have been grouped into a district with a

whole bunch of other people, and I did not bring a map of 12, but I am assuming you've seen a map of PA 12. That my vote has purposely been diluted by the addition of a whole bunch of other barely contiguous communities that don't belong in my district. Because my vote has been diluted, my representation has been diluted, and now I have a congressman who is way further to the extreme than he should be because he doesn't have to worry about the general election. He only worries about the primary.
Q. Extreme what?
A. The extreme of his political party. He is not a centrist or moderate Republican. He is an extremely right wing Republican. Because he doesn't need to worry about running in the general election because he is going to win the general election.
Q. How would you draw the 12th congressional district to make it acceptable to you?
A. I am not a statistician. I'm not a computer programmer. But ideally my district should be compact. It should include the requisite 700 and change thousand number of people that are

required by law. It should not break up municipalities whenever possible. It should include whole townships. It shouldn't split my township, and it should not be based upon the political persuasion of the people in the district. It shouldn't have these little fingers that reach out to grab another clump of Republicans, and it should not have these little carve-outs like Cheswick which were pulled out, leaving this bizarre hole in our district because those votes wouldn't swing the district the other way.

I shouldn't drive down Freeport Road and cross in and out of my district four times in five miles.

Q. Don't you agree that no matter which way you configure the district, you are going to have different population groups no matter what?

A. There are going to be different population groups no matter what. And since our state swings, or at least based on the Senate and whole state elections, we swing about a little over half to the Republican side and a little less than half to the Democratic side, you would think that our congressional district

would represent that. Not 13 to 5. Which is nowhere near the population representation.

Q. How many Republicans and how many Democrats population-wise in your district?

A. In my district, I don't know exactly.

Q. So you are saying the Commonwealth of Pennsylvania total congressional districts, there is more Republicans than Democrats?

A. No. I am saying that's what happened in last year's votes. Only 43 percent of the people voted. Lots of people could be registered as Democrats and never vote. Lots of people could be registered as Republicans and never vote. How you are registered doesn't mean how you voted. I don't know.

Q. That's right. You don't have to vote -- you have to vote your party in the primary but not in the general election, correct?

A. Correct. And I don't have to vote at any of those times.

Q. You don't have to vote.

A. Right.

Q. But you say you do vote.

A. I do.

Q. Because that's an important right of being a

citizen.

A. It is an important obligation of being a citizen.

Q. Okay, obligation. So, Doctor, is it your position that there is some perfect configuration of congressional districts that is out there that would allow for you to elect a Democratic in the 12th congressional district?

A. That is not my point. There is not a perfect way of drawing districts. There are certainly better ways than what happened, but there are no perfect ways. And the goal is not that we elect a Democrat. My goal is not that we elect a Democrat in the 12th. My goal is that the citizens who live in the 12th decide who represents us.

In the past, I had Jason Altmire who is a liberal Democrat. I had Melissa Hart who is a Republican. I had Mark Critz then who beat Jason Altmire. I have had both Republican and Democratic representation. But it went back and forth, and those representatives were responsive to the people in their district because they knew they might

be out next time.

Q. Could that be because of personality of the candidate and their positions more than how many Republicans or how many Democrats happen to be in their district? Such as I know Melissa Hart, she is a dynamic lady, I think.

A. I am sorry, could you rephrase that.

Q. Well, I am just --

A. Could Keith Rothfus not being responsive to my concerns be because Keith Rothfus is not a responsive person as opposed to how the district is? I don't understand.

Q. What I am saying, taking Melissa Hart as an example, could she have been elected because of her personality and her positions politically and all the other factors that go into it, her integrity, her character, her education, her charisma? I mean, there are a lot of reasons why people vote for somebody, isn't there?

A. There are people who vote for them because they recognize their name on the ballot. People get voted in for all sorts of reasons.

Q. That's right. But it seems to me you are taking the position that the only reason

people get voted in is because of the geographic configuration of the district. It has nothing to do with any other characteristic of that candidate.
A. I am saying that a party can run a good candidate or a bad candidate or anything in between. But we are starting off from a point where it is way more difficult than it should be for a moderate of either party to win, or for any, in our gerrymandered district, for any Democrat to win. It is an extra bar which shouldn't be there.
Q. Let me ask you this question. When was the last time a Republican was elected mayor of the City of Pittsburgh?
A. I would assume never, but I have no idea.
Q. That's a pretty good assumption.
MR. HEALEY: 1930 -- '31, that was the last one.
A. But the configuration -- but who lives in my district didn't change, just my district borders changed. Nobody moved in or out of my neighborhood to change.
Q. Well, the Borough of Fox Chapel where you live, is it predominantly Republican or

Democrat?
A. My precinct voted 65 percent for Hillary in the last election. They also voted for Rothfus primarily I think because maybe they didn't know who McClelland was, because the alternative did not campaign.
Q. So people were splitting their ticket. They weren't voting straight R or straight D in your precinct.
A. Yes. And the time before that when Rothfus ran unopposed, most people voted for him as opposed to not voting for that one.
Q. Now in this order, Doctor, the court says that you produced documents that describe the harm that is in your custody. You produced certain emails. Are they representative of the harm that you had?
A. No.
Q. Do you have documents, Doctor, that are representative of the harm alleged in the civil action 17-4392?
A. I'm not sure what sort of document I would have that says that my vote doesn't count the way it should. How does one document that -- other than obviously looking at the map. I

assume that somebody has already produced a copy of the congressional maps. Do we have a copy of congressional maps?
MR. HEALEY: I do not. I know it is in the records.
MR. HALL: I don't have it either.
Q. Well, the question is, as of right now, Doctor, you don't have any documents of any kind that reflect the harm that you are alleging in this case; is that right?
A. You have my statement about the harm that I am alleging in this case I suppose.
Q. You made that statement.
A. Yes.
Q. What I am asking you, beyond the oral statement, you don't have any documents that form the basis for your oral statement of the harm that you are alleging in this case?
A. No. What sort of statement would you propose would demonstrate that harm?
Q. I am saying documents.
A. What sort of documents would you suggest that I should be producing?
Q. Well, see the way this works --
A. Because I don't understand your question.

Q. I know what you are saying.
MR. HEALEY: I think it's fair, she doesn't have a specific document responsive to that question.
Q. I am just reading what the court said. They said ask the witness if they have a document that evidences their harm, and you are saying you don't have such a document.
A. I have no document in my possession which I think is what it says that says that. There are plenty of documents in the public record that evidence that. I think basically the congressional map.
Q. So if you had the congressional map, you would offer that to me as a document that evidences of the harm that you've had; is that right?
A. That evidences how my vote was diluted by this ridiculous looking map.
Q. Does any other document come to mind even if it is not in your possession?
A. No.
Q. Now, you brought with you some emails, Doctor. Let's start off with this.
-----
(Exhibit 3 was marked for identification.)

-----

Q. I will show you what we marked as 3, Dr. Kellerman. Could you identify this email, please.
A. This is from my email. What do you mean by identify?
Q. It must be, because that was printed out by my paralegal this morning from your computer.
A. These are my emails, yes.
Q. Give me an overview. What are you doing here? You are meeting Senator Vulakovich?
A. I met with Senator Vulakovich who is my state senator. I met with him to discuss with him whether he was going to support Senate Bill 22 which is the redistricting bill to redraw maps after the 2020 census, have those maps drawn by a nonpartisan citizens commission instead of our current system.
Q. And Senator Vulakovich is an R or D?
A. Senator Vulakovich is a Republican.
Q. What did he tell you when you met him in the parking lot?
A. We didn't meet him in the parking lot. We met in the parking lot to get our stuff together and then go in together. He allowed us to

come into his office, yes. He was very polite. He listened. At that time he said he was open to listening to it, but he was not going to co-sponsor it. My state representative who also is a Republican is, in fact, a co-sponsor of the equivalent house bill. It is a bipartisan bill.
Q. What has happened to that bill?
A. At the moment, it is sitting in the state government committee where it will sit until these lawsuits are resolved. Because nobody is interested in investing any political capital in bills that might be moot.
Q. So you are referencing, you know, the cases that we are here today testifying in and other cases that have been filed, some as high as the Supreme Court?
A. And they are also talking about the Wisconsin Supreme Court case.
Q. So people don't want to invest in something that may be worthless depending on how the courts decide these things?
A. I guess. The people in the email are both Republicans and Democrats. Maureen is a registered Republican who has been actively

involved in her local Republican party for two decades. So this is not a Democratic issue. This is a citizens issue.
Q. So you are saying these emails represent bipartisan actions?
A. Maureen is a Republican and Carolyn who is the third person that went is a Democrat and has been for a long as I know.
Q. Doctor, in your mind, these emails, what do they represent? You said you had them. You brought these with you today, and I appreciate that.
A. They don't represent anything. Brian asked me anything in my email that included the word "gerrymandering" I should forward, and this actually was about gerrymandering.

-----

(Exhibit 4 was marked for identification.)

-----

Q. Let me show you Exhibit 4. This is also an email that we printed out from your laptop, right?
A. Uh-huh.
Q. Would you tell us what this represents from November 28 and then it goes back to May 3?

A. That was just my sharing of what I understood was going on with the Senate Bill 22 with the people I know on-line. So I just shared what my conversation with Senator Folmer and Senator Williams who are, I believe, both in the state government committee, with where the bill stood back in May which was that it sounded like they were going to likely be hearing sometime in the summer. I don't believe that ever happened, but I don't know for certain.
Q. So the exhibit is kind of like a history of where the status of Senate Bill 22 was as of May 2017?
A. Yes.
Q. Now as far as you know, has anything else happened to that, Doctor?
A. Since May? The equivalent House bill which is 722 was introduced. It has 90 co-sponsors from both parties. It is also sitting there.
Q. For the same reason we just discussed.
A. Yes.
Q. I am going to ask you some background questions. Have you ever gone by any other name?

A. No.
Q. And what is your date of birth, please?
A. July 15, 1965.
Q. And I think you did give me your address, right?
A. 1299 Fox Chapel Road, I did.
Q. How long have you resided there, Doctor?
A. 17 years.
Q. You have your own business?
A. Yes.
Q. What is the name of that business?
A. Pittsburgh Veterinary Internal Medicine.
Q. You have an office or a clinic, or what do you have?
A. It is mobile practice.
Q. Do you have like a van?
A. No. I do ultrasounds at local veterinarians' practices, and it fits in a backpack. It is the size of a large laptop computer.
Q. You make house calls?
A. I visit other veterinary hospitals.
Q. Do you have a specialty?
A. Internal medicine.
Q. How long have you been so employed with your mobile veterinary practice?

A. I have been mobile since 2004, and prior to that I worked at Pittsburgh Veterinary Specialists, and it was a combined PVS and Pittsburgh Veterinary Internal Medicine. We had a practice in Shaler.
Q. What veterinary medical college did you go to?
A. Cornell.
Q. How long have you been registered with the Democratic party?
A. I think since I was 18.
Q. Now since you were registered, Doctor, have you been active in the Democratic party?
A. No. And I regret that greatly.
Q. I think you've described that you have voted in elections from 2005 to the present, right?
A. Yes.
Q. You're a regular voter in the general election and the primary; is that right?
A. Yes.
Q. And we talked about you have never been prohibited from voting.
A. Correct.
Q. Now, during this time from 2005, Doctor, did you make political contributions?
A. I might have sent Sanders $15. I thought

about it. I don't remember if I did.
Q. Bernie Sanders?
A. Yes.
Q. But other than Bernie, did you send anybody else any money?
A. No.
Q. Did any government official stop you from making political contributions?
A. No.
Q. Did any law ever stop you from making political contributions?
A. The law does limit how much of a political contribution I can make currently which I --
Q. That's for all of us, right?
A. Yes.
Q. But you never got up to that point, right?
A. Oh, not before November.
Q. I'm not following that.
A. I have been donating to Senator Casey, and I will max out that donation this year.
Q. That will be your first time getting to the max?
A. Yes.
Q. That's on behalf of Senator Casey?
A. Yes.

Q. Now, have you, Doctor, ever campaigned for or spoken in support of any candidate?
A. Not prior to the November elections. Do you want to know now?
Q. Well, you are saying November. You are saying last November.
A. The ones that passed, yes.
Q. What did you do?
A. Nothing before November. Now I have. I am advocating for a State Senate candidate in my district.
Q. Who is that?
A. Stephanie Walsh. And if you are in PA 38 she is worth meeting.
Q. I would like to, but I'm not. So you are saying you're active for Stephanie after last November's election?
A. Yes.
Q. You weren't active in last November's election --
A. Correct.
Q. -- other than voting?
A. Right.
Q. Now you are campaigning for Stephanie? Do you speak on her behalf?

A. No. I hosted a house party for her, and I will knock on doors for her when the time comes.
Q. That's campaigning.
A. Yes.
Q. Where does Stephanie live?
A. She is in Highland Park. Which oddly is in my Senate district, despite being on the other side of the river.
Q. I see what you mean. I always thought people kind of migrated from like Shadyside, Squirrel Hill, Highland Park out to Fox Chapel.
A. Well, you have to migrate across a bridge.
Q. I take it that no government official ever stopped you from campaigning or speaking on behalf of any political candidate?
A. No.
Q. Was there any law that would have stopped you from campaigning or speaking on behalf of any candidate?
A. Not that I am aware of.
Q. Doctor, have you ever participated in any public protests of any kind?
A. I have.
Q. Would you explain that, please.

A. I attended a Planned Parenthood rally when I was in college. I attended a local women's march. I protest at Senator Toomey's office regularly on Tuesdays, if I can swing that with work. I protested against the Muslim ban. I protest in front of Keith Rothfus' office on Wednesdays. Initially we were demanding that he hold a town hall and listen to us. He still has not done that. Now it is more issue oriented.
Q. Who organizes these protests?
A. People who live there. The women's march was -- I mean the local women's march, somebody on-line said we should have one, and 12 people showed up at the local Panera's and organized a march. I was in charge of port-a-johns. So you really don't need a lot of experience to be a protestor. Nobody is paying us, and if we are supposed to get paid, we are doing it wrong.
Q. What are you protesting about with Senator Toomey?
A. A, that you can't get in contact with him. He is completely inaccessible. He refuses to meet with constituents. At the moment, I

think the tax reform proposal is horrendous.
Q. Doctor, did any law stop you from participating in any other civic activity?
A. I don't think so.
Q. We have talked about your political contributions on a federal, state or local candidate. You are mainly with Stephanie right now making contributions?
A. I don't think I have given her money. I have given her time.
Q. Now since 2005, have you contacted your member of Congress on any issues or constituent service matters?
A. Yes.
Q. Would you tell us about that, please.
A. I have called Congressman Rothfus' office about funding for the wall, the southern border wall, immigration, the Dreamers, the Better Care and Reconciliation Act, whatever the BCRA was called before it got called the BCRA, the tax reform proposal.
Q. We are talking about Keith.
A. Yes. Oh, yes. Pretty much -- the Power Plant Act, repealing the Clean Water Act -- because we don't need clean water. Basically whatever

seems to be going. The Consumer Financial Protection Bureau. He is a big advocate of this Choice Act to get rid of Dodd-Frank. Really anything that has been going on.
Q. Do you call his office?
A. I call his office. And generally somebody answers, they take my name and my ZIP code, and they promise they are going to pass that on.
Q. You tell them the subject matter that you are concerned about?
A. Yes.
Q. And have you written to Congressman Rothfus?
A. Regularly, yes.
Q. When you say regularly, what are we talking about? Once a month?
A. Twice a week.
Q. That's pretty regularly, I would say.
A. Not every week. I missed Thanksgiving.
Q. Do you email him or do you send him letters?
A. I primarily email him. There is a "contact me" spot on his website where you can cut and paste and send him mail.
Q. Does he ever respond?
A. I get form letters back.

Q. What do they say?
A. They say thank you for contacting me. Most of the time they have the correct topic, but not always. The first one I got back about the border wall, basically said thank you for agreeing with me that funding a border wall is really important, and I hope to continue to hear from you. It clearly was not read.
Q. Since 2005, have you contacted your senator?
A. I have.
Q. What has that been about?
A. I generally contact Senator Casey to thank him for standing up for the Affordable Care Act and his votes against Betsy DeVos and the other cabinet members. Senator Toomey I have contacted about sanctuary cities, about budgets, about funding for the NIH, about immigration, about the tax reform proposal. Do you need more? The environment, the Dream Act, Puerto Rico.
Q. This is Senator Toomey?
A. Yes.
Q. Has Senator Toomey been responsive to you?
A. No, and his staffers aren't always polite.
Q. Have they ever gotten back to you on any of

these issues?
A. Have I ever received a call back? I generally call and give my information. One day a long time -- back in December, a staffer actually called me back. I think they weren't that busy back then and asked some questions.
Q. What did you talk about?
A. God, I don't remember.
Q. Did you ever contact your governor?
A. Occasionally.
Q. Which governor?
A. Governor Wolf.
Q. Has he been responsive?
A. His office is, yes.
Q. On what subjects?
A. Opposing the gun -- whether he would veto SB 83 the guns in school act if it came up, supporting Planned Parenthood. And then I have basically just called and said thank you for working hard.
Q. You don't have a mayor in Fox Chapel, do you?
A. We do.
Q. Have you contacted your mayor?
A. No. I am very happy with my borough council. The town sort of seems to chug along.

Q. There is a borough council and the borough council has a mayor in Fox Chapel?
A. Yes.
Q. And we talked about you have never run for public office?
A. No.
Q. Have you ever attempted to draw what you would consider a fair district?
A. No.
Q. I think you mentioned before, you don't feel you are qualified to do that.
A. Correct. I mean, there are people who are writing computer programs that will do that. I do feel that I would be qualified to be on a nonpartisan citizens commission, but, no, I have no expertise in map drawing.
Q. What would be the political composition of a fair district for you, Doctor?
A. It would represent the people who live in the district. It would be a district that generally follows a combination of township and natural borders. In areas where there are highways and things, then those would be taken into account, because, you know, like crossing a large highway, the people on one side might

not really belong in that district if their whole civic life is held on the other side.

Like you know what happened with the Civic Arena in Pittsburgh, it cut communities apart. It should follow real community lines, and it should be drawn based upon the actual community, not based upon the history of how people vote, and I don't see how that should be relevant.
Q. How people vote can change though?
A. Yes, it can.
Q. From year to year, right?
A. Yes.
Q. It really can.
A. Yes.
Q. What would the racial composition of a fair district be for you, Doctor?
A. It depends upon the district and where people live. I understand that people of color and minority should not be disenfranchised and that the Voting Rights Act protects them in how districts are drawn, and that's primary going to, in my area, going to affect urban districts much more than my district.

My school system is something like 92

or 95 percent white.
Q. Fox Chapel School District?
A. Yes. We are sadly nondiverse. My district is not, unfortunately, going to be terribly racially diverse. But if there were a racially different community sitting in the middle of my district, it shouldn't be carved down and stuck in somebody else's district.
Q. Doctor, when you voted in 2010, did the shape the -- I think you said the 4th district harmed you.
A. I looked up my district, and I don't remember exactly when it was redrawn, but my district has been strange twice now. We were the 4th -- do you know the time frame? I don't know the time frame.
MR. HEALEY: I can't answer for you.
A. I think my district actually was gerrymandered back in 2000 and then got -- got exaggerated in 2010. So I think that we were actually the 4th before 2010 -- I don't remember the exact time frame.
Back when I was in the 4th, I didn't really pay any attention. Looking at the map, it looked like my district was a fairly normal

looking blob. It wasn't a rectangle, but, I mean, it looked like a fairly compact looking thing. I never really paid attention to it. I went and voted.
And my state districts are not horrendous, my particular 30 and 38 are -- like we have that little Highland Park business on the other side of the river, but overall my district is relatively normal looking. It is my congressional district that is bizarre.
Q. Don't you agree if you try to gerrymander, or whatever you want to call it, a district to satisfy one particular criteria, let's say racial, and you push it one way, it necessarily is going to create an imbalance somewhere else.
A. I don't agree with that. The way people who live in Johnstown are now part of my district are no more white than the white people who live over in Cheswick who are now not part of my district.
Q. So it would be your testimony that when you voted in 2012, the shape of your district harmed you; is that right?

A. Yes.
Q. As we discussed in this deposition.
A. Yes.
Q. When you voted in 2016, how did the shape of your district harm you? And if so, how?
A. The shape of my district -- the composition of my district was determined by the shape of my district. It is not actually that it is this weird shape that hurts me. It is that we had to make these weird shapes to get these people and these people and take these people over here in the narrow part out that harms me.
Q. Did Keith run in 2016?
A. Yes. And he won.
Q. I know Keith. Just coincidentally.
A. And it harmed me by diluting the power of my vote because my vote should count because when you take all of the other people nearby who are part of my community and my nearby communities, and you cut them out because they vote like I do, and instead, you put in these group of people and that group of people, and you are just sticking them in there, not because they are nearby or belong in my district, but because they vote like somebody

else wants them to vote, that harms me. When my district should be about 50-50 because that's who lives in the area around me, that my district should be able to pick the representative who represents us.
Right now, my vote counts less -- doesn't count the way it should, and my representative is chosen by a bunch of people over here who are in a community very different than my community.
Q. What community is that?
A. We have Johnstown and Beaver. We have very -- we don't have the river communities which are much closer to me. I am three miles from the river.
There is nothing wrong with the people in Beaver and there is nothing wrong with people in Johnstown, but they are not the compacting, contiguous group of people who should belong to my district.
And we didn't, and the people in Beaver and the people in Johnstown didn't decide that they should be in this district. Somebody else decided this for us. And they have decided this so that they would break up

the Democratic votes and increase the number of Republican votes. So we don't get to pick who our representative is anymore.
Q. Doctor, are you aware that Pennsylvania lost a congressional seat as a result of the 2010 census?
A. Yes, that's why my district got picked to go away. That's why I'm not in the 4th anymore.
Q. So there had to be --
A. There had to be some changes, absolutely. But there is no reason in the world they by chance ended up looking the way they do.
Q. Are you aware that each congressional district is required to have the same population?
A. Uh-huh.
Q. Do you know why?
A. Because of the theory that congressional, our representatives represent us based on a one vote, one person one vote ideal.
Q. Do you know what the Voting Rights Act is?
A. Uh-huh.
Q. What is that?
A. Okay, I don't know exactly what the Voting Rights Act is. I have read it.
Q. It is not trying to be a test.

MR. HEALEY: She is not a lawyer, but per her understanding, that's fine.
MR. HALL: Well, I don't think you have to be a lawyer to understand it.
MR. HEALEY: There are Supreme Court cases on that one.
Q. Is there any reason, Doctor, that you would have waited until October, November 2017 to file a lawsuit challenging the 2011 plan and --
A. Me personally?
Q. Why not file in 2012 or 2013, 2014? It's been five years.
A. I didn't file this personally.
Q. You are just part of a group.
A. Yes. I mean, if somebody had asked me in 2012 would I be interested in doing something about my gerrymandered district, I would have said yes.
MR. HALL: I think I'm about done. Let me take a minute here and let me just check some notes.

-----

(There was a recess in the proceedings.)

-----

MR. HALL: Thank you, Doctor, very much.
MR. HEALEY: We will waive.

-----

(The proceedings were concluded at 10:40 a.m.)

-----

COMMONWEALTH OF PENNSYLVANIA) CERTIFICATE
COUNTY OF ALLEGHENY ) ss

I, Sheila Stauffer, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify that the witness was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth; that the foregoing deposition was taken at the time and place stated herein; and that the said deposition was recorded stenographically by me and then reduced to typewriting under my direction, and constitutes a true record of the testimony given by said witness, all to the best of my skill and ability.

I further certify that the inspection, reading and signing of said deposition were waived by counsel for the respective parties and by the witness.

I certify that I am not a relative or employee of either counsel, and that I am in no way interested, directly or indirectly, in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 29TH day of November, 2017.

NOTARY PUBLIC