## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **LOUIS AGRE**, *et al.* | **CIVIL ACTION** |
| **v.** | **NO. 17-4392** |
| **THOMAS W. WOLF**, Governor of the Commonwealth of Pennsylvania, **JONATHAN MARKS**, Commissioner of the Pennsylvania Bureau of Commissions, Elections, and Legislation, **ROBERT TORRES**, Acting Secretary of the Commonwealth of Pennsylvania, **JOSEPH B. SCARNATI, III**, President Pro Tempore of the Pennsylvania Senate, and **MICHAEL C. TURZAI**, Speaker of the Pennsylvania House of Representatives, in their official capacities. | |

**BEFORE:  Smith, Chief Circuit Judge; Shwartz, Circuit Judge; Baylson, District Judge.**

## <u>MEMORANDUM</u>

**Smith, Chief Circuit Judge**                                    **January 10, 2018**

### I.       Introduction

Plaintiffs seek a declaratory judgment that the Pennsylvania General Assembly exceeded its authority under the United States Constitution when it enacted a congressional redistricting plan that was intended to favor candidates from the Republican Party.  Amended Complaint, ECF No. 88 at 1, 6, 11.  Invoking 42 U.S.C. § 1983, Plaintiffs allege a direct violation of the "Elections Clause."  *Id.* at 2.  The Elections Clause, Article 1, Section 4, Clause 1 of the Constitution, provides state legislatures with authority to prescribe "[t]he Times, Places and Manner of holding

1

Elections for Senators and Representatives." U.S. Const. art. I, § 4, cl. 1.[1] Under

Plaintiffs' theory, the Clause gives States very limited power: to promulgate procedural

rules, and to do so in a neutral fashion. ECF No. 88 at 2. Plaintiffs argue that the

General Assembly exceeded this authority when it redrew Pennsylvania's federal

congressional districts in 2011. They contend that the General Assembly prioritized

partisan, political ends over "neutral districting criteria,"[2] and, in so doing, violated the

Elections Clause's fairness requirement. *Id.* at 8–9; Plaintiffs' Post-Trial Memorandum

of Fact and Law, ECF No. 204 at 9.

---

[1] The full text of the Clause reads: "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1.

[2] The districting criteria identified includes compactness, respect for municipal boundaries, and preservation of communities of interest. "Compactness," as the term is used in the redistricting context, is a measure of the "aerial or territorial density" of a district. *See* Testimony of Prof. James Gimpel, Trial Tr. Dec. 7, 2017 PM 9:5–6. A related term used in the redistricting context is "contiguity," which means that the entire district is connected. *Id.* at 59:22–25, 60:1–2.

Plaintiffs allege that Republican members of the General Assembly employed a line-drawing practice known as "packing" and "cracking." ECF No. 88 at 9. Packing and cracking, also referred to as "stacking" and "splitting," *see Davis v. Bandemer*, 478 U.S. 109, 116–17 (1986) (plurality), is a technique meant to limit a political party's electoral success in State districts by "packing" voters who are likely to vote for candidates of a particular party into super-majority districts, where those candidates will likely receive well over 50% of the vote, and "cracking" that party's remaining likely voters across other districts, dispersed so that its candidates will likely fail to obtain a majority of votes. *Id.* If successful, the disfavored party's candidates obtain overwhelming electoral success in the few "packed" districts, but lose (even if narrowly) in the numerous "cracked" districts. *See Whitford v. Gill*, 218 F. Supp. 3d 837, 854 (W.D. Wis. 2016) (discussing allegation that "packing" and "cracking" leads to "wasted votes," or a "dilut[ion]" of the disfavored party's votes).

Through this lawsuit, Plaintiffs seek a sea change in redistricting.  They are forthright about this intention:  they desire a judicial mandate that Art. I, § 4, of the Constitution prohibits any political or partisan considerations in redistricting.[3]

Plaintiffs' ambitious theory suffers from three fatal flaws.  First, the Framers provided a check on state power within the text of the Elections Clause, but it is a political one—action by Congress.  The language and history of the Clause suggest no direct role for the courts in regulating state conduct under the Elections Clause.  Second, the Elections Clause offers no judicially enforceable limit on political considerations in redistricting.  Plaintiffs' partisan blindness theory was long ago rejected by the Supreme Court, and for good reason.  The task of prescribing election regulations was given, in the first instance, to political actors who make decisions for political reasons.  Plaintiffs ignore this reality.  In fact, they ask the Court to enforce the supposed constitutional command by requiring the Commonwealth of Pennsylvania to develop a new process that will somehow sanitize redistricting by removing political influence.[4]  Courts cannot mandate new processes for creating election regulations.  The Elections Clause leaves

---

[3] *See* Statement of Alice Ballard, Counsel for Plaintiffs, Hearing Tr. Nov. 7, 2017 14:23–25, 15:1–4 ("We're offering an easily manageable standard to evaluate gerrymandering, and that easily manageable standard is no more gerrymandering.  If we win this case, the era of gerrymandering in federal elections is over.  That's our case.").

[4] *See* Amended Complaint, ECF No. 88 at 11 (asking the Court to "[d]irect and order that defendant State officers develop [alternative districting plans] *through a process that has reasonable safeguards against partisan influence, including the consideration of voting preferences*.") (emphasis added); Plaintiffs' Post-Trial Memorandum of Fact and Law, ECF No. 204 at 10 ("In the [C]omplaint, [we] sought not to impose a particular plan *but to require the defendants to devise a neutral process that will guard against the abuses that led to this unconstitutional map*.") (emphasis added).

that to state legislatures and to Congress—bodies directly accountable to the people. Third, Plaintiffs' Elections Clause claim is an unjustifiable attempt to skirt existing Supreme Court precedent.  Partisan gerrymandering claims under the First Amendment and/or Equal Protection Clause are justiciable, but a majority of justices have yet to agree on a standard.  Despite the lack of agreement, the justices favoring justiciability uniformly acknowledge that the courts should not assume a primary role in redistricting. Out of concern for a healthy separation from this most political of matters, the justices have proposed high bars for judicial intervention.  Contrary to that concern, Plaintiffs offer an Elections Clause theory that invites expansive judicial involvement.  Plaintiffs suggest that the Elections Clause offers an easily manageable standard.  What they really mean is that it offers a lower bar—an easy path to judicial intervention.

Plaintiffs seek to chart a new path,[5] one that ignores the constitutional text, casts aside persuasive precedent, and brings with it inevitable problems that should counsel restraint before entering the political thicket of popular elections.  For these reasons, I would hold the Plaintiffs' Elections Clause claim to be non-justiciable.[6]

---

[5] Until very recently, no court has granted relief from a redistricting plan, or much less considered the merits of a claim for relief, under the Elections Clause.  *See Common Cause v. Rucho*, Nos. 16-1026, 16-1164, slip op. at 187 (M.D.N.C. Jan. 9, 2018) (finding North Carolina's 2016 Congressional Redistricting Plan to violate the Fourteenth Amendment's Equal Protection Clause, the First Amendment, and Art. I of the Constitution.); *cf. Lance v. Coffman*, 549 U.S. 437 (2007) (dismissing on standing grounds Colorado voters' claim that a court's drawing of a congressional map violated the Elections Clause).

[6] The views expressed herein are my own.  Judge Shwartz joins me in entering judgment in favor of the Defendants, but does so for separate reasons as set forth in her opinion.  Judge Baylson would enter judgment in favor of the Plaintiffs, as explained in his detailed opinion.

---

### a.   Procedural History

The procedural history of this matter is a brief one.  Plaintiffs, who began as a group of five Pennsylvania residents and eventually grew to a group of twenty-six, filed a Complaint on October 2, 2017, in the United States District Court for the Eastern District of Pennsylvania.  ECF No. 1.  The Honorable Michael M. Baylson, to whom the matter was assigned, promptly executed his duties pursuant to 28 U.S.C. § 2284 and notified me, as Chief Judge of the United States Court of Appeals for the Third Circuit, that the matter required a three-judge panel.[7]  Oct. 5, 2017 Letter, ECF No. 37.  Recognizing the time-sensitive nature of this matter, and pursuant to statutory authority, Judge Baylson conducted a pre-trial scheduling conference and entered a Scheduling Order.  *See* ECF Nos.  2, 20, 24.  The Scheduling Order provided for expedited discovery and a trial to begin on December 4, 2017.  ECF No. 20.  On October 19, 2017, pursuant to my authority under 28 U.S.C. § 2284, I appointed the Honorable Patty Shwartz of the United States Court of Appeals for the Third Circuit, and myself, to adjudicate this matter with Judge Baylson.  ECF No. 34.  After ruling on various pre-trial matters, a four-day trial was held from December 4–7, 2017.  Post-trial briefs were filed on December 15, 2017.  ECF Nos. 204, 206, 207.

---

[7] Under 28 U.S.C. § 2284(a), a district court of three judges is required, *inter alia*, for actions "challenging the constitutionality of the apportionment of congressional districts."  The chief judge of the circuit assigns the panel, which includes the originally assigned judge and two others, "at least one of whom shall be a circuit judge."  28 U.S.C. § 2284(b)(1).  Actions challenging state redistricting plans fall within the statutory requirement.  *See, e.g., Shapiro v. McManus*, 136 S. Ct. 450, 454 (2015) (noting that an action challenging Maryland's redistricting scheme is plainly an "apportionment" challenge).

For the reasons outlined in my opinion below and the opinion of Judge Shwartz, *post*, judgment will be entered for Defendants.[8]

*        *        *

Because I would rule this action non-justiciable as a matter of law,[9] I dispense with any discussion of the factual record.[10]  I proceed by discussing the history of the Elections Clause, the relevant jurisprudence, and finally why I believe Plaintiffs' Elections Clause claim is not cognizable.  Before doing so, I note the extensive work of my two colleagues on this panel and commend their energy and effort in drafting thorough opinions in what has been a demanding timeframe.

---

[8] The record having been fully developed and the parties having received a fair opportunity to present their arguments, I would enter summary judgment under Rule 56(f) of the Federal Rules of Civil Procedure.  *See Gibson v. Mayor & Council of City of Wilmington*, 355 F.3d 215, 222-25 (3d Cir. 2004) (discussing permissible circumstances for *sua sponte* entry of summary judgment).  Judge Shwartz would enter judgment under Rule 52.

[9] The Legislative Defendants challenge the Plaintiffs' standing to bring suit.  *See, e.g.,* Legislative Defendants' Post-Trial Submission, ECF No. 207 at 10 ("While [we] do not deny that Plaintiffs are passionate and civic-minded individuals, the fact remains that their generalized grievances about proportional representation and some alleged violation of the Election Clause simply do not suffice for Article III standing.").  As my colleague Judge Shwartz discusses in her concise and well-written opinion, *post*, standing to bring partisan gerrymandering claims remains unsettled.  Because I would enter judgment in favor of the Defendants on other jurisdictional grounds, I take no position on the Plaintiffs' Article III standing.  *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006) ("The doctrines of mootness, ripeness, and *political question* all originate in Article III's 'case' or 'controversy' language, no less than standing does.") (emphasis added); *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999)) ("[T]here is no mandatory 'sequencing of jurisdictional issues.'").

[10] My colleagues provide detailed identification of the parties and summaries of the evidence presented at trial.  I dispense with any such discussion as unnecessary for my legal conclusion, and express no opinion as to my colleagues' weighing of the evidence.

6

## II.      History of the Elections Clause

Plaintiffs argue that the Elections Clause prohibits the drawing of congressional districts based on partisan motivations.  Because the Clause's text explicitly assigns the power to prescribe election regulations to *political* bodies—specifically, state legislatures and the federal Congress—Plaintiffs must look outside of the constitutional text in order to support their theory.  History, however, provides no support for Plaintiffs' theory.  Historical records surrounding the Constitutional Convention and succeeding State ratification proceedings evince no basis upon which this Court might read Plaintiffs' desired limitations into the Elections Clause.  In this section, I examine that history.

The purpose of the Elections Clause was to ensure orderly elections for the House of Representatives.  Rather than attempt to spell out a detailed election code within the Constitution itself, the Framers decided to confer a discretionary power over elections to politically accountable legislatures.  Noting that it could "not be alleged that an election law could have been framed and inserted into the Constitution, which would have been always applicable to every probable change in the situation of the country," Alexander Hamilton argued that "it will therefore not be denied that a discretionary power over elections ought to exist somewhere."  THE FEDERALIST NO. 59 (Alexander Hamilton).  Writing in 1787, Hamilton went on to identify "only three ways[] in which this power could have been reasonably modified and disposed."  *Id.*  First, the discretionary power over elections could be "lodged wholly in the National Legislature," second, it could be lodged "wholly in the State Legislatures," and third, it could be lodged "primarily in the latter, and ultimately in the former."  *Id.*  The members of the Constitutional Convention

ultimately settled on the third manner—allowing state legislatures to use their localized knowledge to prescribe election regulations in the first instance, but "reserv[ing] to the national authority a right to interpose, whenever extraordinary circumstances might render that interposition necessary to its safety." *Id.*

Notably, Hamilton made no reference to either state or federal courts when he identified "only three ways" that "a discretionary power over elections" could be "reasonably modified and disposed." *Id.*  Rather, Hamilton argued in favor of assigning this *discretion* to state and federal legislatures.  By contrast, Plaintiffs identify partisan gerrymandering as a problem that the federal judiciary is well situated to correct. Plaintiffs' argument, however, ignores the discretionary nature of the power afforded to state and federal legislatures.  Quite simply, their argument conflates legislative *inaction* with legislative *inability*.

State legislatures exercise the discretionary power afforded to them by the Elections Clause when those legislatures draw election districts.  Similarly, Congress exercises the discretion afforded to it by the Elections Clause when Congress decides against upsetting those State regulations.  Yet Plaintiffs ask this Court to assume the roles of state and federal legislatures, urging us to exercise the *discretion* that has been explicitly reserved to those political bodies.  Accepting Plaintiffs' invitation to do so would require this Court to declare that the current political climate calls for action rather than inaction—a political declaration that Article III of the Constitution constrains us from making.

Providing Congress with the ability to override election regulations prescribed by the several states was the subject of significant debate at the time of the framing. Examining this history counsels against concluding that the judiciary has an expansive role to play under the Elections Clause.  Such a conclusion would require us to assume that, although significant debate was had over providing Congress with the power to override state regulations, the Framers covertly provided a similar power to the courts but without textual reference.  As examined below, the intensity of the debate over empowering a single federal body—Congress—to override State regulations necessarily casts doubt on any theory which would require doubling that power by granting it to the judiciary as well.

At the time of the framing, the main rationale put forward in support of a congressional power to make and alter election regulations was a rationale grounded in self-preservation.  As Alexander Hamilton put it, the "propriety [of the Elections Clause] rests upon the evidence of this plain proposition, that *every government ought to contain in itself the means of its own preservation*."  THE FEDERALIST NO. 59 (Alexander Hamilton) (emphasis in original).  Here Hamilton expresses a fear commonly expressed at the time of the framing—namely, that the several States would simply thumb their noses at a newly-formed federal government and decide against establishing any federal elections at all.  Examining an earlier draft of the Elections Clause brings this fear into focus.

One early draft provided:

> The times and places and manner of holding the elections of the members of each House shall be prescribed by the Legislature of each State; but their provisions concerning them may, at any time, be altered by the Legislature of the United States.

Records of the Federal Convention, August 9, 1787.  One difference between this early draft and the ultimately-ratified version is that, while the above-quoted draft refers to "each House," the ultimately-ratified version explicitly disallows Congress from regulating "the Places of chusing Senators."  U.S. Const. art. I, § 4.  This change stemmed from a motion by James Madison and Gouverneur Morris,[11] and was intended to protect the States from congressional interference when it came to electing federal Senators.[12]  Another amendment to the early draft language quoted above was more controversial.  It empowered Congress to not only alter State regulations, but to make election regulations itself in the first instance.  Records of the Federal Convention, August 9, 1787.

Empowering Congress to make election regulations out of whole cloth was seen by some as an intrusion into the realm of the States' prerogatives.  *See, e.g.*, FEDERAL FARMER NO. 3 ("[B]ut why in laying the foundation of the social system, need we

---

[11] As an intermediate step, the motion put forward by Madison and Morris altered the reference to "Each House" to simply "the House of Representatives."  Records of the Federal Convention, August 9, 1787.

[12] Prior to the ratification of the Seventeenth Amendment, federal Senators were chosen by state legislatures.  The Seventeenth Amendment altered this framework, establishing the popular election of federal Senators.  U.S. const. amend. XVII. ("The Senate of the United States shall be composed of two Senators from each state, elected by the people thereof, for six years; and each Senator shall have one vote.  The electors in each state shall have the qualifications requisite for electors of the most numerous branch of the state legislatures.").

unnecessarily leave a door open to improper regulation? . . . Were [the Elections Clause]
omitted [from the Constitution], the regulations of elections would be solely in the
respective states, where the people are substantially represented; and where the elections
ought to be regulated"); FEDERAL FARMER NO. 12 ("It has been often urged, that
congress ought to have power to make these regulations, otherwise the state legislatures,
by neglecting to make provision for elections, or by making improper elections, may
destroy the general government. . . . Should the state legislatures be disposed to be
negligent . . . they [already] have a very simple way to do it . . . they have only to neglect
to chuse senators. . . . These and many other reasons must evince, that it was not merely
to prevent an annihilation of the federal government that congress has power to regulate
elections."); Debate in Pennsylvania Ratifying Convention ("If the Congress had it not in
their power to make regulations, what might be the consequences?  Some states might
make no regulations at all on the subject."); Debate in Massachusetts Ratifying
Convention ("[I]f the states shall refuse to do their duty, then let the power be given to
Congress to oblige them to do it.  But if they do their duty, Congress ought not to have
the power to control elections."); Debate in North Carolina Ratifying Convention, July
25, 1788 ("But sir, [the Elections Clause] points forward to the time when there will be
no state legislatures—to the consolidation of all the states.  The states will be kept up as
boards of elections.").

Including this congressional power within the Elections Clause led to a proposed
amendment from the North Carolina ratifying Convention that would have prohibited
Congress from making election regulations in the first instance, "except when the

11

legislature of any state shall neglect, refuse, or be disabled by invasion or rebellion."
James Iredell, Proposed Amendment, North Carolina Ratifying Convention, August 1,
1788.  Notably, this debate continued even after New Hampshire became the ninth and
last state necessary for ratification of the Constitution in 1788.  Considering the Bill of
Rights in 1789, the House of Representatives considered an amendment that would have
prohibited Congress from "alter[ing], modify[ing], or interfer[ing] in the times, places, or
manner of holding elections of Senators, or Representatives, except when any State shall
refuse or neglect, or be unable, by invasion or rebellion, to make such election."  House
of Representatives, An Amendment to Art. I, § 4, Cl. 1.  James Madison acknowledged
the benefit of such an amendment, stating that "[i]f this amendment had been proposed at
any time either in the Committee of the whole or separately in the House, I should not
have objected to the discussion of it."  *Id.*  Considering the Amendment in August of
1789, however, Madison concluded that he could not "agree to delay the amendments
now agreed upon[] by entering into the consideration of propositions not likely to obtain
the consent of either two-thirds of this House or three-fourths of the State Legislatures."
*Id.*

It appears, then, that empowering the federal Congress to override State election
regulations was not a power that the Framers surreptitiously inserted into the
Constitution.  Rather, it was a power that was subject to considerable debate—a debate
that continued even after the Constitution was ratified.  I concede that this history is not
dispositive.  Yet I am satisfied that it strongly cautions against concluding that a similar

power to override state election regulations was provided to the federal judiciary without mention in the text and without any similar debate having taken place.

This is not to say that the courts were entirely absent from the Framers' minds when they were debating the merits of the Election Clause. North Carolina delegate John Steele, for example, suggested that "[t]he judicial power of [the federal] government is so well constructed as to be a check" against Congress misusing the power granted to it in the Elections Clause. Debate in North Carolina Ratifying Convention, July 25, 1788. The commonly complained of misuses to which Steele referred included Congress regulating the "place" of elections so that elections would be held only in geographic locations that favored a particular class of candidates, the "time" of elections so that elections would be held less frequently than the relevant congressional terms called for, and the "manner" of elections so that elections be carried out in a way that ignored a State's preference for an electoral majority. *See, e.g.*, Debate in Massachusetts Ratifying Convention, January 16, 1788 ("[S]uppose the legislature of this state should prescribe that the choice of the federal representatives should be in the same manner as that of governor—a majority of all the votes in the state being necessary to make it such—and Congress should deem it an improper *manner*, and should order it be as practicsed in several of the Southern States, where the highest number of votes make a choice. . . . Again, as to the *place* . . . may not Congress direct that the election for Massachusetts shall be held in Boston? And if so, it is possible that, previous to the election, a number of the electors may meet, agree upon the eight delegates, and propose the same to a few towns in the vicinity, who, agreeing in sentiment, may meet on the day of election, and

13

carry their list by a major vote."); Debate in North Carolina Ratifying Convention, July 25, 1788 ("[Congress] may alter the time from six to twenty years, or to any time; for they have an unlimited control over the time of elections.").

As Steele argued, however, such concerns were overblown because *other* provisions of the Constitution would prohibit Congress from acting in such a way, and the courts could enforce those other provisions.  Debate in North Carolina Ratifying Convention, July 25, 1788 ("If the Congress make laws inconsistent with the Constitution, independent judges will not uphold them, nor will the people obey them."); *see also id.* ("Does not the Constitution say that representatives shall be chosen every second year?  The right of choosing them, therefore, reverts to the people every second year." (Iredell)).

Steele's reference to "independent judges" actually cuts against Plaintiffs' theory in two ways.  First, it illustrates that to the extent the federal judiciary was considered in the debates surrounding the Elections Clause, it was seen as a check on *Congress*.  In other words, the ability for the judiciary to act as a check on congressional interference in State regulations was used as a selling point to convince skeptical delegates that they should not fear granting an Elections Clause power to Congress.  This is at odds with the argument that Plaintiffs advance here: that the federal judiciary was not seen as a limit on federal interference with state regulations, but that it was silently empowered to act as a second source of federal interference.  Second, the ability for the federal judiciary to act as a check by enforcing *other* constitutional provisions undermines Plaintiffs' argument that the Election Clause itself acts as a source of substantive limitations on state

14

regulations.  As discussed in Part III below, the Supreme Court has identified other

constitutional provisions that restrict state and federal action in the elections context.

Although the Framers were fearful of State legislatures "mould[ing] their regulations as

to favor the candidates they wished to succeed," Records of the Federal Convention,

James Madison, August 9, 1787, the constitutionally prescribed remedy for that fear was

plenary oversight by Congress, and a federal judiciary capable of ensuring that other

provisions of the Constitution were not violated.

### III.    Jurisprudence

As the preceding section demonstrates, the Framers did not envision such a

primary role for the courts, and the text of the Clause reflects as much.  So too, Supreme

Court precedent supports a limited role for the judiciary.  That role is primarily limited to

enforcing the guarantees of the First Amendment and the Fourteenth Amendment's Equal

Protections Clause.  The protections afforded by those provisions are robust, yet

generally unobtrusive to States in promulgating election regulations.  Likewise

unobtrusive are the Supreme Court cases interpreting the Elections Clause.  The Court

has interpreted the Clause as providing great leeway to the States and their citizens to

determine how regulations will be promulgated.  To be sure, the Elections Clause permits

only procedural regulations, and that limitation is enforced most often through the First

Amendment or the Equal Protection Clause.  The Supreme Court has struck down state

regulations as directly violative of the Elections Clause in very few cases—two to be

exact.  By limiting its intervention, the Court has emphasized the power the Elections

Clause gives to the people in controlling election regulations.

### a.    Source of State Authority

Before considering Plaintiffs' claim regarding state power to draw district lines, one must be clear as to the source of that power.  Legislative Defendants[13] suggest that the power to draw district lines existed prior to ratification, and thus falls within the States' sovereign authority.  *See* ECF No. 168-1 at 7.[14]  If they are correct, the Elections Clause claim easily fails: Pennsylvania cannot exceed its authority under the Elections Clause by exercising a reserved power.  However, Legislative Defendants provide no evidence that drawing lines for federal districts is a power reserved by the Tenth Amendment.

Indeed, Legislative Defendants' argument appears to be foreclosed by the Supreme Court's reasoning in *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995).  As discussed in greater detail below, *Thornton* dealt with the States' power *vel non* to add term-limit qualifications for members of Congress, including Senators.  *Id.* at 783.  The threshold question in *Thornton* was whether the States have sovereign authority to add qualifications for their congressional representatives.  The Supreme Court held that they do not:  "the states can exercise no powers whatsoever, which exclusively spring out of the existence of the national government, which the constitution does not delegate to

---

[13] "Legislative Defendants" refers to Joseph B. Scarnati, III, in his official capacity as President Pro Tempore of the Pennsylvania Senate, and Michael C. Turzai, in his official capacity as Speaker of the Pennsylvania House of Representatives.

[14] Given the expedited schedule in this case, the Scheduling Order did not provide for motions under Rule 56 of the Federal Rules of Civil Procedure.  Nonetheless, the Legislative Defendants' tendered a Motion for Summary Judgment and Memorandum in Support on December 1, 2017.  ECF Nos. 168, 168-1.  The panel acknowledged and denied the Motion at the start of trial.  Trial Tr., Dec. 4, 2017 AM 33:6–15.

them. . . .  No state can say, that it has reserved, what it never possessed."  514 U.S. 779,

802 (quoting 1 Story § 627).   Because "electing representatives to the National

Legislature was a new right, arising from the Constitution itself" the Court held that

"[t]he Tenth Amendment . . . provides no basis for concluding that the States possess

reserved power to add qualifications to those that are fixed in the Constitution."  *Id.* at

805.

The Court adhered to this view of reserved powers in *Cook v. Gralike*, 531 U.S.

510 (2001).  *Gralike* concerned Missouri's power to use ballot labels as a means of

advising voters about candidates support for federal term limits.  *Id.* at 514.  The Supreme

Court had to consider whether States, as sovereigns, possessed reserved power to instruct

their representatives.  It reasoned: "[n]o other constitutional provision gives the States

authority over congressional elections, and no such authority could be reserved under the

Tenth Amendment.   By process of elimination, the States may regulate the incidents of

such elections, including balloting, only within the exclusive delegation of power under

the Elections Clause."  *Id.* at 522–23.

In the face of such robust language, Legislative Defendants cite *Chapman v.

Meier*, 420 U.S. 1 (1975), as suggesting that "redistricting falls within the [S]tates'

inherent powers."  ECF No. 168-1 at 7.  Yet no support for such suggestion can be found

in *Chapman*, a case concerning the reapportionment of a North Dakota's *state* legislative

body.  While the Court acknowledged that "reapportionment is primarily the duty and

responsibility of the State through its legislature or other body," *id.* at 27, that statement

hardly speaks to the basis for such authority, much less to States' authority with respect to *federal* elections.

In the absence of support for Legislative Defendants' argument, I adhere to the rationale of *Thornton* and *Gralike* and conclude that the States' authority to redistrict is a power delegated by Art. I, § 4, and not a power reserved by the Tenth Amendment.

### b.    Elections Clause Cases

Having concluded that the Elections Clause is the source of state redistricting authority, I turn to the primary cases interpreting the meaning of the Clause. The Court has defined the structural features of the Elections Clause. It has interpreted the word "Legislature" as giving leeway to the States and their citizens, and it has interpreted the phrase "Times, Places, and Manner" as giving States power to develop a complete code for elections. However, the Court has also made clear that state authority is limited to *procedural* regulations. And while the Court generally enforces the latter regulation through the First Amendment or Equal Protection Clause, it struck down two term-limit-related laws after concluding that they were not procedural, but substantive. The Court has never suggested, however, a role for itself in policing the fairness of procedural regulations under the Elections Clause.

### 1.    Defining "Legislature" and "Times, Places, and Manner"

In *State of Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565, 566 (1916), Ohio voters challenged the use of the State's referendum system to override redistricting legislation passed and duly enacted by the state legislature. The voters argued that the referendum was not part of the "Legislature" and hence could not, per the Elections Clause, have a

18

role in the redistricting process.  *Id.* 566–67.   The Supreme Court rejected the argument, holding that Ohio's referendum process "was contained within the legislative power."  *Id.* at 568.

In deciding the issue, the Court recognized Congress's power over state election regulations.  It looked to whether Congress had expressed an opinion on States' use of the referendum.  *Id.*  It found that Congress, in passing the 1911 redistricting legislation replaced the phrase "the legislature of each state" with "in the manner provided by the laws thereof."  *Id.* (quoting act of February 7, 1891, chap. 116, 26 Stat. 735; Cong. Rec. vol. 47, pp. 3436, 3437, 3507).  This modification, according to the Supreme Court, was meant specifically to prevent challenges to States' use of the referendum.  *Id.* at 568–69.

Lastly, the Court considered the allegation that referendum systems were "repugnant to" the Elections Clause, "and hence void," such that Congress had no power to permit them.  *Id.* at 569.  The Court held that the claim necessarily raised a non-justiciable question.  That is, the claim rested upon a theory that "to include the referendum in the scope of the legislative power is to introduce a virus which destroys that power, which in effect annihilates representative government, and causes a state where such condition exists to be not republican in form, in violation of the guaranty of the Constitution."  *Id.* (citing U.S. Const. art. IV, § 4).  "[T]he proposition and the argument disregard the settled rule that the question of whether that guaranty of the Constitution has been disregarded presents no justiciable controversy, but involves the exercise by Congress of the authority vested in it by the Constitution."  *Id.* (citing *Pac. States Tel. & Tel. Co. v. State of Oregon*, 223 U.S. 118 (1912)).

In summary, the Court in *Hildebrant* defined the term "legislature," but was unwilling to entertain the suggestion that Congress was excluded from permitting use of the referendum.  The latter argument, according to the Court, was necessarily a Guarantee Clause argument, and was thus non-justiciable.

The Supreme Court again considered the meaning of the term "Legislature" in *Smiley v. Holm*, 285 U.S. 355 (1932).  In *Smiley,* a Minnesota voter alleged that the State's 1931 redistricting plan was inoperative because it had been vetoed by the Governor, and not repassed as required by state law.  *Id.* at 361–62.  The Court had to decide whether the Elections Clause gave state legislatures, as institutions, a unique role in prescribing election regulations, or whether the power was instead vested in the states' ordinary lawmaking function.  "The primary question now before the Court is whether the function contemplated by article 1, § 4, is that of making laws."  *Id.* at 365.

The *Smiley* Court used expansive language in defining the power given by the Elections Clause:

> The subject-matter is the 'times, places and manner of holding elections for senators and representatives.'  It cannot be doubted that these comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved.

285 U.S. at 366.  The Court recognized that this gave power, as well, to prescribe criminal laws to protect the right to vote.  *Id.*  In short, "[a]ll this is comprised in the

20

subject of 'times, places and manner of holding elections,' and involves lawmaking in its essential features and most important aspect."  *Id.*

The Court further recognized, relative to Congress:

> This view is confirmed by the second clause of article 1, § 4, which provides that 'the Congress may at any time by law make or alter such regulations,' with the single exception stated.  The phrase 'such regulations' plainly refers to regulations of the same general character that the legislature of the State is authorized to prescribe with respect to congressional elections.   In exercising this power, the Congress may supplement these state regulations or may substitute its own.  It may impose additional penalties for the violation of the state laws or provide independent sanctions. It 'has a general supervisory power over the whole subject.'

285 U.S. at 366–67 (citation omitted).

The *Smiley* Court held that "[w]hether the Governor of the state, through the veto power, shall have a part in the making of state laws, is a matter of state polity."  285 U.S. at 368.  "Article 1, § 4, of the Federal Constitution, neither requires nor excludes such participation.  And provision for it, as a check in the legislative process, cannot be regarded as repugnant to the grant of legislative authority."  *Id.* at 399–400.  Ultimately, the Court held that the Elections Clause refers to the States' lawmaking power.  "Article 1, section 4, plainly gives authority to the state to legislate within the limitations therein named."  *Id.* at 372.

In addition to recognizing that the term "Legislature" refers to States' lawmaking function, the *Smiley* Court recognized the authority given by the Elections Clause "to provide a complete code for congressional elections."  *Id.* at 366.

Finally, in *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652 (2015), the Supreme Court considered a challenge to Arizona Proposition

106, which established the Arizona Independent Redistricting Commission ("AIRC") and removed the redistricting process wholly from the State's institutional legislature.

Proposition 106 was "[a]imed at 'ending the practice of gerrymandering and improving voter and candidate participation in elections.'"  135 S. Ct. at 2661 (citing Ariz. Const., Art. IV, pt. 2, § 1, ¶¶ 3–23).  As such, it "amended the Arizona Constitution to remove congressional redistricting authority from the state legislature, lodging that authority, instead, in a new entity, the AIRC."[15]  *Id.*

The Legislature argued that the AIRC deprives it of the "primary responsibility" for redistricting vested in it by the Elections Clause.  *Id.* at 2663.  After concluding that the Legislature, as a body, had standing, the Court turned to the merits.  *Id.* at 2663-66. The Court first acknowledged the holdings in *Hildebrant* and *Smiley*: "our precedent teaches that redistricting is a legislative function, to be performed in accordance with the State's prescriptions for lawmaking, which may include the referendum and the Governor's veto."  135 S. Ct. at 2668.  The Court discussed the meaning of "legislature"

---

[15] The AIRC "convenes after each census, establishes final district boundaries, and certifies the new districts to the Arizona Secretary of State."  135 S. Ct. at 2661.  The State Legislature has a defined and limited role, which includes making only non-binding recommendations and making the necessary appropriations for its members.  *Id.*  The AIRC is composed of five members, who each serve for one term.  *Id.*  Four of the five members are appointed by the ranking officer and minority leader of each chamber of the State Legislature.  *Id.*  However, they are chosen from a list compiled by Arizona's Commission on Appellate Court Appointments.  *Id.*  Moreover, elected representatives or candidates for office may not serve on the AIRC, and no more than two members of the Commission may be members of the same political party.  *Id.*  Finally, the fifth member, who is chosen by the other four, "cannot be registered with any party already represented on the Commission.  *Id.*  Members may be removed by the Governor "for gross misconduct, substantial neglect of duty, or inability to discharge the duties of office," but only upon concurrence of two-thirds of the Arizona Senate."  *Id.*

during the founding era, and concluded that it referred generally to "the power to make

laws." *Id.* at 2671.

The Court held that, because the Arizona Constitution put the people, through the

initiative process, on the same footing as their representative body, "the people may

delegate their legislative authority over redistricting to an independent commission just as

the representative body may choose to do." *Id.*  The Court explained:

> [T]he Elections Clause permits the people of Arizona to provide for
> redistricting by independent commission.  To restate the key question in this
> case, the issue centrally debated by the parties: Absent congressional
> authorization, does the Elections Clause preclude the people of Arizona from
> creating a commission operating independently of the state legislature to
> establish congressional districts?  The history and purpose of the Clause
> weigh heavily against such preclusion, as does the animating principle of our
> Constitution that the people themselves are the originating source of all the
> powers of government.

135 S. Ct. at 2671.  Turning to the history of the Elections Clause, the Court explained

that "[t]he dominant purpose of the Elections Clause, the historical record bears out, was

to empower Congress to override state election rules, not to restrict the way States enact

legislation." *Id.* at 2672.  The Court recognized the concern of the Framers that

politicians and factions within the States would "manipulate electoral rules . . . to

entrench themselves or place their interests over those of the electorate." *Id.*  And while

those concerns have "hardly lessened over time," remedies exist *in the hands of the*

*people:* "[t]he Elections Clause . . . is not reasonably read to disarm States from adopting

modes of legislation that place the lead rein in the people's hands."  135 S. Ct. at 2672

(internal citation omitted).  Emphasizing the role of *the people* in addressing Madison's

concerns, the Court concluded:

23

Both parts of the Elections Clause are in line with the fundamental premise that all political power flows from the people. *McCulloch v. Maryland*, 4 Wheat. 316, 404–405 (1819). So comprehended, the Clause *doubly empowers the people*. They may control the State's lawmaking processes in the first instance, as Arizona voters have done, and they may seek Congress' correction of regulations prescribed by state legislatures.

The people of Arizona turned to the initiative to curb the practice of gerrymandering and, thereby, to ensure that Members of Congress would have "an habitual recollection of their dependence on the people." The Federalist No. 57, at 350 (J. Madison). In so acting, Arizona voters sought to restore "the core principle of republican government," namely, "that the voters should choose their representatives, not the other way around." Berman, Managing Gerrymandering, 83 Texas L.Rev. 781 (2005). *The Elections Clause does not hinder that endeavor.*

135 S. Ct. at 2677 (emphasis added).

In summary, the Supreme Court's decision in *Arizona State Legislature*, together with *Hildebrant* and *Smiley*, demonstrate the Supreme Court's role in defining the basic structural features of the Elections Clause. However, nothing in the opinions suggests a role for the courts in "restrict[ing] the way States enact legislation." *Arizona State Legislature*, 135 S. Ct. at 2672. In fact, the Court recognized a limitation on how far it would go in considering Elections Clause challenges. In *Hildebrant*, the Court held that claims regarding Congress's ability to bless the state referendum system necessarily implicate the Guarantee Clause, and are therefore non-justiciable. 241 U.S. at 566.

## 2. Further Defining "Manner"

Beyond *Hildebrant*, *Smiley*, and *Arizona State Legislature*, the Supreme Court added important structural definition to the Elections Clause in *U.S. Term Limits, Inc., v. Thornton*, 514 U.S. 779 (1995), and *Cook v. Gralike*, 531 U.S. 510 (2001). In these cases, the Court made clear that state and Congressional power under the clause was

24

limited to *procedural* regulations.  It thus declined to recognize power under the Clause

for Arkansas and Missouri to effectuate term-limit regulations.

   *U.S. Term Limits, Inc. v. Thornton* concerned Arkansas State constitutional

Amendment 73, which prohibited "the name of an otherwise-eligible candidate for

Congress from appearing on the general election ballot if that candidate has already

served three terms in the House of Representatives or two terms in the Senate."  514 U.S.

at 783. The Arkansas Supreme Court struck down the Amendment on federal

constitutional grounds, holding that States possess "no authority to change, add to, or

diminish the requirements for congressional service enumerated in the Qualifications

Clauses."  *Id.* at 785 (internal quotation marks omitted).  The U.S. Supreme Court

affirmed, focusing largely on the Qualifications Clause, U.S. Const. Art. I, § 2, cl. 2.

   In addition to arguments raised under the Qualifications Clause, the Supreme

Court considered the alternative argument that Amendment 73 was a permissible exercise

of state power to regulate the "Times, Places and Manner of holding Elections."  514

U.S. 779, 828.  The petitioners argued that Amendment 73 "merely regulat[ed] the

'Manner' of elections, and that the amendment [was] therefore a permissible exercise of

state power under Article I, § 4, cl. 1."  *Id.* at 832.

   This argument, the Supreme Court recognized, required that Congress, too, would

be able to "make or alter" regulations such as Amendment 73.  *Id.*  The Court considered

it "unfathomable" that the Framers would have given Congress such authority:

> As our decision in *Powell* [*v. McCormack*, 395 U.S. 486 (1969),] and our
> discussion above make clear, the Framers were particularly concerned that a
> grant to Congress of the authority to set its own qualifications would lead

inevitably to congressional self-aggrandizement and the upsetting of the delicate constitutional balance. . . . We refuse to adopt an interpretation of the Elections Clause that would so cavalierly disregard what the Framers intended to be a fundamental constitutional safeguard.

Moreover, petitioners' broad construction of the Elections Clause is fundamentally inconsistent with the Framers' view of that Clause. The Framers intended the Elections Clause to grant States authority to create procedural regulations, not to provide States with license to exclude classes of candidates from federal office.

514 U.S. at 832–33.

The Court went on to discuss historical evidence of the "procedural focus of the Elections Clause":

During the Convention debates, for example, Madison illustrated the procedural focus of the Elections Clause by noting that it covered "[w]hether the electors should vote by ballot or vivâ voce, should assemble at this place or that place; should be divided into districts or all meet at one place, sh[oul]d all vote for all the representatives; or all in a district vote for a number allotted to the district."  2 Farrand 240.  Similarly, during the ratification debates, proponents of the Constitution noted: "[T]he power over the manner only enables them to determine *how* these electors shall elect—whether by ballot, or by vote, or by any other way."  4 Elliot's Debates 71 (Steele statement at North Carolina ratifying convention) (emphasis in original).

514 U.S. at 833.  According to the Court, "the Framers understood the Elections Clause as a grant of authority to issue procedural regulations, and not as a source of power to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints."  *Id.* at 833–34.  The Court proceeded to list numerous cases "interpreting state power under the Elections Clause" that reflected the same understanding:

The Elections Clause gives States authority "to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved."  *Smiley v.*

26

*Holm,* 285 U.S., at 366.  However, "[t]he power to regulate the time, place, and manner of elections does not justify, without more, the abridgment of fundamental rights." *Tashjian v. Republican Party of Conn.,* 479 U.S. 208, 217 (1986).  States are thus entitled to adopt "generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself." *Anderson v. Celebrezze,* 460 U.S. 780, 788, n. 9 (1983). . . .
In short, we have approved of state regulations designed to ensure that elections are "'fair and honest and . . . [that] some sort of order, rather than chaos, . . . accompan[ies] the democratic processes.'" *Burdick v. Takushi,* 504 U.S. [428, 433 (1992) (quoting *Storer v. Brown,* 415 U.S. 724, 730 (1974))].

514 U.S. at 834–35.  The Court then summarized:

> The provisions at issue in *Storer* and our other Elections Clause cases were thus constitutional because they regulated election *procedures* and did not even arguably impose any substantive qualification rendering a class of potential candidates ineligible for ballot position.  They served the state interest in protecting the integrity and regularity of the election process, an interest independent of any attempt to evade the constitutional prohibition against the imposition of additional qualifications for service in Congress.  And they did not involve measures that exclude candidates from the ballot without reference to the candidates' support in the electoral process.  Our cases upholding state regulations of election procedures thus provide little support for the contention that a state-imposed ballot access restriction is constitutional when it is undertaken for the twin goals of disadvantaging a particular class of candidates and evading the dictates of the Qualifications Clauses.

*Id.* at 835.

The Supreme Court emphasized in *Thornton* that regulations permissible under the Elections Clause are those meant to protect the integrity and regularity of the election process.  Yet the cases cited in *Thornton* as "interpreting state power under the Elections Clause" were all decided on First Amendment or Equal Protection grounds.  To be sure, the *Thornton* Court did not discuss those constitutional provisions.  Instead, it directly

considered and rejected the argument that the Elections Clause gave Arkansas power to enact a regulation that could not fairly be characterized as procedural.

This procedural-substantive distinction establishes that where a new regulation is clearly not procedural, the Court may find it *ultra vires* under the Elections Clause.  In so holding, the Court did not create a new avenue for policing the fairness of procedural regulations under the Elections Clause.

The second case to consider the constitutionality of a state regulation under the Elections Clause is *Cook v. Gralike*, 531 U.S. 510 (2001).  Responding to the Supreme Court's ruling in *Thornton*, "the voters of Missouri adopted in 1996 an amendment to Article VIII of their State Constitution designed to lead to the adoption of a specified 'Congressional Term Limits Amendment' to the Federal Constitution."  531 U.S. at 513. Apart from instructing members of the Missouri congressional delegation "'to use all of [their] delegated powers to pass the Congressional Term Limits Amendment' set forth in [Art. VIII, § 16, of the Missouri Constitution]," the amendment had three operative sections, meant to compel compliance:

> Section 17 [required] that the statement "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS" be printed on all primary and general [election] ballots adjacent to the name of a Senator or Representative who fail[ed] to take any one of eight legislative acts in support of the proposed amendment.  Section 18 provide[d] that the statement "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS" be printed on all primary and general election ballots next to the name of every nonincumbent congressional candidate who refuse[d] to take a "Term Limit" pledge that commit[ted] the candidate, if elected, to performing the legislative acts enumerated in § 17.  And § 19 direct[ed] the Missouri Secretary of State to determine and declare, pursuant to §§ 17 and 18, whether either statement should be printed alongside the name of each candidate for Congress.

28

531 U.S. at 514–15 (citing Mo. Const., Art. VIII).  Gralike, a candidate for Congress,

brought suit to enjoin enactment of the law.  The District Court held that Article VIII

contravened the Qualifications Clause, that it burdened Gralike's First Amendment right

against retaliation, and that it was an impermissible attempt by Missouri to contravene

Article V of the Constitution.  *Id.* at 516–17.  The Eighth Circuit affirmed, and the

Supreme Court granted certiorari.  *Id.* at 518.

As discussed above, the Supreme Court first considered whether the States have a

reserved right to instruct its representatives.  The Court held that "the means employed to

issue the instructions, ballots for congressional elections, are unacceptable unless Article

VIII is a permissible exercise of the State's power to regulate the manner of holding

elections for Senators and Representatives."  531 U.S. at 520.  Thus, the key question in

*Gralike* was whether the Elections Clause permitted such ballot labels.  The Court held it

did not.  While "the Elections Clause grants to the States 'broad power' to prescribe the

procedural mechanisms for holding congressional elections," 531 U.S. 510, 523 (2001)

(quoting *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986)), the Court

held that "Article VIII is not a procedural regulation."  *Id.*  It explained:

> It does not regulate the time of elections; it does not regulate the place of
> elections; nor, we believe, does it regulate the manner of elections.  As to the
> last point, Article VIII bears no relation to the "manner" of elections as we
> understand it, for in our commonsense view that term encompasses matters
> like "notices, registration, supervision of voting, protection of voters,
> prevention of fraud and corrupt practices, counting of votes, duties of
> inspectors and canvassers, and making and publication of election returns."
> *Smiley*, 285 U.S., at 366; *see also U.S. Term Limits, Inc. v. Thornton*, 514
> U.S., at 833.  In short, Article VIII is not among "the numerous requirements
> as to procedure and safeguards which experience shows are necessary in
> order to enforce the fundamental right involved," *Smiley*, 285 U.S., at 366,

ensuring that elections are "fair and honest," and that "some sort of order, rather than chaos, is to accompany the democratic process," *Storer v. Brown*, 415 U.S. 724, 730 (1974).

531 U.S. at 523–24.

Rather than regulate the manner of elections, the Court held that "Article VIII [was] plainly designed to favor candidates who are willing to support the particular form of a term limits amendment set forth in its text and to disfavor those who either oppose term limits entirely or would prefer a different proposal." *Id.* at 524.

The Supreme Court described the ballot labels as "the Scarlet Letter." *Id.* at 525. The pejorative label met voters' eyes at a critical moment, which led to a clear impact on outcomes:

> it seems clear that the adverse labels handicap candidates "at the most crucial stage in the election process—the instant before the vote is cast." *Anderson v. Martin*, 375 U.S. 399, 402 (1964). At the same time, "by directing the citizen's attention to the single consideration" of the candidates' fidelity to term limits, the labels imply that the issue "is an important—perhaps paramount—consideration in the citizen's choice, which may decisively influence the citizen to cast his ballot" against candidates branded as unfaithful. *Ibid.* While the precise damage the labels may exact on candidates is disputed between the parties, the labels surely place their targets at a political disadvantage to unmarked candidates for congressional office. Thus, far from regulating the procedural mechanisms of elections, Article VIII attempts to "dictate electoral outcomes." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S., at 833–834. Such "regulation" of congressional elections simply is not authorized by the Elections Clause.

531 U.S. 525–26.

Justice Kennedy filed a concurring opinion. He discussed the particular harm caused by regulations like the Missouri Amendment: "[i]f state enactments were allowed to condition or control certain actions of federal legislators, accountability would be

blurred, with the legislators having the excuse of saying that they did not act in the

exercise of their best judgment but simply in conformance with a state mandate."  531

U.S. at 528 (Kennedy, J., concurring).  He continued:

> if there are to be cases in which a close question exists regarding whether the
> State has exceeded its constitutional authority in attempting to influence
> congressional action, this case is not one of them.   In today's case the
> question is not close.  Here the State attempts to intrude upon the relationship
> between the people and their congressional delegates by seeking to control
> or confine the discretion of those delegates, and the interference is not
> permissible.

*Id.* at 530.

Chief Justice Rehnquist, joined by Justice O'Connor, concurred in the judgment,

stating that he would affirm on First Amendment grounds:  "I believe that Article VIII

violates the First Amendment right of a political candidate, once lawfully on the ballot, to

have his name appear unaccompanied by pejorative language required by the State."  531

U.S. at 530–31 (Rehnquist, C.J., concurring in the judgment).

The Supreme Court's language in *Gralike* is forceful regarding the limits of state

power under the Elections Clause.  The Court held in no uncertain terms that "Article

VIII is not a procedural regulation."  531 U.S. at 523.  However, *Thornton* and *Gralike*

both concerned newly enacted regulations that were *sui generis*.  They bore little relation

to other regulations, such as the regulations in *Storer* that, among other things, required

party disaffiliation before a candidate could run as an independent.   415 U.S. at 726-27.

As discussed above, procedural regulations are subject to scrutiny under the First

Amendment and the Equal Protection Clause.  *See, e.g.*, *Tashjian v. Republican Party of*

*Connecticut*, 479 U.S. 208 (1986) (holding that Connecticut's closed primary statute

impermissibly interfered with political party's First Amendment right to define its

associational boundaries); *Storer*, 415 U.S. 724 (upholding against an Equal Protection

challenge California's ballot access measures that, among other things, required party

disaffiliation before a candidate could run as an independent); *Williams v. Rhodes*, 393

U.S. 23 (1968) (holding Ohio election law that virtually prohibited third party candidates

from appearing on the ballot violated the Equal Protection Clause).  However, the

Supreme Court has never struck down necessary[16] procedural regulations under the

Elections Clause.

### c.      Justiciability

I turn next to the question of justiciability, specifically the political question

doctrine.  The Supreme Court has struggled over the years to determine its role in

regulating the inherently political business of elections, namely in the area of

redistricting.  A majority of the justices have found partisan gerrymandering claims under

the First Amendment and/or the Equal Protection Clause to be justiciable, but have yet to

agree on a standard.  The caselaw demonstrates two things:  the Court has never

---

[16] Redistricting schemes are necessary procedural regulations in that States with more than one representative are required by federal law to redistrict following every decennial census.  *See* 2 U.SC. § 2c (requiring single-member districts); *Reynolds v. Sims*, 377 U.S. 533, 568 (1964) (requiring equipopulous legislative districts).  State redistricting plans are thus necessary procedural regulations.  *See Arizona State Legislature*, 135 S. Ct. at 2678 (Roberts, C.J., dissenting) ("The Elections Clause both imposes a duty on States and assigns that duty to a particular state actor: In the absence of a valid congressional directive to the contrary, States must draw district lines for their federal representatives.").

suggested that the Elections Clause provides a workable standard for partisan

gerrymandering challenges.  Second, the standards proposed under the Equal Protection

Clause and the First Amendment set a high bar for Court intervention.  Plaintiffs' theory

uses the Elections Clause in a new manner, and one that skirts the high bar otherwise

contemplated for partisan gerrymandering claims.

  *Colegrove v. Green*, 328 U.S. 549 (1946), is an early example of the Supreme

Court staying its hand with respect to election regulations.  Voters from Illinois brought

suit alleging that the disparity in size of their congressional districts violated the

Constitution as well as the Reapportionment Act of 1911.  *Id.* at 550.  In denying relief,

the Supreme Court cited its inability to "remap" the State of Illinois.  It reasoned:

> The petitioners urge with great zeal that the conditions of which they
> complain are grave evils and offend public morality.  The Constitution of the
> United States gives ample power to provide against these evils.  But due
> regard for the Constitution as a viable system precludes judicial correction.
> Authority for dealing with such problems resides elsewhere.  Article I,
> section 4 of the Constitution provides that "The Times, Places and Manner
> of holding Elections for . . . Representative[s], shall be prescribed in each
> State by the Legislature thereof; but the Congress may at any time by Law
> make or alter such Regulations . . . ."  The short of it is that the Constitution
> has conferred upon Congress exclusive authority to secure fair representation
> by the States in the popular House and left to that House determination
> whether States have fulfilled their responsibility.  If Congress failed in
> exercising its powers, whereby standards of fairness are offended, the
> remedy ultimately lies with the people.  Whether Congress faithfully
> discharges its duty or not, the subject has been committed to the exclusive
> control of Congress.  An aspect of government from which the judiciary, in
> view of what is involved, has been excluded by the clear intention of the
> Constitution cannot be entered by the federal courts because Congress may
> have been in default in exacting from States obedience to its mandate.

*Id.* at 554.  The Court believed that "[t]o sustain th[e] action would cut very deep into the

very being of Congress" and suggested that "[c]ourts ought not to enter this political

thicket." *Id.* The Court declared that the remedy for the voters' alleged harm was a political one: "[t]he remedy for unfairness in districting is to secure State legislatures that will apportion properly, or to invoke the ample powers of Congress. The Constitution has many commands that are not enforceable by courts because they clearly fall outside the conditions and purposes that circumscribe judicial action." *Id.* The Court concluded by listing examples of other constitutional provisions that are without judicial remedy, including the demand to deliver a fugitive from a sister state, the duty to see that the laws are faithfully executed, and "[v]iolation of the great guaranty of a republican form of government in States." *Id.* at 556.

The reasoning of *Colegrove*, however, was stripped of its import years later in *Baker v. Carr*, 369 U.S. 186 (1962). The plaintiffs in *Baker* brought an Equal Protection challenge to the apportionment[17] of the Tennessee General Assembly's districts. *Id.* at

---

[17] It bears noting that the term "apportionment" is used interchangeably to refer to both the allotment of congressional representatives among the states and the allotment of population among congressional districts within a state (also termed "reapportionment" or more appropriately, "redistricting."). *See* Apportionment, Black's Law Dictionary (10th ed. 2014) (using term interchangeably); Reapportionment, Black's Law Dictionary (10th ed. 2014) (defining term as "[r]ealignment of a legislative district's boundaries to reflect changes in population and ensure proportionate representation by elected officials . . . [a]lso termed redistricting.").

The Supreme Court has used the term "apportionment" with reference to both the allotment of congressional representatives among the states, *see Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (challenge to Congress' method for tabulating state population, declaring that "[c]onstitutional challenges to apportionment are justiciable."), the allotment of population among both state legislative and federal congressional districts, *see Wesberry v. Sanders*, 376 U.S. 1, 4 (1964); *Reynolds*, 377 U.S. at 537, and in the context of partisan gerrymandering claims, *Shapiro*, 136 S. Ct. at 454.

As discussed below, one must avoid concluding that general pronouncements about the justiciability of "apportionment" cases apply, *a fortiori*, to partisan

188.  The apportionment map, first enacted in 1901, remained in effect in 1961, despite

"substantial growth and redistribution of [the State's population]."  *Id.* at 192.  Plaintiffs

alleged that the state map "arbitrarily and capriciously apportioned representatives," yet

the District Court, relying on *Colegrove*, held that it lacked subject matter jurisdiction

over the suit.  *Id.* at 192, 197, 202.  The Supreme Court distinguished the political

question doctrine from subject matter jurisdiction.  *Id.* at 202.  It held that the District

Court possessed subject matter jurisdiction, that the case was not a non-justiciable

political question, and remanded.  *Id.* at 237.

In so ruling, the Supreme Court undertook to explain the political question

doctrine, laying out the possible formulations as follows:

> Prominent on the surface of any case held to involve a political question is
> found a textually demonstrable constitutional commitment of the issue to a
> coordinate political department; or a lack of judicially discoverable and
> manageable standards for resolving it; or the impossibility of deciding
> without an initial policy determination of a kind clearly for nonjudicial
> discretion; or the impossibility of a court's undertaking independent
> resolution without expressing lack of the respect due coordinate branches of
> government; or an unusual need for unquestioning adherence to a political
> decision already made; or the potentiality of embarrassment from
> multifarious pronouncements by various departments on one question.

369 U.S. at 217.

The *Baker* Court suggested that *Smiley,* discussed *supra*, along with its

companion cases *Koenig v. Flynn*, 285 U.S. 375 (1932), and *Carroll v. Becker*, 285 U.S.

380 (1932) "settled the issue in favor of justiciability of questions of congressional

---

gerrymandering claims.  For example, Justice O'Connor in *Franklin* stated plainly that
constitutional challenges to apportionment are justiciable, despite her belief to the
contrary in *Bandemer* and *Vieth* regarding partisan gerrymandering claims.

redistricting."  369 U.S. at 232.  However, *Baker* was not directly applicable to the

Elections Clause.  It involved a state apportionment scheme, meaning its language is only

controlling so far as it was adopted by later cases dealing with congressional

apportionment.

Two years after *Baker* was decided, the Supreme Court made clear that *Colegrove*

was a dead letter in *Wesberry v. Sanders*, 376 U.S. 1, 7 (1964).  *Wesberry* concerned the

population equality of Georgia's congressional districts.  The Court reasoned:

> Th[e] statement in *Baker*, which referred to our past decisions holding congressional apportionment cases to be justiciable, we believe was wholly correct and we adhere to it.  Mr. Justice Frankfurter's *Colegrove* opinion contended that Art. I, § 4, of the Constitution had given Congress 'exclusive authority' to protect the right of citizens to vote for Congressmen, but we made it clear in *Baker* that nothing in the language of that article gives support to a construction that would immunize state congressional apportionment laws which debase a citizen's right to vote from the power of courts to protect the constitutional rights of individuals from legislative destruction, a power recognized at least since our decision in *Marbury v. Madison*, 1 Cranch 137, in 1803.  *Cf. Gibbons v. Ogden*, 9 Wheat. 1.  The right to vote is too important in our free society to be stripped of judicial protection by such an interpretation of Article I.  This dismissal can no more be justified on the ground of 'want of equity' than on the ground of 'non-justiciability.'  We therefore hold that the District Court erred in dismissing the complaint.

376 U.S. at 6–7.  Finding the case justiciable, the Court remanded in light of the

population inequality among congressional districts, suggesting that "one person, one

vote" was required.  *Id.* at 18.  Importantly, while *Wesberry* held that the Elections

Clause does not immunize state congressional apportionment laws from judicial

protection, it did not suggest that the Elections Clause was a source of the right.  Instead,

the Court read a "one person, one vote" requirement into Art. I, § 2, and remanded the case on that basis. *Id.* at 17–18.

The same year that *Wesberry* was decided, the Supreme Court cemented the one person, one vote principle, as a requirement under the Equal Protection Clause, for state legislative districts. The case, *Reynolds v. Sims*, 377 U.S. 533, 537 (1964), was an action challenging the apportionment of the Alabama State Legislature. The Court explained that it had "indicated in *Baker* . . . that the Equal Protection Clause provides discoverable and manageable standards for use by lower courts in determining the constitutionality of a state legislative apportionment scheme." *Id.* at 557. *Reynolds*, like *Baker* before it, has no direct bearing on the Elections Clause, as its subject matter was the apportionment of a state legislature.

Despite the Supreme Court's pronouncements in *Baker* and *Reynolds* about the justiciability of state apportionment cases, the Court considered the issue anew when faced with a partisan gerrymandering claim in *Davis v. Bandemer*, 478 U.S. 109 (1986). *Bandemer* was a challenge to Indiana's state legislative apportionment on partisan gerrymandering grounds rather than on population equality grounds. *Id.* at 113. Democrats filed suit "alleging that the 1981 reapportionment plans constituted a political gerrymander intended to disadvantage Democrats." *Id.* at 114. The Court began by discussing justiciability. *Id.* at 118. [18] It acknowledged *Baker* and *Reynolds* as establishing the justiciability of population equality cases, but proceeded to survey the

---

[18] While the lead opinion is a plurality opinion by Justice White, Section II, which discusses justiciability, is designated as the opinion of the Court. 478 U.S. at 113.

Court's willingness to consider elections cases, including racial gerrymandering cases

and those concerning multi-member legislative districts. *Id.* at 118–21. The Court did

not base its determination on these past cases, other than to hew towards the *Baker*

analysis. It quoted *Baker,* noting that

> [j]udicial standards under the Equal Protection Clause are well developed
> and familiar, and it has been open to courts since the enactment of the
> Fourteenth Amendment to determine, if on the particular facts they must, that
> a discrimination reflects no policy, but simply arbitrary and capricious
> action.

478 U.S. at 122 (1986) (quoting *Baker*, 369 U.S. at 226). The Court also held that

"[d]isposition of this question *does not involve us in a matter more properly decided by a*

*coequal branch of our Government*," *id.* (emphasis added), that "[t]here is no risk of

foreign or domestic disturbance" and "in light of our cases since *Baker* we are not

persuaded that there are no judicially discernible and manageable standards by which

political gerrymander cases are to be decided." *Id.*

Despite deciding that the claim was justiciable, the Court entered judgment against

the plaintiffs. *Id.* at 143. The test proposed by the plurality required a showing of both

discriminatory intent and discriminatory effects. *Id.* at 127 ("[I]n order to succeed the

[plaintiffs are] required to prove both intentional discrimination against an identifiable

political group and an actual discriminatory effect on that group."). The plurality

reasoned that the plaintiffs had not met the threshold showing of adverse effects, which

they described as evidence that "the electoral system is arranged in a manner that will

consistently degrade a voter's or a group of voters' influence on the political process as a

whole." *Id.* at 132.  The plaintiffs relied on the results of a single election, which the plurality said was "unsatisfactory." *Id.* at 135.

Chief Justice Burger, in a brief opinion concurring in the judgment, advocated for political solutions brought about by the will of the voters.  He reasoned: "In my view, the Framers of the Constitution envisioned quite a different scheme.  They placed responsibility for correction of such flaws in the people, relying on them to influence their elected representatives."  478 U.S. at 144 (Burger, C.J., concurring in the judgment). He continued with a quote from Justice Frankfurter's *Baker* dissent, arguing that: "[i]n a democratic society like ours, relief must come through an aroused popular conscience that sears the conscience of the people's representatives." *Id.* (quoting *Baker*, 369 U.S. at 270 (Frankfurter, J., dissenting)).

Justice O'Connor, joined by Chief Justice Burger and then-Justice Rehnquist, also disagreed with the plurality's justiciability holding.  According to Justice O'Connor, "[n]othing in [Supreme Court] precedents compels us to take this step, and there is every reason not to do so." 478 U.S. at 144 (O'Connor, J., concurring in the judgment).  Justice O'Connor continued: "I do not believe, and the Court offers not a shred of evidence to suggest, that the Framers of the Constitution intended the judicial power to encompass the making of such fundamental choices about how this Nation is to be governed." *Id.* at 145.  Justice O'Connor warned of the dangers of opening the door to political gerrymandering claims:

> Federal courts will have no alternative but to attempt to recreate the complex process of legislative apportionment in the context of adversary litigation in order to reconcile the competing claims of political, religious, ethnic, racial,

39

occupational, and socioeconomic groups. Even if there were some way of limiting such claims to organized political parties, the fact remains that the losing party or the losing group of legislators in every reapportionment will now be invited to fight the battle anew in federal court. Apportionment is so important to legislators and political parties that the burden of proof the plurality places on political gerrymandering plaintiffs is unlikely to deter the routine lodging of such complaints. Notwithstanding the plurality's threshold requirement of discriminatory effects, the Court's holding that political gerrymandering claims are justiciable has opened the door to pervasive and unwarranted judicial superintendence of the legislative task of apportionment. There is simply no clear stopping point to prevent the gradual evolution of a requirement of roughly proportional representation for every cohesive political group.

478 U.S. at 147. Justice O'Connor also suggested that the Court's holding required

initial policy determinations. For example, she believed the plurality's reasoning meant

that "it is constitutionally acceptable for both parties to 'waste' the votes of individuals

through a bipartisan gerrymander, so long as the parties themselves are not deprived of

their group voting strength to an extent that will exceed the plurality's threshold

requirement." *Id.* at 155. Justice O'Connor believed that "[t]his choice confers greater

rights on powerful political groups than on individuals; that cannot be the meaning of the

Equal Protection Clause." *Id.* She also distinguished racial gerrymandering cases, noting

that "[v]ote dilution analysis is far less manageable when extended to major political

parties than if confined to racial minority groups" and that "while membership in a racial

group is an immutable characteristic, voters can—and often do—move from one party to

the other or support candidates from both parties." *Id.* at 156.

Justice Powell filed an opinion concurring in part and dissenting in part, joined by

Justice Stevens. 478 U.S. at 161. He agreed with the plurality "that a partisan political

gerrymander violates the Equal Protection Clause only on proof of 'both intentional

discrimination against an identifiable political group and an actual discriminatory effect on that group.'" *Id.* at 161 (quoting plurality opinion at 127). However, he criticized the plurality's focus on vote dilution, specifically its reliance on the one person, one vote principle. *Id.* at 162. Justice Powell proposed that a number of other relevant factors should be considered including "the shapes of voting districts and adherence to established political subdivision boundaries" as well as "the nature of the legislative procedures by which the apportionment law was adopted and legislative history reflecting contemporaneous legislative goals." *Id.* at 173. "To make out a case of unconstitutional partisan gerrymandering, the plaintiff should be required to offer proof concerning these factors, which bear directly on the fairness of a redistricting plan, as well as evidence concerning population disparities and statistics tending to show vote dilution. No one factor should be dispositive." *Id.*

Reconsidering the issue eighteen years later, the Court splintered again in *Vieth v. Jubelirer*, 541 U.S. 267 (2004). A four Justice plurality, led by Justice Scalia and including Justice O'Connor, believed that all partisan gerrymandering claims should be non-justiciable. *Vieth* involved a challenge to the 2002 Pennsylvania congressional map. *Id.* at 272. Justice Scalia suggested that "[p]olitical gerrymanders are not new to the American scene," and that "[i]t is significant that the Framers provided a remedy for such practices in the Constitution." *Id.* at 274. He continued: "Article I, § 4, while leaving in state legislatures the initial power to draw districts for federal elections, permitted Congress to 'make or alter' those districts if it wished." *Id.* at 275. Justice Scalia surveyed the history of the Elections Clause and Congress's action thereunder, and noted:

41

> As Chief Justice Marshall proclaimed two centuries ago, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 1 Cranch 137, 177 (1803). Sometimes, however, the law is that the judicial department has no business entertaining the claim of unlawfulness—because the question is entrusted to one of the political branches or involves no judicially enforceable rights. *See, e.g., Nixon v. United States*, 506 U.S. 224 (1993) (challenge to procedures used in Senate impeachment proceedings); *Pacific States Telephone & Telegraph Co. v. Oregon*, 223 U.S. 118 (1912) (claims arising under the Guaranty Clause of Article IV, § 4). Such questions are said to be "nonjusticiable," or "political questions."

541 U.S. at 277. Justice Scalia believed that the passage of eighteen years since *Bandemer*, "with nothing to show for it," warranted revisiting the question of justiciability. *Id.* at 281. His plurality opinion concluded: "neither Article I, § 2, nor the Equal Protection Clause, nor (what appellants only fleetingly invoke) Article I, § 4, provides a judicially enforceable limit on the political considerations that the States and Congress may take into account when districting." *Id.* at 305.

Justice Kennedy, concurring in the judgment, counseled caution in entering the realm of political gerrymandering, but stated that he would not foreclose the possibility of a workable standard. "A decision ordering the correction of all election district lines drawn for partisan reasons would commit federal and state courts to unprecedented intervention in the American political process. The Court is correct to refrain from directing this substantial intrusion into the Nation's political life." 541 U.S. at 306 (Kennedy, J., concurring in the judgment).

According to Justice Kennedy:

> When presented with a claim of injury from partisan gerrymandering, courts confront two obstacles. First is the lack of comprehensive and neutral principles for drawing electoral boundaries. No substantive definition of

42

> fairness in districting seems to command general assent.  Second is the
> absence of rules to limit and confine judicial intervention.  With uncertain
> limits, intervening courts—even when proceeding with best intentions—
> would risk assuming political, not legal, responsibility for a process that often
> produces ill will and distrust.

541 U.S. at 306–07.  Justice Kennedy acknowledged that the goal of districting is "to

establish fair and effective representation for all citizens" but that the lack of any "agreed

upon model of fair and effective representation makes this analysis difficult to prove."

*Id.* at 307.  He stated that "manageable standards for measuring [the burden on

representational rights] are critical to [the Court's] intervention."  *Id.* at 308.

Notably, Justice Kennedy pointed to plaintiffs-appellants' fairness principle "that a

majority of voters in the Commonwealth should be able to elect a majority of the

Commonwealth's congressional delegation."  *Id.*  According to him, "there is no

authority for this precept."  *Id.*  And with respect to "neutral" districting criteria, such as

contiguity and compactness, Justice Kennedy noted that they "are not altogether sound as

independent judicial standards for measuring the burden on representational rights."  *Id.*

at 308.  These purportedly neutral criteria, Justice Kennedy recognized:

> cannot promise political neutrality when used as the basis for relief.  Instead,
> it seems, a decision under these standards would unavoidably have
> significant political effect, whether intended or not.  For example, if we were
> to demand that congressional districts take a particular shape, we could not
> assure the parties that this criterion, neutral enough on its face, would not in
> fact benefit one political party over another.  *See Gaffney* [*v. Cummings*, 412
> U.S. 735, 753 (1973)] ("District lines are rarely neutral phenomena.  They
> can well determine what district will be predominantly Democratic or
> predominantly Republican, or make a close race likely"); *see also* R. Bork,
> The Tempting of America: The Political Seduction of the Law 88–89 (1990)
> (documenting the author's service as a special master responsible for
> redistricting Connecticut and noting that his final plan so benefited the
> Democratic Party, albeit unintentionally, that the party chairman personally

43

congratulated him); M. Altman, Modeling the Effect of Mandatory District Compactness on Partisan Gerrymanders, 17 Pol. Geography 989, 1000–1006 (1998) (explaining that compactness standards help Republicans because Democrats are more likely to live in high density regions).

541 U.S. at 308–09.

Justice Kennedy proceeded to counsel patience in the search for a manageable standard. *Id.* at 310.  He noted that the Fourteenth Amendment presently governs, but suggested that First Amendment principles may be better suited for a manageable test. *Id.* at 313–16.

Four justices dissented.  They proposed narrow standards for partisan gerrymandering claims, meant to prevent the opening of a floodgate.  *See, e.g.*, 541 U.S. at 318 (Stevens, J., dissenting) ("I would decide this case on a narrow ground.  Plaintiffs-appellants urge us to craft new rules that in effect would authorize judicial review of statewide election results to protect the democratic process from a transient majority's abuse of its power to define voting districts.  I agree with the plurality's refusal to undertake that ambitious project."); 541 U.S. at 347 (Souter, J., dissenting, joined by Ginsburg, J.) (proposing single-district, five-element burden-shifting test); 541 U.S. at 356 (Breyer, J, dissenting) (acknowledging that "pure politics often helps to secure constitutionally important democratic objectives" but suggesting that claims may proceed where a "purely political" plan "fail[s] to advance any plausible democratic objective").

Specifically, Justice Stevens suggested adoption of the racial-gerrymandering rationale, permitting district-specific challenges wherein it can be shown that partisanship was the predominant factor in drawing a district line.  541 U.S. at 332–339.  (Stevens, J.,

44

dissenting) ("In sum, in evaluating a challenge to a specific district, I would apply the standard set forth in the *Shaw* cases and ask whether the legislature allowed partisan considerations to dominate and control the lines drawn, forsaking all neutral principles.").

Justice Souter proposed "start[ing] anew" with a burden-shifting framework similar to that in the employment discrimination context. 541 U.S. at 346 (Souter, J., dissenting) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). His approach "would require the plaintiff to make out a prima facie case with five elements." *Id.* at 347. First, he would need to show that he belonged to a "cohesive political group." *Id.* Second, "a plaintiff would need to show that the district of his residence . . . paid little or no heed to those traditional districting principles whose disregard can be shown straightforwardly: contiguity, compactness, respect for political subdivisions, and conformity with geographic features like rivers and mountains." *Id.* at 347–48 (citation omitted). Third, "the plaintiff would need to establish specific correlations between the district's deviations from traditional districting principles and the distribution of the population of his group." *Id.* at 349. Fourth, "a plaintiff would need to present the court with a hypothetical district including his residence, one in which the proportion of the plaintiff's group was lower (in a packing claim) or higher (in a cracking one) and which at the same time deviated less from traditional districting principles than the actual district." *Id.* Finally, "the plaintiff would have to show that the defendants acted intentionally to manipulate the shape of the district in order to pack or crack his group." *Id.* at 350.

If a plaintiff could make the *prima facie* case, Justice Souter's approach would shift the burden to the defendants. They would then need to "justify their decision by reference to objectives other than naked partisan advantage." *Id.* at 351. For example, "[t]hey might show by rebuttal evidence that districting objectives could not be served by the plaintiff's hypothetical district better than by the district as drawn, or they might affirmatively establish legitimate objectives better served by the lines drawn than by the plaintiff's hypothetical." *Id.*

Justice Breyer had a different view. He explained that "[t]he use of purely political boundary-drawing factors, even where harmful to the members of one party, will often nonetheless find justification in other desirable democratic ends, such as maintaining relatively stable legislatures in which a minority party retains significant representation." 541 U.S. at 360 (Breyer, J., dissenting). He proposed that relief would be warranted only where, for example, the "*unjustified* use of political factors to entrench a minority in power" could be shown. *Id.* Justice Breyer explained: "by entrenchment I mean a situation in which a party that enjoys only minority support among the populace has nonetheless contrived to take, and hold, legislative power. By *unjustified* entrenchment I mean that the minority's hold on power is purely the result of partisan manipulation and not other factors." *Id.* Justice Breyer concluded that, while the political process can often provide a remedy for abuse of the redistricting process, "where partisan considerations render the traditional district-drawing compromises irrelevant" and "where no justification other than party advantage can be found . . . . [t]he risk of

harm to basic democratic principle[s] is serious; identification is possible; and remedies can be found." *Id.* at 367.

The justices in *Vieth* made virtually no mention of the Elections Clause as the textual source of a manageable standard. Plaintiffs-appellants provided only limited reference to the Clause in their briefing. *See, e.g.,* Brief for Appellants at 25–27, *Vieth*, 541 U.S. 267 (No. 02-1580), 2003 WL 22070244 at *25–*27 (citing *Smiley*, *Thornton*, and *Gralike* as interpreting "Times, Places, and Manner" to permit only procedural regulations). And Justice Scalia termed plaintiffs-appellants invocation of the Clause "fleeting," bluntly stating that the Clause contains no "judicially enforceable limit" for political considerations in redistricting. 541 U.S. at 305 (plurality). Neither Justice Kennedy nor the dissenting justices stated otherwise. Justice Stevens mentioned in a footnote that the Court's Elections Clause decisions in *Thornton* and *Gralike* "buttressed" the "requirement of governmental neutrality" in election regulations, but he went no further in discussing the Clause's applicability to redistricting claims. 541 U.S. at 333 n.26 (Stevens, J., dissenting).

Following *Bandemer* and *Vieth,* the Supreme Court was again presented with a partisan gerrymandering challenge in *League of United Latin American Citizens v. Perry* (*"LULAC"*), 548 U.S. 399 (2006). *LULAC* was an amalgamation of four consolidated cases challenging Texas' 2003 congressional apportionment statute. *Id.* at 409. The plaintiffs alleged that the Texas Legislature's sole intent in crafting the mid-decade plan was partisan advantage, thereby rendering the plan presumptively unconstitutional as a violation of the First Amendment. *Id.* at 416-17. The Court rejected this theory. And the

discussion of partisan gerrymandering within Section II A of Justice Kennedy's opinion

commanded a majority.  It stated:

> Based on two similar theories that address the mid-decade character of the 2003 redistricting, appellants now argue that Plan 1374C should be invalidated as an unconstitutional partisan gerrymander. In *Davis v. Bandemer*, 478 U.S. 109 (1986), the Court held that an equal protection challenge to a political gerrymander presents a justiciable case or controversy, *id.*, at 118–127, but there was disagreement over what substantive standard to apply.  *Compare id.*, at 127–137 (plurality opinion), with *id.*, at 161–162 (Powell, J., concurring in part and dissenting in part). That disagreement persists.  A plurality of the Court in *Vieth* would have held such challenges to be nonjusticiable political questions, but a majority declined to do so. . . .  We do not revisit the justiciability holding but do proceed to examine whether appellants' claims offer the Court a manageable, reliable measure of fairness for determining whether a partisan gerrymander violates the Constitution.

548 U.S. at 413–14.  Writing for himself, Justice Kennedy went on to recognize that Art.

I, § 4, "leaves with the States primary responsibility for apportionment of their federal

congressional . . . districts."  *Id.* at 414 (quoting *Growe v. Emison*, 507 U.S. 25, 34

(1993)).  He added that "Congress, as the text of the Constitution also provides, may set

further requirements, and with respect to districting it has generally required single-

member districts."  *Id.*

Justice Kennedy identified the limited but important role for the courts in

protecting voting rights by stating that the appellants' case for adopting their test "is not

convincing."  *Id.* at 417.  He suggested that the simplicity of the proposed test was in part

its downfall.  "A successful claim attempting to identify unconstitutional acts of partisan

gerrymandering must do what appellants' sole-motivation theory explicitly disavows:

48

show a burden, as measured by a reliable standard, on the complainants' representational rights." *Id.* at 418.

In dissent, Justice Stevens proposed a narrow test for partisan gerrymandering claims, requiring both purpose and effect: "First, to have standing to challenge a district as an unconstitutional partisan gerrymander, a plaintiff would have to prove that he is either a candidate or a voter who resided in a district that was changed by a new districting plan." 548 U.S. at 475 (Stevens, J., dissenting). Second, regarding purpose, "if a plaintiff carried her burden of demonstrating that redistricters subordinated neutral districting principles to political considerations and that their predominant motive was to maximize one party's power, she would satisfy the intent prong of the constitutional inquiry." *Id.* at 475–76. Third, regarding effects, "a plaintiff would be required to demonstrate the following three facts: (1) her candidate of choice won election under the old plan; (2) her residence is now in a district that is a safe seat for the opposite party; and (3) her new district is less compact than the old district." *Id.* at 476. Justice Stevens explained:

> [t]he first two prongs of this effects inquiry would be designed to measure whether or not the plaintiff has been harmed, whereas the third prong would be relevant because the shape of the gerrymander has always provided crucial evidence of its character. . . . Moreover, a safe harbor for more compact districts would allow a newly elected majority to eliminate a prior partisan gerrymander without fear of liability or even the need to devote resources to litigating whether or not the legislature had acted with an impermissible intent.

*Id.*

The foregoing cases, culminating with *LULAC*, are informative.  Yet they fail to instruct on whether partisan gerrymandering claims are cognizable under the bare Elections Clause.  What those cases do tell us is that the route the Court has established for partisan gerrymandering claims is a narrow one, and that route remains a work in progress.  No precise test has been agreed upon.  Plaintiffs wish to avoid that route.  Rather than offer a narrow, workable test under the First Amendment or the Equal Protection Clause, Plaintiffs pursue a heretofore unexplored pathway: the Elections Clause.  Moreover, they expect this new pathway will lead to what I consider an extremely remote and perhaps unreachable destination: the complete elimination of partisan consideration in congressional redistricting.  In my view, as explained below, the judiciary is ill-equipped and unqualified to tread this pathway.  The sought after destination—structural change in the creation of electoral regulations—can be reached only through the legitimate functioning of the political process.

## IV.    Analysis

The Constitution places the duty of crafting election regulations primarily in the hands of the people.  The Supreme Court has expressed its intention to respect that prudent choice, especially when it comes to partisan gerrymandering.  The Court has endeavored to find a manageable standard for such claims, one that will allow it to identify the extreme cases and act only where a clear showing is made that a citizen's right to vote has been intentionally and meaningfully infringed.  No such standard is

contained within the Elections Clause, as shown by its text, its history, and the Supreme

Court's past reliance on other constitutional provisions to protect the right to vote.[19]

> **a.     The Method of Creating Election Regulations is Textually Committed to Congress.**

As the jurisprudence demonstrates, the Supreme Court has assumed a limited role

in protecting the right to vote.  For example, in *Hildebrant*, the Supreme Court laid out

the parameters of state power under the Elections Clause, but found that a claim

necessarily relying on the Guarantee Clause was non-justiciable.  241 U.S. at 569 (citing

*Pac. States Tel. & Tel. Co.*, 223 U.S. 118).  The Supreme Court has long recognized that

claims under Art. IV, § 4, of the Constitution, which provides that "The United States

shall guarantee to every State in this Union a Republican Form of Government, and shall

protect each of them against Invasion; and on Application of the Legislature, or of the

Executive (when the Legislature cannot be convened), against domestic Violence," are

---

[19] The recent opinion of the United States District Court for the Middle District of North Carolina reaches a different conclusion regarding the justiciability of partisan gerrymandering claims under the Elections Clause.  *Rucho*, slip op at 178.  Nothing in that opinion changes my view.  The majority opinion does not rely primarily on the Elections Clause.  In fact, it acknowledges that if Article I tolerates partisan consideration—which I believe it must in light of the assignment to political actors—then recourse for protecting the right to vote lies in the First Amendment and the Fourteenth Amendment's Equal Protection Clause.  Slip op. at 61.  My opinion likewise acknowledges the recourse available to voters under those provisions.

Judge Osteen's separate opinion in *Rucho* prefers the Elections Clause as the basis for relief, and sets a very high bar: "objectively identifiable facts that . . . partisan considerations dictated the outcome of an election."  *Rucho*, slip op at 204 n.43 (Osteen, J., concurring in part and dissenting in part) (citing *Gralike*, 531 U.S. 510, and *Thornton*, 514 U.S. 779).  Yet his conclusion is based on the admissions of the map drawers rather than the "complex factual analysis" that might otherwise be required under his test.  *Id.* at 199-200, 204-05.

"not cognizable by the judicial power, but solely committed by the Constitution to the judgment of Congress." *Pac. States Tel. & Tel. Co.*, 223 U.S. at 133.  The Court thus declined to consider challenges under the Elections Clause that necessarily relied on such a claim.

Aside from the Guarantee Clause, the Supreme Court has determined that the Senate's power to "try" all impeachments is committed entirely to the Senate's discretion.  In *Nixon v. United States*, 506 U.S. 224, 226 (1993), the petitioner, a former Chief United States District Judge, challenged Senate Rule XI, which permitted a committee of Senators to hear evidence against an individual who has been impeached. The rule provided that the committee would issue a report on the evidence for consideration by the full Senate.  *Id.*  Nixon argued that Rule XI violated Art. I, § 3, cl. 6, of the Constitution, which provides in part that "[t]he Senate shall have the sole power to try impeachments."  *Id.* at 226–29.  He argued that the word "try" "impose[d] by implication an additional requirement on the Senate in that the proceedings must be in the nature of a judicial trial. . . . [which] precludes the Senate from delegating to a select committee the task of hearing the testimony of witnesses. . . ."  *Id.* at 229.  The District Court, along with the Court of Appeals, held the matter to be a non-justiciable political question, and the Supreme Court agreed.  *Id.* at 226, 228.

Discussing the text, the Supreme Court noted the significance of the word "sole," which appears only twice in the Constitution, with the other instance being the grant of impeachment power to the House of Representatives.  *Id.* at 230–31.  The Supreme Court noted that the impeachment power is the only check on the judiciary, and to allow

52

judicial involvement, even for the limited purpose of judicial review, would "eviscerate the important constitutional check placed on the Judiciary by the Framers." *Id.* at 235. The Court concluded that while "courts possess power to review either legislation or executive action that transgresses *identifiable textual limits.* . . . [T]he word 'try' in the Impeachment Trial Clause does not provide an identifiable textual limit on the authority which is committed to the Senate." *Id.* at 237–38.

Such is the case here. The process for crafting procedural regulations is textually committed to state legislatures and to Congress. As the history discussed above demonstrates, the Framers decided that the States would have broad discretion in choosing the manner in which elections would be held. Yet, fearful of abuse, the Framers installed a check on that power. As the text of the Elections Clause makes clear, that check is action by Congress. "Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department . . . ." *Baker*, 369 U.S. at 217. There is no dispute that the Framers gave Congress direct authority to make or alter regulations for the manner of electing congressional representatives. "The dominant purpose of the Elections Clause, the historical record bears out, was to empower Congress to override state election rules . . . ." A*rizona State Legislature*, 135 S. Ct. at 2672. The textual commitment to Congress is clear. While the States shall prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," "the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1. Moreover, "the lack of judicially manageable

standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch." *Nixon*, 506 U.S. at 228–29. As discussed below, the Elections Clause itself contains no manageable standard for the Court to evaluate the procedures for drawing district lines or for policing the level of *political* consideration.

This does not mean that courts have no role in checking state and congressional enactments for compliance with other constitutional guarantees. There is no incongruence in holding that checking State electoral regulations for fairness under the Elections Clause is committed to Congress, but that the courts may define the structure of the Clause and may enforce limits on state action through other constitutional provisions.

*Powell v. McCormack*, 395 U.S. 486 (1969), suggests such a derivation of duty. In *Powell*, the Supreme Court considered whether Congress's power to judge the qualifications of its own members as provided by Art. I, § 5, cl. 1, vested in Congress the sole discretionary power to deny membership by a majority vote. Under Congress's theory, their power to deny membership by a majority vote was unreviewable by the Court—a political question. The Court disagreed. It held that the term "qualifications" referred to those set forth in Art. I, § 2, *id.* at 489, and that the Clause, at most, represented "a 'textually demonstrable commitment' to Congress to judge only the qualifications expressly set forth in the Constitution." *Id*. at 548.

The Court in *Powell* did not leave to Congress the right to define the term "qualifications." However, it did suggest that the actual judging of those qualifications was committed to Congress. In like manner, the Court may define "legislature" and "Times, Places, and Manner" but it leaves the actual mechanics of election regulations to

the States, Congress, and the people, subject to the constraints of the First Amendment and the Equal Protection Clause.

> **b.     The Elections Clause Provides No Judicially Manageable Standard for Policing Procedural Fairness.**

Plaintiffs contend that the neutrality requirement that the Supreme Court has used to describe state power under the Elections Clause is a manageable standard for courts to use in scrutinizing redistricting schemes.  Yet the Supreme Court has never said as much, and has indeed struggled to find a manageable standard even under the Equal Protection Clause and the First Amendment.

The Court in *Nixon* recognized the lack of an "identifiable textual limit" in the Impeachment Trial Clause.  506 U.S. at 228.  The same can be said of the Elections Clause.  Vesting in political bodies the power to prescribe regulations as to "Times, Places and Manner" hardly suggests any inherent restraint, nor does it provide any guidance on what motivations are germane to the process.  "Legislators are, after all, politicians; it is unrealistic to attempt to proscribe all political considerations in the essentially political process of redistricting."  *Karcher v. Daggett*, 462 U.S. 725, 753 (1983) (Stevens, J., concurring).  Moreover, redistricting is a zero-sum game.  Every line drawn will inevitably be to the favor or disfavor of some group or some interest.  As the plurality recognized in *Vieth*:

> The Constitution clearly contemplates districting by political entities, *see* Article I, § 4, and unsurprisingly that turns out to be root-and-branch a matter of politics. *See Miller*, [515 U.S. 900, 914 (1995)] ("[R]edistricting in most cases will implicate a political calculus in which various interests compete for recognition . . . "); *Shaw*, [509 U.S. 630, 662 (1993)] (White, J., dissenting) ("[D]istricting inevitably is the expression of interest group

> politics ..."); *Gaffney v. Cummings*, 412 U.S. 735, 753 (1973) ("The reality
> is that districting inevitably has and is intended to have substantial political
> consequences").

541 U.S. at 285–86. Neither the text nor the history of the Elections Clause provides a

Rosetta Stone for separating the permissible from the impermissible. It is no surprise,

then, that the *Vieth* plurality, considering the Elections Clause only in passing, concluded

that it "provides [no] judicially enforceable limit on the political considerations that the

States and Congress may take into account when districting." *Id.* at 305.

Moreover, the partisan-blind approach Plaintiffs ask us to enforce was rejected by

the Supreme Court in *Gaffney v. Cummings*, 412 U.S. 735 (1973). *Gaffney* was a

challenge to Connecticut's redistricting process that attempted to achieve "fairness

between the political parties." *Id.* at 736. Like Plaintiffs here, the challengers in *Gaffney*

suggested that "those who redistrict and reapportion should work with census, not

political, data and achieve population equality without regard for political impact." *Id.* at

753. The Supreme Court rejected that argument. It held that "this politically mindless

approach may produce, whether intended or not, the most grossly gerrymandered

results." *Id*.

At least one other district court has recognized the lack of standards within the

Elections Clause. In the early stages of the case that would later be decided by the

Supreme Court as part of the *LULAC* decision, the District Court considered an argument

that there was a temporal limit inherent in the Elections Clause:

> Plaintiffs would read an implicit, temporal limitation into the text of the
> Elections Clause, but the argument is empty. The argument is that the
> Elections Clause allows Congress to pass laws regulating elections "at any

time," but does not explicitly allow states to act at any time. Plaintiffs reason that, by failing to include the phrase "at any time" within the grant of power to states, the Elections Clause implicitly denies that power. Hence, they conclude, the Elections Clause allows states to draw districts only once, immediately after the release of each decennial census.

We are unpersuaded. The argument tortures the text of the Clause, which by its clear terms has no such limitation.

*Session v. Perry*, 298 F. Supp. 2d 451, 459 (E.D. Tex.), *vacated sub nom. Henderson v. Perry*, 543 U.S. 941 (2004), *et al.* The District Court reasoned: "[t]he Elections Clause is a broad grant of authority to the states that is checked only by the power of Congress to make or alter voting regulations. Nowhere in the text of the Elections Clause or in judicial interpretations is there a limitation on the frequency with which states may exercise their power." *Id.* at 462. In *LULAC*, Justice Kennedy suggested agreement. *See* 548 U.S. at 418–19 (opinion of Kennedy, J.) ("The text and structure of the Constitution and our case law indicate there is nothing inherently suspect about a legislature's decision to replace mid-decade a court-ordered plan with one of its own.").

Neither does the language of *Thornton* or *Gralike* provide a judicially manageable standard for partisan gerrymandering cases. The principle that States may not attempt to "dictate electoral outcomes," "favor or disfavor a class of candidates," or "evade important constitutional restraints." *Thornton*, 514 U.S. at 833–34, is surely the animating spirit driving the Supreme Court's quest to find a standard under the Equal Protection Clause or the First Amendment to decide these cases. Yet the Court has never turned to the Elections Clause as the source of a manageable standard.

The Court's ability to categorize Arkansas's Amendment 73 term-limit requirements and Missouri's Article VIII ballot label requirements as substantive regulations, and thus *ultra vires*, does nothing to meaningfully assist a court in measuring the permissible degree of political or partisan consideration in redistricting plans. Those provisions were obviously intended to have an impact on electoral outcomes that disfavored certain candidates. Redistricting schemes, which are required by operation of federal statute and Supreme Court caselaw, have a substantial impact on electoral outcomes no matter how they are crafted. This reality makes it a much more difficult task to determine when the impact becomes *ultra vires*.

### c.       Political Decisions

Another of the *Baker* factors of significance here is "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217. As Justice O'Connor discussed in her *Bandemer* decision, all partisan gerrymandering decisions require some initial determinations that are of a political nature. 478 U.S. at 155.

Here, Plaintiffs ask the Court to mandate an order of operations for drawing congressional districts, whereby factors such as compactness and maintenance of communities of interest must be the priorities in map drawing. First, there is no guarantee that these factors are truly neutral. *See* 541 U.S. at 308–09 (Kennedy, J., concurring in the judgment) ("[A] decision under these standards would unavoidably have significant political effect, whether intended or not.") District lines, no matter how they are drawn, will inevitably be to the benefit or detriment of certain interests. *See id.*

(citing Judge Bork's observation after his service as a special master responsible for redistricting Connecticut, among other sources in support of the proposition).

Second, as already discussed, the decision as to which factors will be prioritized is an inherently political decision and not one within the competency of the judicial branch. Priorities may shift in different parts of a given State to account for geography, regional interests, preservation of working relationships, and so forth. The decision to have single member districts is itself a political decision, made by Congress under its Elections Clause power. As the Supreme Court recognized in *Gaffney*, 412 U.S. at 753, "[t]he very essence of districting is to produce a different—a more 'politically fair'—result than would be reached with elections at large, in which the winning party would take 100% of the legislative seats." This could be read to suggest that the Pennsylvania Republicans' alleged drawing of the 2011 map to "pack and crack" Democratic voters violates the spirit of single member districts. Indeed, it may. But the real point is that it was a *political* decision to require single-member districts. Congress made that decision. Were we to adopt Plaintiffs' theory, all of these political decisions would be subject to scrutiny by the courts—a veritable command that the "most fair" method must always be used. Methods such as those used by the Arizona Independent Redistricting Commission would be open to additional scrutiny, a kind of scrutiny that they are not subject to under the Equal Protection Clause or the First Amendment. *Gaffney* made clear that States enjoy greater leeway than Plaintiffs seek to impose.

**d.**   **Plaintiffs Provide No Compelling Justification for Bypassing Existing Precedent.**

Permitting redistricting challenges under the Elections Clause does nothing to ameliorate the decades-long struggle to craft a judicially manageable standard under the Equal Protection Clause or First Amendment.  If anything, it introduces further difficulty.

The justices who favor justiciability of partisan gerrymandering claims have consistently noted the importance of a high bar for judicial intervention.  In *Karcher*, Justice Stevens suggested that "constitutional adjudication that is premised on a case-by-case appraisal of the subjective intent of local decisionmakers cannot possibly satisfy the requirement of impartial administration of the law that is embodied in the Equal Protection Clause of the Fourteenth Amendment."  462 U.S. at 753–54 (Stevens, J., concurring).  However, "if a plan has a significant adverse impact *upon a defined political group*, an additional showing that it departs dramatically from neutral criteria should suffice to shift the task of justification to the state defendants.  *For a number of reasons, this is a burden that plaintiffs can meet in relatively few cases.*"  *Id.* (emphasis added).  His belief that the standard for intervention should be one met only in relatively few cases is further reflected by his opinions in *Vieth* and *LULAC*, and those of his fellow dissenters in *Vieth*.  Moreover, as Justice Kennedy recognized: "[a] decision ordering the correction of all election district lines drawn for partisan reasons would commit federal and state courts to unprecedented intervention in the American political process.  The Court is correct to refrain from directing this substantial intrusion into the Nation's

60

political life." 541 U.S. at 306 (Kennedy, J., concurring in the judgment).  Justice

Kennedy sought a "limited and precise rationale."  *Id.*

Plaintiffs began this litigation by offering what they viewed as a workable

standard under the Elections Clause: "none means none."  *See* Plaintiffs' Response in

Opposition to Legislative-Defendants' Motion to Dismiss, ECF No. 53 at 3.[20]  When

pushed to propose a test for such a claim, Plaintiffs were true to their promise and

proposed the following elements: "(1) the defendants used partisan election data to create

the 2011 Plan; and (2) defendants did so to serve their political interest."  Plaintiffs' Brief

Regarding the Elements of Their Claims, ECF No. 157 at 1.

Far from a "limited and precise rationale," Plaintiffs' initially-offered Elections

Clause theory is expansive and seeks to do precisely what a majority of the Supreme

Court has cautioned against: have the courts intrude significantly into the nation's

political life.

The seeming simplicity of Plaintiffs' original test is its downfall.  In light of that

deficiency, the panel gave Plaintiffs, on the eve of trial, another opportunity to propose

elements for their claim.  Order for Plaintiffs to Clarify Elements of Proof, ECF No. 169.

Plaintiffs proposed, anew, a four part test, requiring: (1) "that those who created the map

---

[20] As stated in their Memorandum opposing the first Motion to Dismiss:
*Vieth* and other cases try but fail to come up with a judicially manageable
standard to distinguish between "some" gerrymandering and "too much."
Because this case draws no such inchoate line between "some" and "too
much," it does present a judicially manageable standard: none means none,
at least in federal elections.
ECF No. 53 at 3.

manipulated the district boundaries of one or more Congressional districts, intending to generate an expected number of winning seats for the party controlling the process that is greater than the expected number of winning seats that would be determined by the voters if the districts were drawn using even-handed criteria;"  (2) that the "discriminatory intent" be "a substantial motivating factor in the line drawing decisions;" (3) that the drafters of the map "achieved their intended goal;" and (4) that "the composition of the state's [c]ongressional delegation as a whole resulted from the use of partisan data, such that the map itself, rather than the voters, solidified that composition."  Plaintiffs' Statement of the Elements They Must Prove, ECF No. 173.

This new test is a far cry from Plaintiffs' original "none means none," intent-only standard.  To be sure, the four-part test tracks more closely those tests proposed by members of the Supreme Court in *Vieth*:  it requires a showing of both intent and effects. However, the Plaintiffs' "expected number of winning seats" metric rings of proportional representation.  Proportional representation as a constitutional requirement has been consistently rejected.  *See LULAC*, 548 U.S. at 419 (Opinion of Kennedy, J.) ("To be sure, there is no constitutional requirement of proportional representation . . . ."); *Vieth*, 541 U.S. at 288 (plurality) ("Deny it as appellants may (and do), this standard rests upon the principle that groups (or at least political-action groups) have a right to proportional representation.  But the Constitution contains no such principle."); *Bandemer*, 478 U.S. at 130 (plurality) ("Our cases . . . clearly foreclose any claim that the Constitution requires proportional representation or that legislatures in reapportioning must draw district lines

to come as near as possible to allocating seats to the contending parties in proportion to what their anticipated statewide vote will be.").

Plaintiffs' effort on the eve of trial to fashion a more viable standard does not save their Elections Clause theory. It falls short of Plaintiffs' initial promise: to offer a cogent, workable theory that is unique to the Elections Clause. It also defies Plaintiffs' assertion that their Elections Clause test is *different* from the test adopted by the District Court in *Whitford v. Gill*, 218 F. Supp. 3d 837 (W.D. Wis. 2016), because it does not rely on a measure of how "'extreme'" the gerrymander is or on "maps that reflect 'extreme and durable partisan bias.'" Plaintiffs' Response in Opposition to Motion to Intervene as Plaintiffs, ECF No. 68 at 5 (quoting proposed-Plaintiff-Intervenors' Complaint in Intervention, ECF No. 54-2 at 19).

In short, finding a judicially manageable standard under the Elections Clause is every bit as challenging as finding one under the First Amendment or the Equal Protection Clause. There is no compelling reason to accept Plaintiffs' invitation and journey down this new path.

### e.    The Action and Inaction of Congress Does not Warrant Judicial Intervention.

#### 1.    The History of the Three-Judge Court Act is not Suggestive of a Congressional Desire for Court Intervention.

Plaintiffs argue that Congress's decision to require three-judge panels for reapportionment cases suggests its view on the justiciability of such claims.[21]  However, Congress's decision to *retain* three judge panels for reapportionment cases suggests nothing about the justiciability of partisan gerrymandering cases, especially those brought under the Elections Clause.

The Three-Judge Court Act, passed in 1910, prohibited single federal district court judges from "issuing interlocutory injunctions against allegedly unconstitutional [s]tate statutes."  S. Rep. No. 94-204, at 4 (1978), as reprinted in 1976 U.S.C.C.A.N. 1988, 1989 ("S. Rep.").  According to a Senate Report released in advance of the repeal of significant portions of the Act, "[t]he provision for three-judge courts was enacted by Congress as a solution to a specific problem."  *Id.*  That specific problem was federal judges' issuance of interlocutory injunctions against the enforcement of state regulatory statutes in the wake of *Ex parte Young*, 209 U.S. 123 (1908).  S. Rep. at 4, 1976 U.S.C.C.A.N. at 1988.

---

[21] Closing Argument of Thomas Geoghegan, Counsel for Plaintiffs, Trial Tr. Dec. 7, 2017 PM 71:25, 72:1–9 ("And also Congress has delegated the power to keep watch over these states to this Court.  That's exactly why three judges are on this panel.  You're here because of 28 U.S.C. [§] 2284 where Congress says you are the people who are supposed to figure out whether or not these predations by the state are consistent with the structure of the United States Constitution.  That's your role.  You are here to hear constitutional challenges to redistricting.  It's not something where you're usurping something that Congress doesn't want you to be involved in.").

The state statutes were meant to rein in abuses resulting from the "vigorous expansion of big business and the railroads" around the turn of the century. *Id.* Much to the frustration of the States, the interlocutory injunctions were granted "on the strength of affidavits alone" and the temporary restraining orders were granted *ex parte*. *Id.* Therefore, "[t]he rationale of the act was that three judges would be less likely than one to exercise the Federal injunctive power imprudently. It was felt that the act would relieve the fears of the States that they would have important regulatory programs precipitously enjoined." *Id.*

The need for three-judge courts, however, was soon mitigated by other developments, including statutory and rule changes. *See* S. Rep. at 2, 1976 U.S.C.C.A.N. at 1989. By the 1970s, there was near unanimous agreement that the three-judge panel process was no longer required, and that it was a significant burden on the judiciary. Chief Justice Burger, in his annual report on the state of the Judiciary in 1972 called for "totally eliminat[ing]" three-judge district courts which he described as "disrupt[ing] district and circuit judges' work." S. Rep. at 3, 1976 U.S.C.C.A.N. at 1990 (quoting Remarks of Warren E. Burger, Chief Justice of the United States, before American Bar Association, San Francisco, Calif., August 14, 1972). Chief Justice Burger explained: "[t]he original reasons for establishing these special courts, whatever their validity at the time, no longer exist." *Id.*

Congress agreed to act. However, it chose to keep three-judge courts for "certain cases under the Civil Rights Act of 1964," "cases under the Voting Rights Act of 1965," and "cases involving congressional reapportionment or the reapportionment of a

statewide legislative body."  S. Rep. at 9, 1976 U.S.C.C.A.N. at 1996.  As to

apportionment cases, the Senate Report explained that "it is the judgment of the

committee that these issues are of such importance that they ought to be heard by a three-

judge court and, in any event, they have never constituted a large number of cases."  *Id.*

There can be little doubt about the importance of voting-rights cases.  By the time

Congress considered abolishing the Three-Judge Court Act in the 1970s, cases involving

one-person, one-vote and the protection of minority voting rights were being adjudicated

by three-judge courts.  The Senate Report specifically cites *Reynolds v. Sims*, 377 U.S.

533 (1964).  S. Rep. at 9, 1976 U.S.C.C.A.N. at 1996.

However, because the courts were already in the business of deciding

reapportionment cases, Congress's decision to retain three-judge panels for these cases

suggests nothing about its views on justiciability.  The Supreme Court had spoken, and

Congress was reacting.  Further, this legislative history predates *Bandemer* and *Vieth*, the

first partisan gerrymandering cases to consider justiciability in any detail.

Moreover, the fact of 28 U.S.C. § 2284 suggests nothing about Congress's view of

the Elections Clause.  Congress did not retain three-judge panels for cases invoking the

Clause.  *See, e.g., Gralike v. Cook,* 191 F.3d 911, 914 (8th Cir. 1999) (noting proper

jurisdiction of Elections Clause case, unrelated to apportionment, adjudicated by single-

judge district court).  And because the words "apportionment" and "reapportionment" are

general terms used in different contexts, *see* footnote 17, *supra*, we cannot presume that

Congress contemplated partisan gerrymandering claims when it used those terms.

In short, Congress's decision to retain three-judge courts to decide reapportionment cases tells us nothing about Congress's view of partisan gerrymandering claims, nor does it suggest anything about whether Congress considered claims under the Elections Clause to be justiciable.

### 2. Congressional Inaction Does Not Warrant Interference.

### i. Congress has Acted, and Legislation is Pending.

"The power bestowed on Congress to regulate elections, and in particular to restrain the practice of political gerrymandering, has not lain dormant." *Vieth*, 541 U.S. at 276 (plurality).  Federal law requires single-member districts.  2 U.S.C. § 2c.  This requirement dates back to the Apportionment Act of 1842, which further mandated that the single-member districts be "composed of contiguous territory."  5 Stat. 491.[22]  In 1872, Congress added the requirement that districts "contai[n] as nearly as practicable an equal number of inhabitants," 17 Stat. 28, § 2, and in 1901, imposed a compactness requirement.  31 Stat. 733.  "The requirements of contiguity, compactness, and equality of population were repeated in the 1911 apportionment legislation, 37 Stat. 13, but were not thereafter continued." *Vieth*, 541 U.S. at 276 (plurality).  However, numerous bills have been proposed in the area and many are currently pending. *See id.* (listing proposed bills to regulate gerrymandering);  S. 1880, 115th Congress (2017) (requiring, *inter alia*,

---

[22] The Act required, in part, that "in every case where a state is entitled to more than one Representative, the number to which each State shall be entitled under this apportionment shall be elected by districts composed of contiguous territory equal in number to the number of Representatives to which said State may be entitled, no one district electing more than one representative."

States to conduct congressional redistricting through independent commissions);

H.R.1102, 115th Congress (2017) (same); H.R. 713, 115th Congress (2017) (requiring

States to adopt procedures for public comment on redistricting plans).  Simply put,

Congress has set stricter requirements for redistricting in the past, and nothing but

political will prevents it from doing so again.

### ii.    Action by the Court Interferes with Political Accountability.

There is an argument to be made that extreme gerrymandering frustrates the ability

of the people to hold their elected officials accountable.  However, court interference

with redistricting would only frustrate political accountability.

When state legislatures draw district lines, they do so in the public eye.  If these

legislatures draw district lines that are perceived to be unfair, they risk electoral pushback

from citizens on both sides of the political aisle.[23]  In the absence of court action, that

pushback can be precisely focused on the state legislatures responsible for partisan

gerrymandering.  When federal courts step in, however, they do so at the risk of

muddying the waters—potentially providing state legislatures with enough cover to argue

---

[23] *See, e.g.*, *Arizona State Legislature*, 135 S. Ct. at 2658 ("In 2000, Arizona voters adopted an initiative, Proposition 106, aimed at 'ending the practice of gerrymandering and improving voter and candidate participation in elections.'"); Jeffrey Toobin, *Saving Democracy in Florida*, THE NEW YORKER (July 22, 2014), https://www.newyorker.com/news/daily-comment/saving-democracy-florida ("The redistricting behavior of state legislators has become so craven that a modest political backlash has developed, and a few hopeful signs have emerged.  One came last month, in Florida. . . . Florida voters passed an amendment to the state constitution that banned the creation of legislative districts 'with the intent to favor or disfavor a political party or an incumbent.'").

that their hands are tied by the courts and that they are not responsible for a controversial map. Thus, court action in this area risks diffracting political pressure that would otherwise rest squarely on the shoulders of the responsible legislators.[24]

In addition to shielding state legislatures, court intervention shields the federal Congress from political accountability. Here, it seems that Plaintiffs ask this Court to intervene on the basis that Congress' *decision* not to override particular state regulations reflects Congress' *inability* to override particular state regulations. Thus, the courts must step in to resolve the controversy. Congress, however, has proven itself quite capable of exercising its power under the Elections Clause. When Congress decides against exercising its power to remedy state regulations, it does so publicly—and with the risk that constituents will object to such inaction.[25]

Although Plaintiffs might argue that inaction presents Congress with no real political risk because gerrymandering ensures that their particular seats are safe, this ignores the fact that the Elections Clause places the power to alter state regulations in both houses of Congress. Federal Senators—who must win statewide elections and for

---

[24] *See McDaniel v. Sanchez*, 452 U.S. 130, 150 n.30 (1981) ("Moreover, even after a federal court has found a districting plan unconstitutional, 'redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt.'" (quoting *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978)).

[25] *See* Michael T. Morley, Essay, *The New Elections Clause*, 91 NOTRE DAME L. REV. ONLINE 79, 91 (2016) ("Allowing Congress to control and even determine the outcomes of federal elections creates a substantial risk of direct partisan manipulation. Yet the Constitution's structure embodies the Framers' repeated, deliberate decisions to entrust Congress with such responsibility.").

whom gerrymandering has no effect—are particularly vulnerable to organized political pushback from constituents who may be displeased with congressional inaction. Injecting the federal courts into line drawing decisions comes with the risk of permitting federal Congressmen to duck political accountability by placing the blame on the judiciary.

### iii.    The Political Process is Available.

The argument that the political process is hopelessly broken, warranting court intervention, has proven before to be specious.  Two years after the Supreme Court decided *Vieth*, the party that claimed it was the victim of a partisan gerrymander won an additional four seats in Pennsylvania—a greater than 20% swing in seats, giving the party 55% of the State's nineteen seats.  *See* Joint Statement of Stipulated and Undisputed Facts, Exhibit E, ECF No. 150-3 at 5 (listing names and political affiliations of Pennsylvania's U.S. Representatives in the 109th and 110th Congresses).  In a so-called "wave election," Democratic candidates beat Republican incumbents in four districts. *See* AmericaVotes2006, CNN.COM, http://www.cnn.com/ELECTION/2006/pages/results/states/PA/ (noting the loss of Republican incumbents in districts 4, 7, 8, and 10).  This was not the first time election results ran counter to the expectations of those advancing partisan gerrymandering claims.  *See Vieth*, 541 U.S. at 287 n.8 (plurality) (discussing North Carolina case in which the allegedly disfavored candidates obtained electoral victory a mere five days after the District Court held they had been unconstitutionally excluded from the electoral process).  And it is likely to happen again.  Recent elections have bucked trends.  *See,*

*e.g.,* Michelle Bond, *In historic win, Delco Dems take council seats*, PHILLY.COM (Nov. 7, 2017, 10:50 PM), http://www.philly.com/philly/news/pennsylvania/delaware-county-pa-council-election-result-2017-democrats-20171107.html.  Quite simply, the electorate can be unpredictable.

More fundamentally, I refuse to believe that voters in Pennsylvania have given up on the democratic process.  Broad-based efforts to force political and governmental reform are hardly without precedent in our Nation's history.  While Pennsylvania does not have a referendum system akin those in other states, its constitution can be amended.[26]

To be sure, national political parties as they are presently constituted did not exist at the time of the founding.  Nor do I deny that periods of hyper-partisanship contribute to so-called "gridlock" and frustrate opportunities to effect legislative change.  Yet I see no indication that the will of the people, asserting electoral and other pressure on directly elected members of the General Assembly, cannot provide the relief Plaintiffs seek. There is no evidence in the record before this panel that Plaintiffs have even attempted to utilize the political process to bring about the change they seek.  Even if gerrymandering frustrates accountability to some extent, Plaintiffs argue that their cause is a bipartisan one.  If their cause is indeed bipartisan (or, perhaps more aptly, non-partisan), no partisan map can overcome the will of a broad electorate that seeks such fundamental change.

---

[26] *See* Referendum Handbook, PA Dep't of Cmty. and Econ. Dev., 8th Ed., January 1999, at 2 ("Pennsylvania, unlike many other states has never authorized placing amendments on the ballot by citizen initiative, limiting this prerogative to the legislature."); Pa. Const. art. XI, § 1.

While Plaintiffs may argue that the pernicious effects of gerrymandering have made it difficult to get redistricting reform legislation enacted, I am not satisfied that a broad-based, grassroots reform effort is destined to fail.  If both parties suffer from a lack of competitive districts, as Plaintiffs argue, they have a strong case to take to voters of all persuasions.  In the end, the "[f]ailure of political will does not justify unconstitutional remedies."  *Arizona State Legislature*, 135 S. Ct. at 2690 (Roberts, C.J, dissenting) (quoting *Clinton v. City of New York*, 524 U.S. 417, 449 (1998) (Kennedy, J., concurring)).

## V.    Conclusion

Plaintiffs cite *Arizona State Legislature* to support their theory that the Elections Clause contains enforceable internal constraints.  In doing so, they ignore *Arizona's* larger teaching: political power flows from the people.  At the end of the day, it is the people who control the districting process.[27]

---

[27] 135 S. Ct. at 2677 ("Both parts of the Elections Clause are in line with the fundamental premise that all political power flows from the people.  *McCulloch v. Maryland*, [17 U.S. (4 Wheat.)] 316, 404–405 (1819).  So comprehended, the Clause doubly empowers the people. They may control the State's lawmaking processes in the first instance, as Arizona voters have done, and they may seek Congress' correction of regulations prescribed by state legislatures.").

Justice Breyer, even while dissenting in *Vieth*, also recognized this power of the people. *Vieth*, 541 U.S. at 362–63 (Breyer, J., dissenting) ("Where a State has improperly gerrymandered legislative or congressional districts to the majority's disadvantage, the majority should be able to elect officials in statewide races—particularly the Governor— who may help to undo the harm that districting has caused the majority's party, in the next round of districting if not sooner.  And where a State has improperly gerrymandered congressional districts, Congress retains the power to revise the State's districting determinations. . . . Moreover, voters in some States, perhaps tiring of the political boundary-drawing rivalry, have found a procedural solution, confiding the task to a commission that is limited in the extent to which it may base districts on partisan

Conceivably, were Congress to enact legislation requiring a specific process for drawing Congressional districts, citizens would have recourse to the courts to enforce those statutory requirements.  Such a scenario would materially differ from what this case presents.  It would require the courts to enforce a duly enacted law resulting from political determinations, something courts do routinely, rather than requiring the judiciary to make political determinations in the first instance.  Nothing in *Arizona State Legislature* suggests that the people may choose to delegate redistricting in the first instance to the courts.  Neither may Congress.[28]

The structural change Plaintiffs seek must come from the political branches or from the political process itself, not the courts.  For these reasons, I would hold that the Elections Clause claim raises a non-justiciable political question.

s/ **D. Brooks Smith**

_____

Chief United States Circuit Judge

_____

concerns.  According to the National Conference of State Legislatures, 12 States currently give 'first and final authority for [state] legislative redistricting to a group other than the legislature.'").

[28] *See* 135 S. Ct. at 2689 (Roberts, C.J, dissenting) ("It is a well-accepted principle . . . that Congress may not delegate authority to one actor when the Constitution vests that authority in another actor.").