# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **LOUIS AGRE**, *et al.* | **CIVIL ACTION** |
| **v.** | **NO. 17-4392** |
| **THOMAS W. WOLF**, Governor of the Commonwealth of Pennsylvania, **JONATHAN MARKS**, Commissioner of the Pennsylvania Bureau of Commissions, Elections, and Legislation, **ROBERT TORRES**, Acting Secretary of the Commonwealth of Pennsylvania, **JOSEPH B. SCARNATI, III**, President Pro Tempore of the Pennsylvania Senate, and **MICHAEL C. TURZAI**, Speaker of the Pennsylvania House of Representatives, in their official capacities. | |

## MEMORANDUM

SHWARTZ, Circuit Judge, concurring in the judgment.                    January 10, 2018

Twenty-six Pennsylvania residents (collectively "Plaintiffs")[1] representing all

eighteen of Pennsylvania's congressional districts allege that the Commonwealth's

---

[1] Plaintiffs are Louis Agre, William Ewing, Floyd Montgomery, Joy Montgomery, Rayman Solomon, John Gallagher, Ani Diakatos, Joseph Zebrowitz, Shawndra Holmberg, Cindy Harmon, Heather Turnage, Leigh Ann Congdon, Reagan Hauer, Jason Magidson, Joe Landis, James Davis, Ed Gragert, Ginny Mazzei, Dana Kellerman, Brian Burychka, Marina Kats, Douglas Graham, Jean Shenk, Kristin Polston, Tara Stephenson, and Barbara Shah.  Am. Compl., ECF No. 88.

1

congressional map is so politically gerrymandered[2] that it violates the Elections Clause,

Article I, Section 4 of the Constitution.[3]  Although there may be a case in which a

political gerrymandering claim may successfully be brought under the Elections Clause,

this is not such a case.  Plaintiffs lack standing to bring a statewide challenge to the map

because they have not presented a plaintiff from each congressional district who has

articulated a concrete and particularized injury in fact.  Moreover, even if Plaintiffs

established standing, or if Plaintiffs had raised district-specific challenges to the 2011

map, their claim would still fail because the legal test they propose for an Elections

Clause claim is inconsistent with established law.  For these reasons, I join Chief Judge

Smith in entering judgment[4] in favor of the Legislative and Executive Defendants.[5]

---

[2] "The term 'political gerrymander' has been defined as 'the practice of dividing a geographical area into electoral districts often of highly irregular shape, to give one political party an unfair advantage by diluting the opposition's voting strength." Vieth v. Jubelirer, 541 U.S. 267, 271 n.1 (2004) (quoting Black's Law Dictionary 696 (7th ed. 1999)) (internal brackets omitted).  Similarly, the term "partisan gerrymandering" is used to describe "the drawing of legislative district lines to subordinate adherents of one political party and entrench a rival party in power." Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n, 135 S. Ct. 2652, 2658 (2015).  The terms political gerrymandering and partisan gerrymandering are used interchangeably.

[3] The Complaint also alleged claims under the First Amendment and the Equal Protection Clause, which were dismissed before trial.

[4] I would enter judgment in Defendants' favor pursuant to Federal Rule of Civil Procedure 52, since my opinion is based on a factual finding.  When evaluating a Rule 52 motion, a court makes credibility determinations but "does not view the evidence through a particular lens or draw inferences favorable to either party." EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 271-72 (3d Cir. 2010).

[5] Defendants are Thomas W. Wolf, in his official capacity as Governor of Pennsylvania, Robert Torres, in his official capacity as Secretary of State of Pennsylvania, and Jonathan Marks, in his official capacity as Commissioner of the Bureau of Elections ("Executive Defendants").  Michael C. Turzai, in his official capacity as Speaker of the Pennsylvania House of Representatives, and Joseph B. Scarnati, III, in his official capacity as Pennsylvania Senate President Pro Tempore,

I[6]

The 2010 census revealed that Pennsylvania's population had dropped and, as a result, the Commonwealth lost one seat in Congress.  To address the reduction from nineteen to eighteen congressional seats, Pennsylvania had to redraw its congressional district lines, and in 2011, Pennsylvania adopted a new congressional map (the "2011 Plan").

The creation of the 2011 Plan was tasked, in part, to Erik Arneson, the Communications and Policy Director for Republican State Senator Dominic Pileggi, and William Schaller, who worked for the Republican House Caucus of the Pennsylvania General Assembly.[7]  Schaller admitted that the map-drawing process involved forming a map that was "[b]ased on consultations on how the districts should be put together from the negotiations and discussions with the stakeholders," specifically "Republican stakeholders."  Schaller Dep. 75:24-76:22.  He said that "the information [he] got about the discussions among the Republican stakeholders in that legislative process was probably the most important factor that [he] used in drawing the maps." Schaller Dep.

---

intervened as defendants ("Legislative Defendants").  Mot. to Intervene, ECF No. 45; Order granting Mot., ECF No. 47.

[6] My colleague Judge Baylson has thoroughly summarized the trial testimony.  During trial, we heard testimony either in-person or through depositions from Plaintiffs, legislative staffers who helped develop the districting map that became the 2011 Plan, legislators who witnessed the process surrounding the adoption of the 2011 Plan, and experts who explained, among other things, how the 2011 Plan incorporated or failed to comply with traditional redistricting criteria.

[7] The testimony for these legislative staffers was presented via depositions.  Although the panel was unable to observe their demeanor, the staffers' answers to certain questions caused all three of us to question how forthcoming those witnesses were in their testimony.

76:23-77:5.  Arneson similarly testified that during the map-drawing process, he met with members of Congress, including Republican Representative Bill Shuster, whose preferences regarding the composition of his congressional district "were taken into account."  Trial Tr. Dec. 6, 2017 PM 96:10-14.

Democratic State Senator Daylin Leach testified that "Democrats were not invited to participate in any way" in the creation of the 2011 Plan, and thus neither he nor other Democrats had personal knowledge regarding the map's creation.  Leach Dep. 19:22-20:14.  Democratic Representative Greg Vitali provided a similar description of the process.  The exclusion of Democrats and the lack of transparency concerning the map was also echoed in comments on the floor of the Pennsylvania State Senate and Pennsylvania House of Representatives.  See Legis. Defs.' Ex. 21 at 2692, 2694, 2699; Legis. Defs.' Ex. 22 at 2728, 2730.

Arneson and Schaller relied upon data, referred to by the parties as the "Turzai dataset," that included fields for, among other things, election results for all state (Executive, Senate, House) and national elections (President, Senate, U.S. House) for 2004 to 2010 in even-numbered years.  The dataset also included demographic data, partisan vote share at the precinct level, party registration for the 2004-2010 elections, and voter information at the county, municipal, precinct, and census block levels, with census blocks constituting the smallest statistical geographic unit.  Anne C. Hanna, a Mechanical Engineering Ph.D. candidate at the Georgia Institute of Technology, reviewed the Turzai dataset and found that it included a large volume of partisan voting results and partisan voter registration data for each county for all thirty-three even-year

statewide legislative and Congressional elections from 2004 to 2010. She also testified that partisan indices were constructed for each county. The data was available to all four caucuses of Pennsylvania's legislative bodies.

According to the testimony of the legislative staffers, the map drawing duties were split in half. The Senate staff drew the lines for the eastern part of the Commonwealth, and the House staff drew the lines for the western part. Arneson testified that numerous versions of the maps were drawn, but it appears that only one version, which became known as the 2011 Plan, was publicly shared.

The 2011 Plan, formally known as Senate Bill 1249, was first introduced in the Pennsylvania Senate's State Government committee as a "shell bill" with a printer number[8] of 1520 on September 14, 2011. <u>See</u> Exec. Defs. Ex. 1 at ¶ 1, Ex. A. As a "shell bill," it contained no actual legislative content, an "unusual" feature that Senator Andrew Dinniman could not recall occurring with any other legislation. In short, all the "shell bill" said for each of the eighteen congressional districts was that the particular district "is composed of a portion of this Commonwealth." Exec. Defs. Ex. 1 at Ex. A. Thus, it did not identify the municipalities or counties that would comprise a particular district. Senate Bill 1249 was not actually given any legislative content concerning the municipalities or counties assigned to a particular district until the morning of December 14, 2011, when it came before the State Government committee with printer number 1862. After the bill with printer number 1862 was voted out of the State Government

---

[8] Printer numbers are used to designate different versions of a bill.

committee that morning, it was sent to the Appropriations committee.  <u>See</u> Exec. Defs.
Ex. 1 at ¶¶ 5-6 & Ex. B.  Senator Dinniman testified that although Senate Rule 12
ordinarily requires at least six hours between a bill's referral from the Appropriations
committee and a vote, that rule was suspended for this bill.  The Appropriations
committee approved the bill, and the bill was then sent to the floor of the State Senate
with printer number 1869.

The final vote on Senate Bill 1249, printer number 1869, required a suspension of
another Senate rule.  The normal Senate rules prohibit voting after 11:00 pm, but this rule
was suspended because the Senate needed to vote on the bill before the end of the
legislative year.  The bill passed the State Senate, Exec. Defs.' Ex. 1 at ¶ 7, on a vote of
26-24,[9] and it was then reported to Pennsylvania's House of Representatives, which
considered the bill on December 15, 2011 and December 19, 2011.  Exec. Defs.' Ex. 1 at
¶¶ 8-10; <u>see also</u> Legis. Defs.' Ex. 20 at 2660; Legis. Defs.' Ex. 21 at 2679-2702.
Following impassioned speeches from both sides of the aisle about the bill and the role of
partisanship in its creation—including a concession from then-State Representative
Turzai that "[p]olitics may be taken into account as a factor, although not the controlling
factor," Legis. Defs' Ex. 21 at 2735—the House passed the bill with a vote of 136 to 61
on December 20, 2011, Legis. Defs.' Ex. 22 at 2736.  Governor Tom Corbett signed the
bill into law on December 22, 2011.  Exec. Defs.' Ex. 1 at ¶¶ 13-14.

---

[9] Of the twenty-four votes against Senate Bill 1249, four votes were cast by
Republicans.  No Senate Democrats voted for the bill.  <u>See</u> Pls.' Ex. 29 at 0809.

Since the 2011 Plan's passage, three congressional elections have occurred, and each resulted in the election of thirteen Republican and five Democratic congressmen, meaning Republicans have won 72 percent of the congressional seats, even though Republicans earned only 49 to 56 percent of the votes in those three elections.  See Pls.' Ex. 31 at 6.

Plaintiffs' expert Daniel McGlone, a senior geographic information systems ("GIS") analyst at Azavea, testified that the effect of the 2011 Plan was to "pack" and "crack" Democratic voters in certain districts.  Packing refers to concentrating certain members of a political party in a single district, thereby allowing the other party to win the remainder of the districts.  Cracking refers to splitting members of a political party among multiple districts to prevent them from forming a majority in a single district.  For example, McGlone explained that under the 2011 Plan, the Twelfth Congressional District in southwestern Pennsylvania was made safely Republican by moving certain Democratic areas from it to the Fourteenth Congressional District.  The new Twelfth Congressional District then became the home of two incumbent Democratic congressmen, who had to run against each other for the nomination and then run against a Republican challenger in what had become a heavily Republican-populated district.  This move simultaneously reduced the number of Democratic representatives and increased the number of Republican ones in Pennsylvania's congressional delegation.  Similarly, McGlone explained how the Sixth District split Reading and its Democratic voting base from its suburbs and placed Reading into the Sixteenth District to pack more Democratic voters there.  According to McGlone, the Sixth District thereby became more likely to

elect a Republican representative.  McGlone also concluded that the shape of the district

boundaries in the 2011 map, which included boundaries that reached around municipal

lines or split municipalities, demonstrated a deliberate effort to gather voters in specific

districts based on their political preferences rather than applying traditional districting

criteria, such as preservation of political subdivisions, compactness, contiguity,

preservation of communities of interest, continuity, respect for geographic boundaries,

and incumbency.[10]  He also testified that the 2011 Plan's boundaries would consistently

produce thirteen Republican representatives and five Democratic representatives, Trial

Tr. Dec. 4, 2017 PM 9:16-20, which, as stated before, has been the result of the 2012,

2014, and 2016 congressional elections.

Plaintiffs testified about how the 2011 Plan impacted them.  Plaintiffs are

registered voters from Pennsylvania's eighteen congressional districts and represent

different age groups, genders, educational backgrounds, and occupations.  While many

are registered Democrats, at least three are registered Republicans.  Many plaintiffs

asserted that the 2011 Plan diluted their votes[11] and prevented them from making a

---

[10] McGlone also described other districts, and Judge Baylson has provided detailed descriptions of five congressional districts in his very thorough opinion.

[11] See Diakotos (CD 1) (Trial Tr. Dec. 6, 2017 AM 94:2-3) (stating "I just feel like my voice isn't heard anymore"); Agre (CD 2) (Trial Tr. Dec. 5, 2017 AM 97:3) (testifying "my individual vote [is] affected . . . [because] it's watered down"); Ewing (CD 2) (Trial Tr. Dec. 5, 2017 PM 100:4-5) (testifying that "the ability to effectively [support other candidates] has diminished" under the 2011 Plan); Holmberg (CD 3) (Holmberg Dep. 18:7-9) (testifying "that's another harm is to be heard"); Harmon (CD 5) (Harmon Dep. 44:21-22) ("I don't feel that my voice is being heard"); Magidson (CD 7) (Trial Tr. Dec. 5, 2017 PM 58:16-18) (testifying "I don't think my vote really counts for much at all . . . I don't think I can influence that district"); Landis (CD 8) (Trial Tr. Dec. 5, 2017 PM 82:17-19) (testifying that his "district is going to remain Republican

meaningful electoral choice.[12]  Many Plaintiffs also said that, as a result of the 2011 Plan,

their representatives were not responsive to their requests or inquiries.[13]  Others testified

---

regardless of [his] vote and [his] voice is squashed"); Mazzei (CD 11) (Mazzei Dep.
22:19-22) (stating "my vote has been diluted by the way that the district lines are drawn
by political parties"); Kellerman (CD 12) (Kellerman Dep. 12:23-24, 13:3-6) (testifying
"my vote does not count as much as it should" and that it "has purposely been diluted");
Kats (CD 13) (Kats Dep. 85:16) (testifying "my vote cannot make a difference");
Burychka (CD 13) (Trial Tr. Dec. 5, 2017 PM 67:11-12) (testifying "I sometimes feel
that my voice is lost"); Shenk (CD 15) (Trial Tr. Dec. 5, 2017 PM 39:19-20, 40:4-6)
(testifying that the "map makes [her] vote a waste" and her vote does not have any
effect); Polston (CD 17) (Trial Tr. Dec. 5, 2017 AM 108:9-10) (stating "I am concerned
that my vote is diluted in my area").

[12] Solomon (CD 2) (Solomon Dep. 78:5-8) (noting that he is "harmed by the fact,
maybe, that in some ways you believe that the congressional election . . . is
predetermined"); Ewing (CD 2) (Trial Tr. Dec. 5, 2017 PM 98:21-23) (testifying that, as
a result of partisan gerrymandering, "there's no contest" in his district because it is "very
heavily democratic"); Gragert (CD 10) (Gragert Dep. 37:7-14) (noting that as to possible
candidates for the Tenth Congressional District "the person [he] want[s] is not able to run
or . . . the district is just too large, or you've got to have too much money, you've got to
be on the other side, three hours away, in order to get elected"); Graham (CD 14)
(Graham Dep. 28:15-17) (stating "it's harmed me having a democrat that many years that
I don't have a choice"); Shenk (CD 15) (Trial Tr. Dec. 5, 2017 PM 47:6-9) (testifying
that "other voices have given up hope in running against [the incumbent]" and "we don't
have competitive elections"); Montgomery (CD 16) (Montgomery Dep. 29:7-11) (stating
that "it [the 2011 Plan] stopped me from getting my choice."); Shah (CD 18) (Shah Dep.
12:21-24) (noting that in the last two elections she "didn't have a chance to vote for any
Democrats because there were no Democrats on the ballot").

[13] See Agre (CD 2) (Trial Tr. Dec. 5, 2017 AM 97:21-22) (stating that "if we had
fair districts, we would have more responsive congresspeople"); Holmberg (CD 3)
(Holmberg Dep. 16:24-25, 17:1) (stating that "because the district is no longer
competitive, Representative Kelly does not have to listen to his voters"); Hauer (CD 6)
(Trial Tr. Dec. 5, 2017 AM 119:7-24) (testifying that her Congressman has not responded
to her correspondence and that he "vot[es] along party lines rather than voting for his
constituents"); Mazzei (CD 11) (Mazzei Dep. 25:6-11) (testifying "I don't feel I have a
responsive representative . . . because he doesn't worry about my vote . . . because his
seat is guaranteed . . . ."); Shenk (CD 15) (Trial Tr. Dec. 5, 2017 PM 48:8-11) (testifying
that members of Congress will "focus only on [those] who they know will help reelect
them"); Shah (CD 18) (Shah Dep. 35:20-23) (noting that her representative "doesn't care
about what we [his constituents] think or what we want," focusing instead on his donors).

that the 2011 Plan reduced their access to their representatives[14] and resulted in them being placed in a congressional district with other voters with whom they had "absolutely nothing in common."  Gallagher (CD 1) (Trial Tr. Dec. 6, 2017 AM 84:13-15); see also Kellerman (CD 12) (Kellerman Dep. 41:4-10) (testifying that "my district should be able to pick the representative who represents us", but instead, her representative is chosen by "a very different community").[15]

II

Plaintiffs allege that the 2011 map violates the Elections Clause of the United States Constitution.  The Elections Clause provides:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of ch[oo]sing Senators.

---

[14] See Gallagher (CD 1) (Trial Tr. Dec. 6, 2017 AM 84:25-85:2) (testifying that his Congressman has never visited his section of the congressional district); Diakatos (CD 1) (Trial Tr. Dec. 6, 2017 AM 94:3-5) (testifying that her Congressman has not visited her county because the gerrymandered district prioritizes Philadelphia); Harmon (CD 5) (Harmon Dep. 32:3-4) (noting that she no longer has a "local" representative, but would "have to drive several hours" for a conversation); Davis (CD 9) (Davis Dep. 28:7-13) (noting his congressman is "just so far away from us" based on the "configuration" of the district); Polston (CD 17) (Trial Tr. Dec. 5, 2017 AM 111:4-18) (testifying that the gerrymandering of her district reduced her access to her Congressman because he holds town halls in parts of the district that are far from her home and difficult to reach).

[15] The only plaintiff from Pennsylvania's Fourth District testified that the map as a whole seemed unfairly drawn, but her "particular district is not very gerrymandered"; it is "one of the more compact ones," Turnage Dep. 47:4-18, 48:4-5, and she was unsure whether her particular district was fairly drawn, Turnage Dep. 48:11-12.  She was also unsure how, if at all, the shape of her district harmed her.  Turnage Dep. 50:15-23.  When pressed on how the 2011 Plan specifically harmed her, she explained, "I can't know without having the information basically that . . . the redistricting committee has . . . because I'm not sure how things might change if districting [were] done differently." Turnage Dep. 52:1-5.  Thus, unlike the other Plaintiffs, she did not explain how the 2011 congressional districting specifically impacted her.

U.S. Const. art. I, § 4, cl. 1.  "[T]hese comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places," but also as to "procedure and safeguards."  Smiley v. Holm, 285 U.S. 355, 366 (1932).

The Supreme Court has held, and the parties do not dispute, that the drawing of congressional district lines is among the "time, place, and manner" tasks given to the states.  In League of United Latin American Citizens v. Perry, 548 U.S. 399 (2006) ("LULAC"), for example, the Court explained that Section 2 of Article I and the Elections Clause "leave[] . . . the States primary responsibility for apportionment of their federal congressional . . . districts."  548 U.S. at 414 (internal citations and quotation marks omitted); see also id. at 415 (citing Smiley, 285 U.S. at 366-67, for the proposition that "reapportionment implicated [a] State's powers under Art. 1, § 4").

The Supreme Court's conclusion that the power of state legislatures to draw congressional districts is based on the Elections Clause is also consistent with the Clause's drafting history.  During the Convention debates, James Madison noted that regulating the "manner of holding elections" provided States with "great latitude" that would include whether electors "should be divided into districts or all meet at one place."[16]   The drafting history also shows that the Elections Clause limits a state's power when establishing congressional district lines.  The Framers intended that the Elections Clause provide a means to ensure that congressional elections actually occurred

---

[16] Max Farrand, The Founders' Constitution, (The Records of the Federal Convention of 1787 ed., 1937), available at http://press-pubs.uchicago.edu/founders/documents/a1_4_1s1.html.

and that states sent representatives to the federal government.  The Elections Clause authorized Congress to intercede if a state adopted regulations that precluded congressional elections and thereby withheld sending representatives from the state to the federal government.[17]  Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n, 135 S. Ct. 2652, 2672 (2015) ("[T]he Clause was the Framers' insurance against the possibility that a State would refuse to provide for the election of representatives to the Federal Congress.").

Several Framers also wanted to ensure that state regulations did not favor or disfavor a class of candidates or dictate election outcomes.[18]  These Framers took seriously the possibility that states may use their grant of power under the Elections Clause to favor particular candidates by, among other things, holding elections in seaport towns to effectively "exclude the distant parts of the several States . . . from an equal share in th[eir] government . . . ."[19]  James Madison cautioned that "[w]henever the State Legislatures had a favorite measure to carry, they would take care so to mould their

---

[17] E.g., The Federalist No. 59, 397-403 (Alexander Hamilton) available at http://press-pubs.uchicago.edu/founders/documents/a1_4_1s13.html ("Nothing can be more evident, than that an exclusive power of regulating elections for the National Government, in the hands of the State Legislatures, would leave the existence of the Union entirely at their mercy.  They could at any moment annihilate it, by neglecting to provide for the choice of persons to administer its affairs.");

[18] Alexander Hamilton, however, deemed the possibility that the power to issue election related regulations "might be employed in such a manner as to promote the election of some [favorite] class of men in exclusion of others . . . chimerical."  The Federalist No. 60, 403-10, available at http://press-pubs.uchicago.edu/founders/documents/a1_4_1s14.html (last visited Nov. 20, 2017).

[19] Herbert J. Storing, The Founders' Constitution, (The Complete Anti-Federalist ed., 1981), available at http://press-pubs.uchicago.edu/founders/documents/a1_4_1s6.html (last visited Nov. 20, 2017).

regulations as to favor the candidates they wished to succeed."[20]  It was partly in response to concerns about states passing measures favoring candidates that the Elections Clause was adopted.  Indeed, a delegate at the Massachusetts ratifying convention supported the adoption of the Elections Clause specifically because it allowed Congress to override state election laws passed when "faction and party spirit run high[.]"[21]

Consistent with the foregoing concerns, the Supreme Court has acknowledged that the Elections Clause was "intended to act as a safeguard against manipulation of electoral rules by politicians and factions in the States to entrench themselves or place their interests over those of the electorate." Ariz. State Legis., 135 S. Ct. at 2672.  As a result, the Court has interpreted the Elections Clause "as a grant of authority to issue procedural regulations, and not as a source of power to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints." U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 833-834 (1995).  This authority extends "to enact[ing] the numerous requirements as to procedure and safeguards which . . . are necessary . . . to enforce the fundamental right involved," Smiley, 285 U.S. at 366, by, among other things, ensuring orderly, fair, and honest elections, Storer v. Brown, 415 U.S. 724, 724 (1974).  The ability to adopt "evenhanded restrictions," U.S. Term Limits, Inc., 514 U.S. at 834 (internal quotations and citations omitted), thus falls within the broad scope of the Elections Clause, Ariz. v. Inter Tribal Council of Ariz., Inc., 133 S. Ct.

---

[20] 2 Records of the Federal Convention 241 (M. Farrand rev. 1966).
[21] Debate in Massachusetts Ratifying Convention (16-17, 21 Jan. 1788), in 2 The Founders' Constitution 256 (P. Kurland & R. Lerner eds. 1987).

2247, 2253 (2013).  Accordingly, the Elections Clause imposes some constraints on a state's power in setting electoral rules, which include establishing congressional district boundaries.

III

Having determined that the Elections Clause limits a state's power in setting election rules, we next address whether an Article III court has the authority to review a claim that a state has abused its power in the drawing of congressional district lines.

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies," which ensures that courts only address justiciable matters.  See Flast v. Cohen, 392 U.S. 83, 94-95 (1968) ("Justiciability is the term of art employed to give expression to . . . limit[s] placed upon federal courts by the case-and-controversy doctrine.").  Cases may be non-justiciable because they are moot or not ripe, the plaintiff lacks standing or seeks an advisory opinion, or the case presents a "political question." See id. at 95 ("[N]o justiciable controversy is presented when the parties seek adjudication of only a political question, when the parties are asking for an advisory opinion, when the question sought to be adjudicated has been mooted by subsequent developments, and when there is no standing to maintain the action."); DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006) ("The doctrines of mootness, ripeness, and political question all originate in Article III's 'case' or 'controversy' language, no less than standing does.").

Here, there is no claim that the case is moot, not ripe, or seeks an advisory

opinion, and it does not present a political question.[22]  There are questions, however,

---

[22] A case presents a nonjusticiable political question when it presents a matter that
"is entrusted to one of the political branches or involves no judicially enforceable rights."
Vieth, 541 U.S. at 277 (internal citations omitted).  In Baker v. Carr, the Supreme Court
provided six independent tests for deciding whether a question is entrusted to a political
branch:

> [1] a textually demonstrable constitutional commitment of the issue to a
> coordinate political department; or [2] a lack of judicially discoverable and
> manageable standards for resolving it; or [3] the impossibility of deciding
> without an initial policy determination of a kind clearly for nonjudicial
> discretion; or [4] the impossibility of a court's undertaking independent
> resolution without expressing lack of the respect due coordinate branches of
> government; or [5] an unusual need for unquestioning adherence to a political
> decision already made; or [6] the potentiality of embarrassment from
> multifarious pronouncements by various departments on one question.

369 U.S. 186, 217 (1962).
    To determine whether the Elections Clause textually commits a matter to a
coordinate branch of government, we must "interpret the text in question and determine
whether and to what extent the issue is textually committed."  Nixon v. United States,
506 U.S. 224, 228 (1993).  "[T]he concept of a textual commitment to a coordinate
political department is not completely separate from the concept of a lack of judicially
discoverable and manageable standards for resolving it; the lack of judicially manageable
standards may strengthen the conclusion that there is a textually demonstrable
commitment to a coordinate branch."  Nixon, 506 U.S. at 228–29.
    While there is no doubt that the Elections Clause textually commits certain tasks
to Congress, it does not expressly commit to it the determination of whether a state
regulation violates the Clause.  Rather, the Elections Clause expressly permits Congress
to "at any time by Law make or alter [state] Regulations [concerning the time, place, and
manner of the election of members of the House of Representatives and the Senate],
except as to the Places of ch[oo]sing Senators."  U.S. Const. art. I, § 4, cl. 1.
    Thus, Congress plays a critical but nonexclusive role in reviewing state election
laws.  Indeed, the Supreme Court has rejected an interpretation of the Elections Clause
that "give[s] Congress 'exclusive authority' to protect the right of citizens to vote for
Congressmen," and instead has observed that "nothing in the language of [the Elections
Clause] gives support to a construction that would immunize state congressional
apportionment laws that debase a citizen's right to vote from the power of courts to
protect the constitutional rights of individuals from legislative destruction[.]"  Wesberry

whether the Plaintiffs have established standing to bring their claim and whether they have presented a legally cognizable standard for adjudicating a political gerrymandering claim.

A

"A party has standing only if he shows that he has suffered an 'injury in fact,' that the injury is 'fairly traceable' to the conduct being challenged, and that the injury will likely be 'redressed' by a favorable decision." Wittman v. Personhuballah, 136 S. Ct. 1732, 1736 (2016) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). To satisfy the "injury in fact" requirement, a plaintiff must demonstrate "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal quotations and alterations omitted). "[A] generally available grievance about

---

v. Sanders, 376 U.S. 1, 6 (1964). Thus, the Elections Clause does not reflect a textual commitment to Congress to evaluate whether a state regulation violates the Constitution.

This view is consistent with the fact that the Supreme Court has itself determined whether a state regulation violates the Elections Clause. See, e.g., Smiley, 285 U.S. at 373 (invalidating a congressional map for noncompliance with the Elections Clause); Cook v. Gralike, 531 U.S. 510, 525 (2001) (holding that an amendment to the Missouri state constitution violated the Elections Clause); Wesberry, 376 U.S. at 6 (holding, in an Elections Clause case, congressional apportionment cases to be justiciable); Ala. Legis. Black Caucus v. Alabama, 135 S. Ct. 1257 (2015) (resolving dispute over whether redistricting plan violated the Equal Protection Clause). As such, the plain text of the Elections Clause cannot be read to commit this issue in this case to a coordinate political branch. Furthermore, while Plaintiffs have not provided a legally sufficient standard to resolve their claim, a standard could be crafted that does not involve a policy determination better made by the political branches. Thus, a claim that a state regulation concerning congressional districting violates the Elections Clause does not present a nonjusticiable political question.

government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws"—does not confer standing.  Id. at 573.

Almost all of the plaintiffs testified that, as a result of the 2011 Plan, their votes are diluted, their options are restricted such that they cannot make meaningful electoral choices, they have reduced access to their congressmen, their representatives are less responsive to them, and they have been placed in congressional districts that are not representative of their communities.  Similar harms have been recognized as constitutional injuries in other challenges to state districting maps.  See, e.g., United States v. Hays, 515 U.S. 737, 744 (1995) (describing the representational injury in fact caused by racial gerrymandering as follows: "[w]hen a district obviously is created solely to effectuate the perceived common interests of one racial group, elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole") (citation omitted); Shaw v. Reno, 509 U.S. 630, 636-37, 640-42 (1993) (concluding that a racial gerrymandering claim had been stated by North Carolina residents who alleged vote dilution and explaining that "[t]he right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot" and that electoral schemes can "violate the Fourteenth Amendment when they are adopted with a discriminatory purpose and have the effect of diluting minority voting strength") (quoting Allen v. State Bd. of Elections, 393 U.S. 544, 569 (1969)).  Thus, these harms constitute concrete and particularized injuries in fact.

Defendants' reliance on Lance v. Coffman, 549 U.S. 437 (2007), for the proposition that Plaintiffs have asserted only generalized grievances is unavailing.  In

Lance, four Colorado citizens alleged an Elections Clause violation because the Colorado Supreme Court gave effect to a judicially-created redistricting plan instead of a plan passed by the Colorado legislature. Id. at 437-38. In dismissing the plaintiffs' claims for lack of standing, the Supreme Court concluded that "[t]he only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed," and therefore, plaintiffs alleged only an "undifferentiated, generalized grievance about the conduct of government." Id. at 442. Unlike Lance, Plaintiffs' challenge here is not about whether the legislature or a court can impose a redistricting plan under the Elections Clause, nor do Plaintiffs seek relief based upon an injury to an institution that lost its ability to adopt a redistricting plan. Instead, each plaintiff (except one) has identified personal harms caused by the 2011 Plan—vote dilution, absence of meaningful electoral choice, non-representative and non-responsive congressmen, and lack of access to their congressmen—which are distinguishable from the Lance plaintiffs' generalized grievance. The harm that the Lance plaintiffs alleged "is quite different from the sorts of injuries alleged by plaintiffs in voting rights cases" such as Baker, 369 U.S. at 207-08 (involving a malapportionment claim) "where [the Supreme Court] found standing," Lance, 549 U.S. at 442; see also Smiley, 285 U.S. at 372-73 (ruling on the merits of an Elections Clause claim by a Minnesota "citizen, elector, and taxpayer" seeking to invalidate a reapportionment plan); Whitford v. Gill, 218 F. Supp. 3d 837, 930 (W.D. Wis. 2016) (finding standing of Wisconsin Democrats to bring a partisan gerrymandering claim based on the "personal" injury of vote dilution). Thus, the types of harms that all but one plaintiff have described constitute concrete and particularized injuries.

The question remains whether Plaintiffs have standing to pursue a claim that Pennsylvania's entire congressional map violates the Elections Clause, which is the approach they have selected rather than making district-specific challenges.  See Pls.' Statement of the Elements They Must Prove at 1-2, (Dec. 3, 2017), ECF No. 173 (describing intent and effect in terms of statewide election results) ("Pls' Stmt. of the Elements"); Pls.' Br. Regarding the Elements of Their Claims at 8-9, (Nov. 30, 2017), ECF No. 157 ("A partisan gerrymander is necessarily on a statewide basis . . . . It is an unnecessary hurdle to show intent district by district when all the districts are being shaped by state wide election data.").

There is currently no binding precedent addressing whether a single plaintiff can challenge an entire map on partisan gerrymandering grounds or whether a plaintiff from every district is necessary.  Among three-judge panels, there are split views on this subject.  Compare Common Cause v. Rucho, Nos. 16-1026, 16-1164, slip op. 1, 21-37 (M.D.N.C. Jan. 9, 2018) (analogizing to the malapportionment cases and holding that a single plaintiff can maintain a statewide challenge); Whitford, 218 F. Supp. 3d at 927-30 (same); Whitford v. Nichol, 151 F. Supp. 3d 918, 925 (W.D. Wis. 2015) ("In each of the three cases in which the Supreme Court considered partisan gerrymandering claims, the plaintiffs were challenging the plan statewide, yet only one Justice (Justice Stevens) questioned the plaintiffs' standing.") with Ala. Legis. Black Caucus v. Alabama, Nos. 12-cv-691 & 12-cv-1081, 2017 WL 4563868, at *4-5 (M.D. Ala. Oct, 12, 2017) (explicitly disagreeing with Whitford and stating that plaintiffs bringing a partisan gerrymandering claim "lack standing to challenge districts in which they do not live," thereby implying

that a statewide challenge requires a plaintiff from each district); <u>Comm. for a Fair and Balanced Map v. Ill. Bd. of Elections</u>, No. 1:11-cv-5065, 2011 WL 5185567, at *1 n.1 (N.D. Ill. Nov. 1, 2011) ("To demonstrate injury in fact, a vote dilution plaintiff must show that he or she (1) is registered to vote and resides in the district where the discriminatory dilution occurred; and (2) is a member of the minority group whose voting strength was diluted."); <u>see also</u> <u>Radogno v. Ill. State Bd. of Elections</u>, No. 1:11-cv-04884, 2011 WL 5025251, at *4 (N.D. Ill. Oct. 21, 2011) (stating that "standing analysis for political gerrymandering claims . . . is not particularly clear").   The racial gerrymandering cases, and their requirement that a plaintiff may only challenge racial gerrymandering in the district in which he or she resides, however, support a requirement that a statewide partisan gerrymandering challenge can be brought only if there is a plaintiff from each district who sustained an injury in fact.  <u>See</u> <u>Hays</u>, 515 U.S. at 744-45 (holding that plaintiffs asserting a racial gerrymander can demonstrate injury for standing purposes only where the "plaintiff resides in a racially gerrymandered district" because individuals not in the challenged districts do not suffer "the special representational harms racial classifications can cause in the voting context," with the representational harm being that an elected official "believe[s] that their primary obligation is to represent only the members of [a favored] group, rather than their constituency as a whole").[23]

---

[23] In contrast, plaintiffs from any district challenging malapportionment caused by a districting plan may bring statewide challenges.  <u>See</u> <u>Baker</u>, 369 U.S. 186 at 187, 204-08 (concluding that a malapportionment claim brought by residents of five out of Tennessee's ninety-five counties had standing and describing the vote dilution that results from malapportionment); <u>Reynolds v. Sims</u>, 377 U.S. 533, 537 (1964) (noting that "residents, taxpayers, and voters of Jefferson County, Alabama" brought a

Applying the same requirement in both partisan and racial gerrymandering cases

makes sense.  First, both racial and political gerrymandering involve harms relating to

diminished representation of a particular group rather than the unequal representation of a

specific individual.  See Ala. Legis. Black Caucus, 2017 WL 4563868, at *4 ("Like racial

gerrymandering, partisan gerrymandering has the effect of muting the voices of certain

voters within a given district.").  Second, the representational injury articulated in racial

gerrymandering claims—that "elected officials are more likely to believe that their

primary obligation is to represent only the members of [the favored] group, rather than

their constituency as a whole," Hays, 515 U.S. at 744—is the same type of injury that

occurs in partisan gerrymandering cases.  A person living in a non-gerrymandered district

does not suffer this representational harm, but a person who resides in such a district

does.[24]  Id. at 745.  Third, if a statewide partisan gerrymandering claim were permitted

---

malapportionment case "in their own behalf and on behalf of all similarly situated
Alabama voters"); Wesberry, 376 U.S. at 2 (noting that the plaintiffs who brought the
malapportionment claims "are citizens and qualified voters of Fulton County, Georgia . . .
entitled to vote in congressional elections in Georgia's Fifth Congressional District . . .
[which is] one of ten" congressional districts).

    [24] Notably, three of the five Justices who found partisan gerrymandering is
justiciable have said that such claims require a district-by-district approach.  See Vieth,
541 U.S. at 271-81 (plurality of four Justices finding political gerrymandering to be
nonjusticiable without referencing standing), id. at 306-17 (Kennedy, J., concurring)
(concluding that partisan gerrymandering claims may be justiciable in the future; no
discussion of standing), id. at 317-19, 327 (Stevens, J., dissenting) (suggesting that a
plaintiff only has standing to challenge his or her own district because "racial and
political gerrymanders are species of the same constitutional concern"), id. at 353 (Souter
& Ginsberg, JJ., dissenting) ("I would limit consideration of a statewide claim to one
built upon a number of district-specific ones.").  In a later decision, Justice Stevens
reiterated his view that a district-by-district approach is required.  See LULAC, 548 U.S.
at 475 (Stevens, J., concurring in part and dissenting in part) ("[T]o have standing to
challenge a district as an unconstitutional partisan gerrymander, a plaintiff would have to

without requiring a plaintiff from every district, then partisan gerrymanders would be easier to challenge than racial gerrymanders.  This would be inconsistent with our complete intolerance for race-based gerrymanders, which should never be harder to bring than a partisan gerrymander, where some consideration of politics is tolerable. Therefore, Plaintiffs have standing to bring their statewide challenge only if they can demonstrate an injury to at least one plaintiff in each of Pennsylvania's eighteen districts.

Plaintiffs have adduced evidence that plaintiffs from seventeen of the eighteen districts suffered an injury in fact.  They, however, failed to present facts to show that the plaintiff from the Fourth Congressional District sustained an injury sufficient to confer standing.  Although this plaintiff testified (by deposition) that the state map as a whole seemed unfairly drawn, she said that "her particular district is not very gerrymandered" because it is "one of the more compact ones," and she was unsure how, if at all, the shape of her district harmed her.  Turnage Dep. 47:4-18, 48:4-5, 50:13-23.[25]  Unlike the other plaintiffs, she has not asserted that her vote is diluted, that she experienced decreased choice, non-representative or non-responsive congressmen, lack of access to the district's

---

prove that he is either a candidate or a voter who resided in a district that was changed by a new districting plan.")  These Justices therefore would seem to require a plaintiff from each district to challenge a state's entire map.

[25] To be clear, this plaintiff's failure to demonstrate standing is not because she did not invoke any talismanic words.  A party asking a court to "exercise . . . jurisdiction in his favor" has the burden to "clearly . . . allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.  And when a case has proceeded to final judgment after a trial, as this case has, those facts (if controverted) must be supported adequately by the evidence adduced at trial to avoid dismissal on standing grounds." Hays, 515 U.S. at 743 (internal quotations and citations omitted).  Here, Plaintiffs have failed to present facts showing that this plaintiff suffered an Article III injury in fact.

representative, or otherwise explained how the 2011 Plan impacted her.  Thus, she has

asserted only a generalized grievance that does not establish injury in fact.  Accordingly,

because Plaintiffs have not presented a plaintiff from each congressional district who

sustained an injury in fact, Plaintiffs' statewide challenge fails for lack of standing.[26]

B

Even if Plaintiffs had standing, they have failed to present a legally supported

standard for resolving their claim that the 2011 Plan violates the Elections Clause.

Before examining Plaintiffs' standard, it is important to recognize that the Supreme Court

has held partisan gerrymandering as a general matter can be justiciable.  In Davis v.

Bandemer, 478 U.S. 109, 117 (1986), a majority of the Supreme Court held that partisan

gerrymandering claims are justiciable under the Equal Protection Clause.  Subsequent

Supreme Court precedent has not disturbed this conclusion.  Although a four-Justice

plurality in Vieth—where the Court reviewed an earlier Pennsylvania congressional

district map alleged to have been politically gerrymandered in violation of the Equal

Protection Clause—held that because "no judicially discernible and manageable

standards for adjudicating political gerrymandering have emerged . . . we must conclude

---

[26] The Legislative Defendants also asserted that Plaintiffs lack standing because their claim is not redressable, Legis. Defs.' Br. in Supp. Rule 52(c) Mot. (ECF 185) at 4-6, but this argument is meritless because courts have authority to invalidate unconstitutional redistricting plans and order defendants to redraw maps, which could provide a remedy for Plaintiffs' injuries, See, e.g., Bush v. Vera, 517 U.S. 952, 956-57 (1996) (affirming the district court's holding that three districts in Texas's redistricting plan were unconstitutional racial gerrymanders); Miller v. Johnson, 515 U.S. 900, 903-04, 917-28 (1995) (affirming the district court's conclusion that one district in Georgia's congressional redistricting plan was an unconstitutional racial gerrymander).

that political gerrymandering claims are nonjusticiable . . . ."  541 U.S. at 281, a majority

of the Court disagreed.  Four Justices opined that such a claim was justiciable and offered

possible standards for proving a claim under the Equal Protection Clause.  Id. at 340, 346,

368.  The fifth Justice, Justice Kennedy, stated that he "would not foreclose all possibility

of judicial relief if some limited and precise rationale were found to correct an established

violation of the Constitution in some redistricting cases."  Id. at 306 (Kennedy, J.,

concurring).

　　While the Supreme Court has not yet been asked to decide if judicially

manageable standards could be devised to evaluate a claim of partisan gerrymandering

under the Elections Clause, it has applied a judicially manageable standard to Elections

Clause claims in other contexts.  For instance, in Cook, the Supreme Court examined

whether a Missouri constitutional amendment that, among other things, sought to include

on the ballot a candidate's position on a specific term limits provision, "dictate[d]

electoral outcomes . . . favor[ed] or disfavor[ed] a class of candidates, or . . . evade[d]

important constitutional restraints" in violation of the Elections Clause and concluded

that it was "plainly designed to favor [certain] candidates[.]"  531 U.S. at 523-24.  The

Court relied on the "intended effect" of the Missouri provision in "handicap[ping]

candidates" who fail to support the term limits amendment, id. at 525, as well as the fact

that the provision could not be justified as "necessary in order to enforce the fundamental

right involved," id. at 524 (quoting Smiley, 285 U.S. at 366), or to ensure orderly, fair,

and honest elections "rather than chaos," id. (quoting Storer, 415 U.S. at 730).

24

In his concurrence, Justice Kennedy noted that the "limited power" given to states under the Elections Clause allows them to enact "neutral provisions as to the time, place, and manner of elections . . . ." Id. at 527 (Kennedy, J., concurring). He also observed that non-neutral provisions that favor or disfavor a class of candidates "interfere with the direct line of accountability between the National Legislature and the people who elect it," and that such interference is not consistent with "the design of the Constitution []or sound principles of representative government[.]" Id. at 528 (Kennedy, J., concurring). Thus, a judicially manageable standard could be devised to bring a claim under the Elections Clause. Rucho, slip op. at 175-87 (concluding that a partisan gerrymandered congressional districting plan violates the Elections Clause).

## C

In the context of partisan gerrymandering, plaintiffs must present a judicially manageable standard. See Shapiro, 136 S. Ct. at 456 (suggesting that a political gerrymandering claim may proceed where the plaintiff presented "a plea for relief based on a legal theory put forward by a Justice of this Court and uncontradicted by the majority in any of our cases"); Ala. Legis. Black Caucus v. Alabama, 988 F. Supp. 2d 1285, 1295-96 (M.D. Ala. 2013) (dismissing partisan gerrymandering claim because the plaintiffs "failed to provide . . . 'a judicial standard by which we can adjudicate the claim'"); Perez v. Perry, 26 F. Supp. 3d 612, 622-24 (W.D. Tex. 2014) (same); Comm. for a Fair and Balanced Map v. Ill. Bd. of Elections, No. 1:11-cv-5065, 2011 WL 5185567 at *11-12 (N.D. Ill. Nov. 1, 2011) (same). As a result, I will next examine Plaintiffs' proposed standard to determine if it is legally sound and workable.

25

At the outset of this case, Plaintiffs suggested a standard that barred any consideration of partisanship in drawing congressional district lines.  Our panel informed Plaintiffs that such a standard was likely inconsistent with both the Elections Clause and the Supreme Court's comments about the role of politics in this area.  See Order for Pls. to Clarify Elements of Proof, (Dec. 1, 2017), ECF No. 169.  We specifically noted that this standard ignored both that the political branches are usually the entities involved in the creation of election procedures and the Supreme Court's observation, albeit in gerrymandering cases under other constitutional provisions, that politics is part of the districting process. See, e.g., Gaffney v. Cummings, 412 U.S. 735, 753 (1973) (observing that "[p]olitics and political considerations are inseparable from districting and apportionment").

Plaintiffs responded with the following standard:

To find a violation of the Elections Clause in a redistricting case, Plaintiffs must prove that those who created the map manipulated the district boundaries of one or more Congressional districts, intending to generate an expected number of winning seats for the party controlling the process that is greater than the expected number of winning seats that would be determined by the voters if the districts were drawn using even-handed criteria.

Plaintiffs must prove that the map-drawers' discriminatory intent was a substantial motivating factor in their line-drawing decisions, even if they also considered other factors.

Plaintiffs must prove that the drafters of the map achieved their intended goal, in that the map resulted in a Congressional delegation composition that even a majority of the people could not substantially change.

Plaintiffs may prevail by showing that the composition of the state's Congressional delegation as a whole resulted from the use of partisan data, such that the map itself, rather than the voters, solidified that composition.  It

> is no defense that a few districts remained competitive, or that some districts
> were designed to protect incumbents of the disfavored party.

Pls' Stmt. of the Elements (subheadings omitted).[27]  This standard is legally flawed.  For

example, part of the standard seems to rest on an assumption that there is a guarantee of

proportional representation among political parties.  This view has been rejected.  See

LULAC, 548 U.S. at 419 (opinion of Kennedy, J.) ("To be sure, there is no constitutional

requirement of proportional representation . . . ."); Vieth, 541 U.S. at 288 (plurality

opinion of four justices) (stating that "the Constitution contains no such principle" that

"political-action groups[] have a right to proportional representation" and "nowhere says

that farmers or urban dwellers, Christian fundamentalists or Jews, Republicans or

Democrats, must be accorded political strength proportionate to their numbers"), id. at

338 (Stevens, J., dissenting) ("The Constitution does not, of course, require proportional

representation of racial, ethnic, or political groups.  In that I agree with the plurality.  We

have held however, that proportional representation of political groups is a permissible

objective . . . ."), id. at 352 n.7 (Souter & Ginsburg, JJ., dissenting) ("agree[ing] with this

---

[27] Plaintiffs also assert that the 2011 Plan violates the Elections Clause and, as a result, deprives Plaintiffs of their Privileges and Immunities under the Fourteenth Amendment.  Compl. ¶ 33.  In their Rule 52 motion, the Legislative Defendants do not challenge Plaintiffs' reliance on the Privilege and Immunities Clause.  This is for good reason.  A state's unconstitutional interference with the right to vote violates that Clause. As the Supreme Court observed in United States v. Classic, 313 U.S. 299, 325 (1941), the right to vote is "a right or privilege secured by the Constitution."  See also Wesberry, 376 U.S. at 6-7 ("The right to vote is too important in our free society to be stripped of judicial protection.").  As Justice Kennedy has noted, "national citizenship has privileges and immunities protected from state abridgement by the force of the Constitution itself." Thornton, 514 U.S. at 842.  Thus, a regulation issued under the Elections Clause that interferes with the right to vote is a violation of a citizen's privilege and immunities.

Court's earlier statements that the Constitution guarantees no right to proportional representation" but stating that it "does not follow that the Constitution permits every state action intended to achieve any extreme form of disproportionate representation"); Bandemer, 478 U.S. at 130 (plurality opinion) ("Our cases . . . clearly foreclose any claim that the Constitution requires proportional representation or that legislatures in reapportioning must draw district lines to come as near as possible to allocating seats to the contending parties in proportion to what their anticipated statewide vote will be.").

In addition, Plaintiffs' standard's effect element is inconsistent with Supreme Court precedent.  Plaintiffs' assertion that they "must prove . . . that the map resulted in a Congressional delegation composition that even a majority of the people could not substantially change," Pls' Stmt. of the Elements at 2, was rejected in Vieth.  See Vieth, 541 U.S. at 286 (rejecting an effects prong that tests whether "the 'totality of circumstances' confirms that the map can thwart the plaintiff's ability to translate a majority of votes into a majority of seats").  In fact, Plaintiffs' assertion that they must prove effects at all in an Elections Clause challenge appears to conflict with Cook, where the Supreme Court invalidated the challenged election regulation based solely on an analysis of the Missouri legislature's intent.  See Cook, 531 U.S. at 524 (holding that the challenged election regulation is "plainly designed" to favor certain candidates and its "intended effect" was to "handicap" certain candidates).

Moreover, even if Plaintiffs' proposed standard were not in tension with the foregoing Supreme Court precedent, its focus on the conduct of the "party controlling the process" renders the test inapplicable to situations where the two political parties equally

control the process, i.e., when the two houses of the state legislature are of differing

parties.  For these reasons, Plaintiffs have not presented a legally supported standard.

Furthermore, even if Plaintiffs' standard was legally sufficient, they still would not

prevail.  While they have adduced considerable evidence demonstrating that partisanship

played a major role in drawing congressional district lines,[28] they did not show how what

---

[28] This evidence included: (1) Turzai's statement on the floor of the House, in which he said "[p]olitics may be taken into account as a factor, although not the controlling factor," Legis. Defs.' Ex. 22 at 2735, (2) the mapmakers reliance on largely partisan data, including voter registration and election returns information at the most granular geographic levels, (3) the apparent packing and cracking of Democratic voters in a few districts, including packing two Democratic incumbents into a newly drawn Twelfth Congressional District that was Republican-leaning, which was clearly designed to replace two Democratic seats with one republican seat, (4) the process used to create the 2011 map, which included (a) not disclosing the municipalities and counties assigned to each district until less than twenty-four hours before the map was presented for a vote, and (b) the staffers' focus on implementing the desires of Republican "stakeholders" and securing the required votes to pass the plan, (5) the fact that in each of the three congressional elections since the 2011 Plan took effect have resulted in electing thirteen Republicans and five Democratic congressman, showing that 72 percent of the seats going to Republicans despite the fact Republicans won only 49 to 56 percent of the vote in those elections, and (6) the highly unusual shape of several districts, with no evidence showing they were designed based on neutral criteria.  See, e.g., Cooper v. Harris, 137 S. Ct. 1455, 1463-64 (2017) (stating that a claim of racial gerrymandering requires proof that the legislature "subordinated" other redistricting factors to racial considerations, which may be established "through direct evidence of legislative intent, circumstantial evidence of a district's shape and demographics, or a mix of both"); Hunt v. Cromartie, 526 U.S. 541, 547-49 & n.3 (1999) (stating that circumstantial evidence of "a district's unusual shape can give rise to an inference of political motivation" and that some districts are "so highly irregular that [they] rationally cannot be understood as anything other than an effort to segregate . . . voters on the basis of race" (quoting Shaw v. Reno, 509 U.S. 630, 646-47 (1993)); Bush v. Vera, 517 U.S. 952, 979 (1996) (plurality opinion) (stating that the court has found that "three districts are bizarrely shaped and far from compact" primarily due to racially motivated gerrymandering); Miller v. Johnson, 515 U.S. 900, 913 (1995) ("Shape is relevant . . . because it may be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district[]lines.").

they have labeled (but did not define) as "even handed-criteria" would generate "the expected number of winning seats" and how a map drawn applying such criteria would still comply with the equal populations requirements set forth in <u>Reynolds v. Sims</u>, 377 U.S. 533, 577 (1964) (construing the Equal Protection Clause to require the construction of districts "as nearly of equal population as is practicable"), and the Voting Rights Act. For this additional reason, Plaintiffs are not entitled to relief.

IV

Our colleague has proposed a different standard.  That standard, however, focuses on the perspective of the voter and whether the regulation will discourage voting, rather than on whether the regulation favors or disfavors a candidate or dictates electoral outcomes, as prohibited by the Elections Clause.[29]  While his concern about voter alienation is very well-taken and may be a consequence of an improper election regulation, it is not the focus of the Elections Clause.  Rather, a gerrymandering claim under the Elections Clause requires a plaintiff to prove that the challenged regulation was

---

[29] Our colleague also concludes that a plaintiff challenging a congressional districting plan based on partisan gerrymandering must prove that such a plan violates the Elections Clause by clear and convincing evidence.  While he makes an excellent point that courts should only intervene in the most exceptional circumstances and that such a proof requirement helps to ensure that judicial intervention will occur in limited circumstances, I would apply a preponderance of the evidence burden of proof in such cases because that is the standard the Supreme Court applies in resolving racial gerrymandering cases, which involve similar claims and seek the same relief as partisan gerrymandering cases.  <u>See, e.g.</u>, <u>Cooper v. Harris</u>, 137 S. Ct. 1455, 1479-80 & n.15 (2017) (stating that proving a racial gerrymander in violation of the Equal Protection Clause does not require a specific type of evidence: "if the plaintiffs have already proved by a preponderance of the evidence that race predominated in drawing district lines, then we have no warrant to demand that they jump through additional evidentiary hoops").

"plainly designed" to favor or disfavor a candidate or dictate electoral outcomes.  Cook,

531 U.S. at 523-24.  Furthermore, a defendant confronted with an accusation that a

regulation violates the Elections Clause in this way would be required to show that non-

partisan traditional districting criteria[30] would have resulted in the same regulation, even

---

[30] The Supreme Court has made clear that one person, one vote is a mandatory requirement for each map, meaning districts must be "as nearly of equal population as practicable," Reynolds, 377 U.S. at 577, and deviations of less than one percent have been deemed unconstitutional, see Karcher v. Daggett, 462 U.S. 725, 727 (1983) (affirming the District Court's finding that New Jersey's redistricting plan violated equal population requirements where the population deviation among districts was less than one percent).  In addition, the Court has recognized the obligation to comply with the Voting Rights Act, 42 U.S.C. § 1973, and identified other traditional neutral facts used to draw district lines such as contiguity, compactness, political subdivisions, geography, history, and incumbency.  See, e.g., Harris, 136 S. Ct. at 1306 (recognizing "traditional districting principles such as compactness and contiguity . . . a state interest in maintaining the integrity of political subdivisions . . . or the competitive balance among political parties" (internal brackets, quotation marks, and citations omitted)); Ala. Legis. Black Caucus, 135 S. Ct. at 1270 (identifying "traditional race-neutral districting principles" such as "compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, incumbency protection, and political affiliation"); Vieth, 541 U.S. at 284 (plurality opinion) (listing the following potential goals that a districting map might seek to pursue besides partisan advantage: "contiguity of districts, compactness of districts, observance of the lines of political subdivision, protection of incumbents of all parties, cohesion of natural racial and ethnic neighborhoods, compliance with requirements of the Voting Rights Act of 1965 regarding racial distribution, etc."); id. at 300 (plurality opinion) (noting "the time-honored criterion of incumbent protection" as the "neutral explanation" for when the party receiving the majority of votes fails to acquire a majority of seats in two successive elections); id. at 348 (Souter, J., dissenting) (identifying "traditional districting factors . . . [of] contiguity, compactness, respect for political subdivisions, and conformity with geographic features like rivers and mountains"); Bandemer, 478 U.S. at 167-68 (1986) (recognizing that "districts should be compact and cover contiguous territory" and "[a]dher[e] to community boundaries" in order to "allow communities to have a voice in the legislature that directly controls their local interests"); Sims, 377 U.S. at 578-79 (majority opinion) ("A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme.  Indiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may

in the absence of partisan considerations that favor or disfavor a candidate or dictate electoral outcomes.[31]  A standard that requires a plaintiff to prove that the challenged regulation was plainly designed to favor or disfavor a candidate or dictate electoral outcomes and which provides the defendant with an opportunity to pursue a defense that justifies its districting decisions is both consistent with the Elections Clause and recognizes that politics may play a role in the process so long as it does not dictate outcomes or favor candidates.  Plaintiffs, however, did not present such a standard.

* * * *

When elected officials concoct a system whereby they choose the representative for the voter rather than the other way around, Ariz. State Legis., 135 S. Ct. at 2677, they undermine our system of representative government.  The Elections Clause, its history, and precedent show that Congress has the authority to address this issue.  Under some circumstances, the Elections Clause also provides an avenue for the courts to ensure that the right to vote is untrammeled.  Indeed, when a regulation so disrupts the voting process that a citizen's vote is rendered meaningless, and all requirements for Article III are met, that regulation is not immune from judicial review, Wesberry, 376 U.S. at 6.

* * * *

---

be little more than an open invitation to partisan gerrymandering."); Shapiro v. McManus, 203 F. Supp. 3d 597 (D. Md. 2016) (majority opinion) (identifying "legitimate districting considerations, including the maintenance of communities of interest, and even the protection of incumbents of all parties").

[31] Political considerations are part of the redistricting process, see Gaffney, 412 U.S. at 753 (observing that "'[p]olitics and political considerations are inseparable from districting and apportionment"), but such considerations become impermissible under the Elections Clause when they amount to dictating electoral outcomes.

V.

For these reasons, I would grant the Legislative Defendants' Rule 52 motion.

s/Patty Shwartz
United States Circuit Judge
